**Preliminary Hearing - November 2, 2017**

IN THE SEVENTH JUDICIAL DISTRICT COURT, MONTICELLO DEPARTMENT

SAN JUAN COUNTY, STATE OF UTAH

STATE OF UTAH,

          Plaintiff,        Case No. 171700041

v.

ROSALIE CHILCOAT,

          Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TRANSCRIPT OF PRELIMINARY HEARING

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

BEFORE HONORABLE LYLE R. ANDERSON

NOVEMBER 2, 2017

**Preliminary Hearing - November 2, 2017**

APPEARANCES:

    FOR THE PLAINTIFF:

    Kendall G. Laws

    SAN JUAN COUNTY ATTORNEY'S OFFICE

    30 West 100 South

    Blanding, Utah 84511


    FOR DEFENDANT FRANKLIN:

    Jon D. Williams

    JON D. WILLIAMS, PC

    9 Exchange Place, Suite 600

    Salt Lake City, Utah 84111


    FOR DEFENDANT CHILCOAT:

    Jeremy M. Delicino

    JEREMY DELICINO, LLC

    9 Exchange Place, Suite 600

    Salt Lake City, Utah 84111

**Preliminary Hearing - November 2, 2017**

3

WITNESS:

ZANE ODELL

Direct Examination by Mr. Laws                    Pg. 5

Cross-Examination by Mr. Williams                 Pg. 29

Cross-Examination by Mr. Delicino                 Pg. 42

Re-direct Examination by Mr. Laws                 Pg. 45

Re-cross Examination by Mr. Williams              Pg. 49


JAY BEGAY

Direct Examination by Mr. Laws                    Pg. 53

**Preliminary Hearing - November 2, 2017**

4

SAN JUAN COUNTY, UTAH - NOVEMBER 2, 2017

HONORABLE LYLE R. ANDERSON

THE COURT:  We're here for preliminary hearings in cases 1717-40 and 41. The defendants are Mark Kevin Franklin and Rosalie Jean Chilcoat. Counsel, if you'd identify yourselves, please, for the record?

MR. DELICINO:  Your Honor, Jeremy Delicino for Rosalie Chilcoat.

MR. WILLIAMS:  And, Your Honor, Jon Williams on behalf of Mr. Mark Franklin.

MR. LAWS:  Kendall Laws representing the State, Your Honor.

THE COURT:  All right. Are you ready to go?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Anything you need to address preliminarily?

MR. DELICINO:  Your Honor, we'd invoke the exclusionary rule for the purposes of this proceeding.

THE COURT:  Okay. Any witnesses who have been subpoenaed here to testify are instructed to leave the courtroom unless sitting at counsel table and not to talk to anyone about their testimony until, well, until after they've testified.

Call your first witness, Mr. Laws.

MR. LAWS:  Your Honor, the State would call Zane

**Preliminary Hearing - November 2, 2017**

5

Odell to the stand.

(WITNESS IS SWORN IN)

ZANE ODELL

Having first been duly sworn, testified

upon his oath as follows:

DIRECT EXAMINATION

BY MR. LAWS:

Q.    All right. Mr. Odell, can you state your name and then spell it so that we have it on the record?

A.    Zane Odell, Z-a-n-e, O-d-e-l-l.

Q.    Okay. Thank you. And Mr. Odell, what do you do for a living?

A.    Livestock. I run my own cows and I butcher cows. It's my livelihood that keeps my land and everything in production, I guess.

Q.    Okay. So the reason that you raise livestock is for-- you sell it for--it's beef cows?

A.    Yes.

Q.    As opposed to like dairy or something like that?

A.    Correct. We raise beef.

Q.    Okay. And, Mr. Odell, do you run cattle in San Juan County?

A.    Yes, sir.

Q.    Do you have any land that you run cattle on in the Lime Ridge area of San Juan County?

**Preliminary Hearing - November 2, 2017**

6

A.    Yes.

Q.    Okay.

A.    BLM allotment and state land.

Q.    Okay. And do they butt up next to each other or are they separate?

A.    The state land is checkerboarded throughout the BLM.

Q.    Okay. Okay. So what time of year do you have your cows in that part of the world?

A.    I am permitted from October 1 through May 31st.

Q.    Okay. So you had your cows there in April, the 1st of April of this year?

A.    Yes, sir.

Q.    Okay. And just rough estimate, the cattle that you had there in April of this year, would you value--what would the value of those cows be?

MR. WILLIAMS:  Objection, foundation.

MR. LAWS:  I'm simply asking--it's actually an element of one of the things that have been charged, Your Honor.

MR. DELICINO:  And I have an objection to foundation as to the location. We're referring to a place called there without referring to specifically what property, what location.

THE COURT:  Overruled. I know what they're talking about. Lime Ridge, right? That's what you meant by there?

MR. LAWS:  Yes. I can refer to it as Lime Ridge every

**Preliminary Hearing - November 2, 2017**

7

time if I need to. I'm fine with that. Did you rule on the foundation?

THE COURT:  Objection's overruled. Both objections are overruled.

MR. LAWS:  Thank you, Your Honor.

BY MR. LAWS:

Q.    So value, what would you estimate the value?

A.    A conservative value at that time would have been in excess of 300,000.

Q.    Okay. So are you the permit holder? So do you hold a permit? How does it work with the state lands? What do you--how do you, I guess, get authorization to run cattle on state land?

A.    I purchased it from the prior gentleman. He signed the correct paperwork so that the leases were signed over to me from (inaudible).

Q.    Okay. So that I have it straight in my head, you purchased the lease from the prior owner, but that lease gives you authorization to run the cattle on the property?

A.    Yes.

Q.    Okay.

A.    SITLA and I both signed that agreement there then.

Q.    Okay. So SITLA was also a part of that agreement?

A.    Yes.

Q.    Okay. Then you said that you also have permits to raise cattle on the surrounding BLM property as well? How does

8

that work?

A.    It gives an allotment that I also purchased that from the previous owner. And it is permitted for the same time frame of October 1 through May 31st.

Q.    Okay. So let's talk a little bit about the corral that's located there on the property. Where is the corral that we're here today for, where is that corral located at?

A.    That corral was sitting there on Lime Ridge on a state section. In 2009, I rebuilt those corrals. They were very old and dilapidated. The way it's designed is when I am in the corral (inaudible), I have water in the corral because it's usually (inaudible).

Q.    Okay.

A.    When the animals need a drink of water.

Q.    Okay.

A.    Then during the year when I'm just grazing, the gates, I open it so that they can come in and water there daily.

Q.    Okay. And, let's see, so I think you--so with regards to the water, do you have other facilities for the cattle to drink while they're out there, generally speaking?

A.    Generally speaking?

Q.    Okay.

A.    At that point in time those cows were traveling--

Q.    Hold on. By that point in time you mean April of this

**Preliminary Hearing - November 2, 2017**

9

year?

    A.   Yes.

    Q.   Okay.

    A.   April 1. At that time, when I was there, there was cattle traveling four miles. That's kind of the distance to the other water holes.

    Q.   So why, because there's some ponds on the property, I assume, why were they having to travel so far?

    A.   Yes, there's a pond right there on that state section. It was dry. I had just cleaned it with a dozer.

    Q.   Okay. So it was empty? It didn't have water?

    A.   It was empty.

    Q.   Okay. So you said that you opened the gate when you have the water, or when the cows are going in there to water. On April 1st, what was the--or I guess prior to April 1st, what was the status of--how did you leave that gate?

    A.   I would leave that gate open with the latch chain hooked to the fence so that the wind couldn't blow it shut or a cow rub it shut or anything like that, just so that they could not be without water.

    Q.   So it wasn't just swung open? You actually had a chain wrapped around it?

    A.   Yes, sir.

    Q.   So then let's talk about when you came to the--to April 1st. What did you find when you came to the corral that

**Preliminary Hearing - November 2, 2017**

10

day on April 1st of this year?

A.   April 1st, early that morning, that gate was open as we went out to move some cattle. That evening, coming back in at 6:00, I look and the gate is shut and latched shut. It wasn't blown shut. It wasn't--somebody had shut it and actually latched the chain.

Q.   So the chain was actually wrapped around the post and it was tied down?

A.   Yes, it was secure.

Q.   Okay. So what did you do after you found the gate was closed?

A.   Stopped to not disturb any evidence. I called dispatch for--

Q.   Dispatch for San Juan?

A.   The San Juan County Sheriff's Department, to notify them that there had been some tampering going on there.

Q.   Okay. And then did you find any, or while you were there, did you notice any footprints or tire tracks or anything like that?

A.   Absolutely.

Q.   What did you see?

A.   There was the tire tracks where they pulled in, in front of the gate. There were footprints from there where they walked around in an arch on the end of the gate as they shut it. There was footprints over to the water trough so that they

**Preliminary Hearing - November 2, 2017**

11

knew there was water, that was the water source.

MR. DELICINO:  Objection, speculation.

THE COURT:  Overruled.

BY MR. LAWS:

Q.   Go ahead.

A.   And then they got back to their car, drove up around, and left.

Q.   Okay. So based on the tracks that you saw, you're saying, just so that I understand you correctly, you're saying that they pulled up next to the gate and then turned around and then left after that?

A.   Yes.

Q.   Okay. So let's talk a little bit about, I understand that there, that you were doing some work on your well in that area around that time. Is that correct?

A.   That is correct.

Q.   Okay. So as part of that, were there any other breaks or any other openings in that fence?

A.   Yes, there was an opening in the fence, in kind of the opposite corner. And that was just for the temporary time that it took to complete that well.

Q.   Okay.

A.   To pass the pipe through and things.

Q.   And approximately, since you're familiar with the area, with the facility, how far would you say that that

**Preliminary Hearing - November 2, 2017**

12

opening was from the gate that was closed?

A.    Fifty yards.

Q.    Okay. And from where--

THE COURT:  I'm sorry, what, this is the distance from what to what?

MR. LAWS:  From the gate to the opening that he's talking about that was in the--that was there for the repair of the corral? Or of the well. Sorry, Your Honor.

BY MR. LAWS:

Q.    So from where, from the gate, was that space, was that opening in the fence obvious?

A.    It was not visible from where they parked at the gate.

Q.    Okay.

A.    It was not visible from anywhere you would have stood opening or closing the date.

Q.    Okay. And why is that? I mean, can you explain why it wasn't, wouldn't have been visible?

A.    Looking straight down the fence with the railroad ties for a fence post, the width of them obstructed the view of the wire.

Q.    Okay. And then I understand you had some sort of a camera set up in that area. Can you explain a little bit about that?

A.    Yes, just to kind of monitor because we have

Preliminary Hearing - November 2, 2017

13

encountered problems in the past, I put a camera up just to keep track of what vehicles came and went.

Q.    And on that day, did you, after you found the gate closed, did you check that camera?

A.    Yes, immediately. With the officer that came, we got the camera, pulled the card out and reviewed the pictures.

Q.    Okay. And so I'm going to show you a couple of pictures here that are marked State's Exhibit 2. Can you identify--or do those look familiar to you?

A.    Yes.

Q.    What are they?

A.    This is the picture of their vehicle coming and going.

Q.    Okay.

A.    In there. In the time that it happened.

Q.    And that was--you took those off of your camera?

A.    Correct.

MR. LAWS:   So, Your Honor, I'd like to submit State's Exhibit 2.

MR. DELICINO:   No objection.

MR. WILLIAMS:   No objection.

THE COURT:   2 is received.

BY MR. LAWS:

Q.    All right. Mr. Odell, let's jump to April 3rd of this year. What were you doing on the morning of April 3rd?

**Preliminary Hearing - November 2, 2017**

14

A.   Zeb Dalton and another young man there, Torrence, and I were putting a pump in that well. We had to set a gin poles up and a pick up with a cable to lift the pipe and lower the pump one joint at a time.

Q.   Okay. And so you were working on that well up on the other side of the corral on that morning?

A.   Yes, sir.

Q.   Okay. While you were working on that, did you come in contact with Mr. Franklin and Ms. Chilcoat on that day?

A.   Yes. From where I was sitting there in the pickup to pull the cable, I could see their vehicle come into view as they were leaving Lime Ridge.

Q.   And what--why did it catch your attention? What made it catch? Why did you notice it?

A.   Because there is not very many little trailers with a TAB on the back of it in yellow sides.

Q.   Okay. So did you recognize it from the photographs from your truck?

A.   I recognized that from those photographs, yes.

Q.   Okay. So what did you and the other gentleman that was with you, what did you do at that point?

A.   I took off running.

Q.   Okay.

A.   To try to get to the road to stop and talk to them.

Q.   Okay.

Preliminary Hearing - November 2, 2017

15

A.    Zeb Dalton drove his pickup there because that was a lot faster than my running.

Q.    Okay.

A.    When we did get there, then we stopped. The first thing we did was look at the license plate--

Q.    Okay.

A.    --to confirm that this was the vehicle that was on the game camera.

Q.    Okay. So the license plate on the vehicle that you stopped on the 3rd matched the, what you saw on the camera from the first?

A.    Yes.

Q.    Okay. When you stopped them, did, was there a conversation? Did any--did a conversation occur?

A.    There was. They wanted to know what we're doing, what's wrong, what's going on and we looked at the license plate and then when we were sure of that and says we will wait until the sheriff gets here.

Q.    Okay. At some point did you or anyone else ask Mr. Franklin and or Ms. Chilcoat about the gate closing?

A.    Yes.

Q.    How did that conversation go?

A.    They kept badgering, what are we doing, what's wrong, and I recall as I was talking to dispatch Zeb saying that we have you on camera and you shut the gate on the corral.

16

Q.    Okay. And did either one of them respond to that comment?

A.    The gentleman did. He immediately said oh yeah, yeah, I shut the gate. But that's what I do, I help you guys.

Q.    Okay. But did he explain how he was helping you by closing the gate?

A.    That was asked several times. That was never answered. He just talked on about--kept talking around it.

Q.    Okay. So he never did answer how that was helping?

A.    To this point, I still don't know how that might have helped me.

Q.    Okay. So then at some point did you have a conversation with Mr. Franklin about the land that the corral was located on?

A.    Yes, sir. When the officer arrived, kind of asked what was going on, we told him. So Mr. Franklin and I and the officer, we walked up the little road towards the corral. And on the way up there, I asked Mr. Franklin if he realized this was not federal land. And he said yes I know, this is state land.

Q.    Okay. So he acknowledged that it was on state land rather than federal land?

A.    Absolutely.

Q.    Okay. So we've talked a little bit about the pond that is there just north of the corral. And you've testified

**Preliminary Hearing - November 2, 2017**

17

that it was empty. Would--do you have reason to believe that the defendants would have known that it was empty?

MR. WILLIAMS:  Objection, speculation.

MR. DELICINO:  Objection, speculation and foundation.

THE COURT:  Well, he's asking if he has any reason to know. So the answer to that can be yes or no.

THE WITNESS: Yes, I have a reason to believe.

BY MR. LAWS:

Q.    And what would that reason be?

MR. DELICINO:  Objection, speculation.

MR. LAWS:  He's not telling--

THE COURT:  I don't know whether it's speculation until I know what it is. So he'll have to answer before I can decide whether to admit it or not.

THE WITNESS: I have their photographs that they submitted to the BLM stating that I had--

MR. WILLIAMS:  Your Honor, objection as to they. I think we need to know what he's talking about and what the--

THE COURT:  Well, I assume he means by they your clients.

BY MR. LAWS:

Q.    Who do you mean by they?

A.    Rose Chilcoat.

Q.    Okay.

THE COURT:  Submit for that clarification.

**Preliminary Hearing - November 2, 2017**

18

THE WITNESS:  Sorry about that.

THE COURT:  That's okay.

MR. DELICINO:  And Your Honor, there's been some previous testimony with respect to the footprints and where he said they and with respect to the tire tracks where he said they. If we can clarify that that was not Rose Chilcoat that he was referring to? I mean, now we have some confusion about--

THE COURT:  Why don't you cover that on cross?

MR. DELICINO:  Okay.

BY MR. LAWS:

Q.   So go ahead. How did you--what--

THE COURT:  I think when he said their, he meant the footprints. And I don't know yet whether those were male or female footprints or if he can even tell.

BY MR. LAWS:

Q.   So let's get back to the photographs that you're talking about. What are these? What are the photographs and how do you know about them?

A.   Those photographs were in a document to the BLM. When I am in there looking at my file, I come across them. And they were complaining or saying that I had got out of the scope of my--

MR. WILLIAMS:  Your Honor, same objection with they.

THE WITNESS:  I'm sorry, I did that again.

THE COURT:  Yeah, please stop.

**Preliminary Hearing - November 2, 2017**

19

BY MR. LAWS:

Q.   So who do you mean by they?

A.   Rose's name was on that document.

Q.   Okay. And what was that? What type of document was that?

A.   I guess you would call it a complaint.

Q.   Okay.

A.   Or a notification to the BLM that I had, was in violation of my permit. I had got out of the existing footprint of the ponds.

Q.   Okay.

A.   There were also her photographs or photographs taken by Mr. Franklin with Rose standing in the pictures as a reference.

Q.   Okay.

A.   And those ponds were dry.

Q.   Okay. And did the letter that Ms. Chilcoat sent, did it reference a time frame of when those photographs were taken?

A.   Yes. While they were there recreating that weekend.

Q.   Meaning?

A.   April 1st through April 3rd--

Q.   Okay.

A.   --would be my--

Q.   Okay.

A.   They could have came a day earlier.

**Preliminary Hearing - November 2, 2017**

20

Q. Okay. But that, the same time frame as to why we're here?

A. That exact same time frame.

Q. Okay.

THE COURT: That doesn't actually help me because I don't know how you know it was then.

THE WITNESS: I'm sorry, I didn't hear you.

THE COURT: I don't know how you know it was during that time frame.

MR. LAWS: Your Honor, I'm going to--

THE COURT: You're going to get it?

MR. LAWS: I'm going to get there.

THE COURT: Okay.

BY MR. LAWS:

Q. I'm going to approach and have you look at this. So with regards to the complaint as you've referenced it, how did you come to know about that?

A. I was in searching for some information in my allotment file, or permittee file, which is in the BLM office.

Q. Okay. So I'm going to have you, this is marked as State's Exhibit 1. Is that--can you identify what that document is?

A. Yes. This is the document that I retrieved from there, took copies, and then brought them to you because I thought they would be relevant.

**Preliminary Hearing - November 2, 2017**

21

Q.    Okay. And who is it a correspondence between?

A.    It is a correspondence between Mr. Hofheins, the area office manager, and it is signed sincerely Rose Chilcoat.

MR. DELICINO:  Your Honor, I'm going to object to him testifying with regards to this document. The document hasn't been authenticated. The document is something that he provided a copy of the state of. But the person that created the document or sent the document or if it's a business record, isn't here to testify about it.

THE COURT:  Have you had him testify where he got it?

MR. LAWS:  Yeah. He said that he got it from his file that is on hand at the BLM.

THE COURT:  That's enough. Overruled.

BY MR. LAWS:

Q.    And what's the date on that correspondence?

A.    April 5th.

Q.    Okay.

A.    2017.

Q.    Okay. I'll take that back for a second.

MR. LAWS:  Your Honor, the State would like to admit State's Exhibit 1 into evidence.

MR. DELICINO:  I'd renew my objection.

THE COURT:  Noted and overruled. Exhibit 1 is received.

MR. LAWS:  Thank you, Your Honor. I'll hand it to you

**Preliminary Hearing - November 2, 2017**

22

when I'm done with it, if that's all right.

THE COURT:  Okay.

BY MR. LAWS:

Q.    Give me just a second to gather where I'm going next. In the letter to Mr. Hofheins--you've had the chance to read it?

A.    Yes, sir.

Q.    Okay. And does the letter state what or where Ms. Chilcoat was doing the prior weekend, prior to the 5th of April?

MR. DELICINO:  Same objection. And objection it calls for hearsay.

THE COURT:  Who's objecting?

MR. DELICINO:  On behalf of Ms. Chilcoat.

THE COURT:  Well, it's her statement supposedly so it wouldn't be hearsay. Overruled.

BY MR. LAWS:

Q.    Do you recall?

A.    That they were recreating there in the Lime Ridge area.

Q.    Okay. And in that letter did Ms. Chilcoat make any complaints about you?

A.    Yes. She claimed that I had assaulted her and had destroyed habitat and got out of my scope with my permit, with the pond cleaning.

**Preliminary Hearing - November 2, 2017**

23

Q.   Okay. And did--so I'll ask you, did you or the other two that were there, at least that you saw, did anybody assault Mr. Chilcoat or Mr. Franklin that day?

A.   Nobody got within arms length.

Q.   Okay.

A.   Nobody was touched.

Q.   Okay. And with regards to the BLM being outside of your ponds, to your knowledge was that--

MR. WILLIAMS:  Objection, this calls for a legal conclusion.

THE COURT:  I'll wait until I hear the full question and then I'll decide.

BY MR. LAWS:

Q.   Was that ever investigated by the BLM to your knowledge?

THE COURT:  Overruled. Go ahead.

BY MR. LAWS:

Q.   You can answer that.

A.   Yes, it was investigated.

Q.   And how do you know that?

MR. WILLIAMS:  Objection, this is going to call for a hearsay answer no matter what the answer is. I'll object on those grounds.

THE COURT:  Yeah. We are at a preliminary hearing, though, and usually we allow hearsay at preliminary hearings. I

**Preliminary Hearing - November 2, 2017**

24

guess we have some rules for that. Why does it matter?

MR. LAWS:  I can just ask him if he's received any, what would the word be, any consequences or anything for being outside of the scope of his construction. It goes towards the-- allegations in here, it goes towards that--the allegations in this letter were false and misleading. But that would be towards the one count against Ms. Chilcoat of retaliation against a witness or victim, Your Honor.

THE COURT:  Oh, I guess I'd forgotten that. Okay. So, but it is hearsay as to--

MR. LAWS:  So I can change the question and ask him--

THE COURT:  A conclusion of the investigation.

MR. LAWS:  I can ask him if he's received any consequences or reprimands from the BLM. That wouldn't be hearsay.

THE COURT:  I guess I'm still trying to figure out how that, what that would have to do with whether she's retaliating.

MR. LAWS:  I think it goes a step further. If the complaint is unfounded or false, then it goes further to say that it was out of retaliation rather than out of some self-proclaimed (inaudible).

THE COURT:  Okay. But the way you think you establish that a complaint is unfounded is that the BLM decided not to pursue it?

Preliminary Hearing - November 2, 2017

25

MR. LAWS:  Yeah. That he hasn't received any consequences for going outside the scope.

THE COURT:  Well, I guess I'd prefer a little more direct evidence of whether it's founded or not than what the BLM thinks. Because there may be lots of reasons why the BLM does nothing.

MR. LAWS:  It's their property though, so they have to investigate it. And if there's something wrong, they're going to have some sort of correspondence with him to, with the allottee, the permit holder, to discuss why that wasn't appropriate and how to remedy it.

THE COURT:  Okay. Well, you're proffering that the BLM decided there was no ground to believe he was violating his permit, the terms of his permit, right?

MR. LAWS:  I am now. That's what he was going to--

THE COURT:  You're proffering that he will say that if I allow the question to be asked?

MR. LAWS:  Yes.

THE COURT:  Okay. And that is to establish that in fact he didn't violate the terms of the permit, which would mean that her claim that he had would be unfounded?

MR. LAWS:  Yes.

THE COURT:  Okay. Well, why is that still not a hearsay statement from the BLM?

MR. LAWS:  He's not testifying to anything that

Preliminary Hearing - November 2, 2017

26

they've said. It's just on their action, whether they've done something or not, whether he has been reprimanded or whether he has received any consequences or--

THE COURT:  Well, I think this is a case where an action is an assertion.

MR. LAWS:  Okay.

THE COURT:  A failure to act would be an assertion. There's nothing to act on.

MR. LAWS:  Okay.

THE COURT:  So you're offering it as a statement, in effect, with conduct that there is no reason to think he was going outside the terms of his permit. So it is hearsay. So do you have a hearsay exception?

MR. LAWS:  I don't, Your Honor.

THE COURT:  Okay. It used to be we just allowed hearsay all the time at preliminary hearings, but then when they passed that constitutional amendment, the rules changed to set some standards for preliminary hearings at, for hearsay at preliminary hearings. There is more hearsay allowed at preliminary hearings but it's not a free for all, so I'm going to sustain the objection.

MR. LAWS:  Okay.

BY MR. LAWS:

Q.    A couple more questions for you.

THE COURT:  But, you know, he could testify whether

**Preliminary Hearing - November 2, 2017**

27

he was outside of the terms of his permit if that's what you're trying to establish.

MR. LAWS:  I kind of thought that's what I was asking.

THE COURT:  You were asking what the BLM thought.

MR. LAWS:  Okay.

THE COURT:  Not what he thinks.

MR. LAWS:  Okay.

BY MR. LAWS:

Q.    So in your opinion, as the permit holder, do you feel like--or do you think that you were in violation of the scope, outside the scope of your ponds and things like that, that were complained about.

MR. DELICINO:  Objection, calls for a legal conclusion.

THE COURT:  The proper way to ask the question would be what did she say he did, and to ask him did he do it. But if her statement was a legal conclusion, then you can ask it that way. I have no idea what she said at this point because I haven't seen Exhibit 1 yet.

BY MR. LAWS:

Q.    So based on the complaint that you've read, were you in violation of the rules of your allotment?

A.    No, I was not.

Q.    Okay. Let me ask you a couple of other questions

**Preliminary Hearing - November 2, 2017**

28

here. What is--as a cattle person, what's your concern with a gate, with cows not being able to get to water in April down on Lime Ridge?

A.   That is a very--

MR. WILLIAMS:  Objection, this is not a proper question. He's already been asked and answered that the cows could get to the water.

MR. LAWS:  No, he hasn't.

MR. WILLIAMS:  He testified that there was an opening in the gate, an opening in the fence line in the corral.

MR. LAWS:  That wasn't visible. So I'm asking him, from the location, it wasn't visible. That's what he's testified to.

MR. WILLIAMS:  Well, then I we probably need to ask if the cows could see it and not whether--

MR. LAWS:  I think we'd have to have them on the stand to ask them that.

THE COURT:  You're just asking what the effect would be on the cattle if they couldn't get to water?

MR. LAWS:  Yeah.

THE COURT:  And you're objecting because you don't think it's been established that they couldn't get to water?

MR. WILLIAMS:  Yes.

THE COURT:  Okay. Objection's overruled.

BY MR. LAWS:

**Preliminary Hearing - November 2, 2017**

29

Q.    Go ahead. What's your concern with that?

A.    The environment around April 1st, it's hot, it's dry. Some of those cows were calving. They had been for several weeks. There's baby calves left out. Some of those cows had traveled for four miles to water. If they hang around there until they give up that they're not going to get a drink there, they have to travel maybe another four miles to get to water. Then at that point, they haven't been back to their calf for maybe 24 hours.

Q.    Okay.

A.    The coyotes kill them or some of their calves die of dehydration. And then the cows may not leave to go to water and those cows become emaciated and they don't breed back. So basically just with the course of three days, they could wipe out my whole calf crop.

Q.    Okay.

A.    And part of my next one.

Q.    Okay.

MR. LAWS:  I don't have any additional questions for this witness at this time, Your Honor. Here's Exhibit 1.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Good morning, Mr. Odell. How are you?

A.    I'm good. And yourself?

Q.    I'm doing well, sir. Thank you. My name is Jon

**Preliminary Hearing - November 2, 2017**

30

Williams and I represent Mr. Mark Franklin. That's the gentleman right here. And you've previously met him, you testified to?

A.    Yes.

Q.    Okay. Is that the only time you've met him?

A.    Yes.

Q.    Prior to that day, had you ever heard of the name Mark Franklin?

A.    No, sir.

Q.    Okay. Prior to that day, it sounds like you've heard of the name Rose Chilcoat?

A.    Yes, Rose and I have encountered each other over the years.

Q.    Okay. Well, I want to back up a little bit, and hopefully I don't jump around too often. But I always tell me that I'm examining when they're on the stand that if I ask a question, and assuming there's not an objection, and you don't understand that question, just please tell me and I'll try to rephrase that for you. Okay?

A.    Yes.

Q.    And I want to share with you, I've learned something. And if I don't pronounce this correctly, I want you to know I've tried. I've learned to pronounce this corral and not coral.

THE COURT:  Mr. Williams, try to get that microphone

Preliminary Hearing - November 2, 2017

31

closer to your mouth one way, by moving it or by moving you.

MR. WILLIAMS:  I'm usually accused of being too loud.

BY MR. WILLIAMS:

Q.   So Mr. Odell, in preparation for today's hearing, did you meet with the county attorney?

A.   I did. I came in this morning to acknowledge that I had showed up.

Q.   Okay. And did you sit down and talk with him?

A.   I did for a few minutes.

Q.   Okay. What did you talk about?

A.   I told him I'd never done anything really like this and I wanted to know what I might encounter today.

Q.   Okay. So have you ever testified under oath?

A.   Yes, one time years ago.

Q.   And where were you?

A.   Durango, Colorado on a--it was a deal way back to do with an estate settlement.

Q.   Okay. Was that at a deposition?

A.   I don't know what the legal term of that would have been.

Q.   Were you in an office as opposed to a court?

A.   We were in a courtroom with a judge.

Q.   Okay. And at today's hearing you understand you were placed under oath?

A.   Yes.

**Preliminary Hearing - November 2, 2017**

32

Q.    Okay. So do you understand that if you give a false answer to any questions that I ask you could be prosecuted for perjury?

A.    Yes.

Q.    Do you understand what that means?

A.    I understand what it means. I don't know what the consequences are.

Q.    It means if you were convicted of it, you could go to prison.

A.    Yes.

Q.    Do you understand that?

A.    I understand that.

Q.    All right. So the point is you understand that you need to tell the truth if I ask you a question?

A.    Yes.

Q.    Okay. Let me ask you just a couple of quick questions too because the prosecutor has not given any of this information to me. Have you ever been charged with a crime? You have?

A.    Probably.

Q.    Let's talk about that.

A.    The only crime I may have, it was traffic violations.

Q.    Okay.

A.    That I know of.

Q.    Okay.

**Preliminary Hearing - November 2, 2017**

33

A.    Unless you know of something.

Q.    Never ask a lawyer a question like that because they might try to feed you information. But to your recollection, you don't recall having ever been charged with anything other than a traffic offense?

A.    Correct, it would have been traffic related.

Q.    Okay. So you've never been brought into court--

MR. LAWS:  Objection, Your Honor.

THE COURT:  Sustained. That's the end of that. The only thing you would be able to make relevant in this case would be a felony.

MR. WILLIAMS:  Or a moral turpitude crime, which could be a misdemeanor.

THE COURT:  Well, testimony of dishonesty, actually, is the standard.

BY MR. WILLIAMS:

Q.    Mr. Odell, I want to jump to April 1st. You testified that when you went to the corral, your corral that we've been talking about today, in the morning, the gate was latched open, correct?

A.    Yes.

Q.    And then you went back there in the evening and that gate was latched closed, correct?

A.    Yes.

Q.    At that time you alerted dispatch the--and I assume

**Preliminary Hearing - November 2, 2017**

34

that's the Sun Juan County Sheriff's Office?

A.    Yes, sir.

Q.    And you informed them of what, that there had been someone closing your gate?

A.    Ill intent there at the corral of some kind, closing the gate.

Q.    You just said ill intent. Is that what your testimony is?

A.    There had been something different than how I had left it.

Q.    Okay. And a deputy responded to that location?

A.    Yes.

Q.    Okay. And you gave that deputy a statement?

A.    Yes.

Q.    Okay. To your knowledge, did the deputy look at what you've testified to regarding the tire tracks and the footprints?

A.    Yes.

Q.    He did?

A.    Yes.

Q.    And did he photograph that evidence?

A.    Yes.

Q.    Okay. Did you watch him do that?

A.    We used my daughter's cell phone.

Q.    Let me stop you right there. When you say we used,

**Preliminary Hearing - November 2, 2017**

35

did the deputy or you?

A.    My daughter run it. That is beyond my paygrade.

Q.    Okay. So she took photographs?

A.    Yes.

Q.    Have you testified that if one were to stand at what you've described as the gate that is now closed, one could not see the opening in the fence that was approximately 50 yards away, correct?

A.    That is correct.

Q.    Okay. Now let's inform the Court here about this opening. Okay? If you're standing at this gate that's closed and you're looking the direction of where this opening is so that you could work on the well, how wide is that opening that exists?

A.    It would be the distance between two posts, roughly ten feet.

Q.    Roughly ten feet. Do you have any cows that are wider than ten feet?

A.    No, sir.

Q.    Okay. So at that time when the deputy arrived and when you arrived, the cows were freely walking in and out of that opening, correct?

A.    They had the opportunity. I did not witness a cow walk through there.

Q.    Okay. Let me cut you off. Okay. So that's the

**Preliminary Hearing - November 2, 2017**

36

question. Let me ask the question again.

A.    Okay.

Q.    Your under oath testimony is you never saw any cows going through that opening or standing in the opening?

A.    When I arrived there, there were some cows in the corral.

Q.    Okay.

A.    And the only way they--

Q.    Let me stop you right there. The only way they got there is through that opening, correct?

A.    Yes.

Q.    Okay. So we, it's fair to say then that--

THE COURT:  (Inaudible). Go on, please.

MR. WILLIAMS:  I wanted to make a joke about the cow.

THE COURT:  Yeah.

BY MR. WILLIAMS:

Q.    So what we're talking about really is line of sight. Does that make sense? What I'm talking about is if you have line of sight on something, it means we really can't look around corners, right?

A.    Correct.

Q.    Okay. So if one is standing at the opening of this gate, and just approximate for the Court here, how many steps to the side would one need to take before you saw that opening?

A.    I did not count steps so I can't give you an honest

answer there.

Q. Okay. But my question is one of approximation. If you were to--you know this area. You rebuilt it in 2009, I think was your testimony.

A. Yes.

Q. You spend a lot of time there. In fact, on that day you were there twice. So let's just approximate. Is it three feet? Is that fair to say? If I went three feet out, I would see--I would have line of sight?

A. No.

Q. No? Let me double it to six feet.

A. No.

Q. Okay. So in other words your testimony is this is a large arch? Because if it's a straight line and I go out a few feet, I'd be able to see that opening, correct?

A. You should.

Q. If it's arching, then I'm going to have to go out farther, correct?

A. It's a straight line. The way that--

Q. Okay. I don't have any other questions. You've answered that for me. Thank you. You've also testified that according to your view of the tire tracks and the footprints that someone exited the vehicle as they approached the gate, correct?

A. That would be my observation because there were no

Preliminary Hearing - November 2, 2017

38

footprints on top of those first tire tracks.

Q.    Okay. Let me ask you this then. The tire tracks continue and go down toward the opening, this unfinished fence that we're talking about, correct? The tire tracks continue on down there and in fact they drive right by this opening, correct? And then the car turns around, according to the tracks, and exits, correct?

A.    Yes.

Q.    Okay. Is it possible that the car drove in and went to the opening that we're talking about in the fence, turned around, came back and then exited? Went, tire tracks, footprints over to the watering hole, came back, shut the gate and then left. Is that a possibility?

A.    That is a possibility that somebody could do that, but not what the tracks indicated.

Q.    Okay. And you have a particular--I won't even go on with that. Mr. Odell--

MR. WILLIAMS:  Can I approach the witness, Judge?

THE COURT:  Yes.

BY MR. WILLIAMS:

Q.    During your time speaking with one of the deputies he asked you to write a statement, didn't he?

A.    Yes.

Q.    Okay. And I want you just to glance through this. I don't want you to read it. I just want you to look at it and

Preliminary Hearing - November 2, 2017

39

tell me that is the statement that you made to the officer.

A.    This is my statement.

Q.    Is that the statement in its entirety?

A.    I believe that to be true.

Q.    Okay. Mr. Odell, let me fast forward to April 3rd. You've testified that Mr. Franklin in a vehicle drives up and you encounter them at some point, correct?

A.    Correct.

Q.    And at the time you encountered them were you--you didn't allow them to leave, did you?

A.    No, sir.

Q.    Were you physically blocking their ability to drive their vehicle away?

A.    I personally? No. There was a vehicle parked to where they could not.

Q.    So you and Mr. Dalton and Torrence--I apologize, I forgot Torrence's last name. I'll refer to him more properly when I remember it. But between the three of you, you stopped their ability to leave, didn't you?

A.    Yes.

Q.    Okay. Your testimony is that a few minutes later a deputy shows up?

A.    Yes, sir.

Q.    And is that Deputy Begay who is sitting right here at counsel table?

**Preliminary Hearing - November 2, 2017**

40

A.    Yes, sir.

Q.    Do you recognize him?

A.    Yes.

Q.    Had you known him prior to this date?

A.    Prior to this date or April 3rd?

Q.    That was a poor question. I appreciate you correcting me. Prior to April 3rd.

A.    No, sir.

Q.    That was the first time you'd met him?

A.    Yes, sir.

Q.    Okay. And when Mr. Begay, Deputy Begay, I apologize, arrived you told Mr. Begay that you believed that it was Mr. Franklin that had closed the gate to your corral, correct?

A.    I believe I told him that he said he had shut the gate.

Q.    Okay. And then a conversation ensues between all of you, doesn't it?

A.    Yes.

Q.    Okay. Are you aware that Mr. Begay was wearing a body camera that day?

A.    At that time, no, sir.

Q.    Okay. So the whole thing's recorded. Okay? And do you recall that Mr. Franklin is telling you and telling Deputy Begay that he saw the opening in the fence, the opening that we're talking about where you're going in and out, where the

Preliminary Hearing - November 2, 2017

41

cows have entered and exited. Do you remember that?

A.    I am aware of that.

Q.    Okay. Do you remember that?

A.    Yes.

Q.    Okay. So you remember him telling you that the cows were fine, they were going in and out when we left. Do you remember that?

A.    I remember that.

Q.    Okay.

THE COURT:  You're soon going to get to the point where I'm no longer interested in the opening of the gate or opening in the fence.

MR. WILLIAMS:  Well, ironically, I think I just arrived at that same designation.

THE COURT:  Oh, good.

MR. WILLIAMS:  But if I could have just a second.

THE COURT:  And whether somebody can see it or not.

MR. WILLIAMS:  Mr. Odell, thank you for your time. I don't have any further questions.

THE WITNESS:  Thank you.

THE COURT:  And I'm not more interested because you're at that table.

MR. DELICINO:  I assumed not.

THE COURT:  Okay.

MR. DELICINO:  And I didn't plan on asking those

**Preliminary Hearing - November 2, 2017**

42

questions, Your Honor.

CROSS-EXAMINATION

BY MR. DELICINO:

Q. So on April 1st, let me just take you back to April 1st of 2017. You didn't see anybody open that gate or close that gate, right?

A. Correct.

Q. Okay. You certainly didn't see Mr. Franklin or Ms. Chilcoat open or close that gate?

A. That is correct.

Q. You did, however, have the camera record a vehicle that came to the property, correct?

A. That is correct.

Q. And in that camera still that matches a vehicle that came a couple of days later?

A. That is correct.

Q. But in the camera still that you provided, the photographs, you can't see who the occupants of that vehicle are, can you?

A. That is correct.

Q. You don't know who was in there, who was driving?

A. That is correct.

Q. Or if there was just one person?

A. That is correct.

Q. Referring back to this email that you looked at and I

Preliminary Hearing - November 2, 2017

43

believe you said you saw it in your permittee file, is that correct?

A.   Yes.

Q.   And that there were certain, I believe your testimony was, allegations that were made against you, correct?

A.   Yes.

Q.   And one of those was that you, that--excuse me, Ms. Chilcoat had said that you had physically, you or your group had physically blocked the vehicle, their vehicle, from leaving that day?

A.   Yes.

Q.   And I say that day, on April 3rd?

A.   I haven't read that for a little bit, so I'm not sure of that exact wording.

Q.   Okay. Let me--

MR. DELICINO:  If I may approach, Your Honor?

THE COURT:  Yes.

BY MR. DELICINO:

Q.   If it would help you to refresh your recollection to look at the bottom paragraph. That's where I'm going to focus my questions on, on the second page, which is underlined. Did that help refresh your recollection as to what you read in the complaint?

A.   Yes.

Q.   And in that email there was an allegation or an

44

assertion that you and your group, and by group I mean you and Zeb, Zeb Dalton, and the other individual Torrence, that you blocked, physically blocked Ms. Chilcoat and Mr. Franklin's vehicle, correct?

A.    Correct.

Q.    And that happened, right?

A.    Correct.

Q.    Okay. And that she asserted that you had accused, you or your group had accused them of criminal activity?

A.    Yes.

Q.    And that in fact happened, correct? You did make that accusation?

A.    I don't know that I did. I was on the phone with dispatch as some of the conversation went on.

Q.    Okay. And you called dispatch because you thought there was criminal activity, correct?

A.    That is correct.

Q.    Safe to say you thought that criminal activity had taken place?

A.    Yes. Thinking and saying are two different though.

Q.    Okay. And that during the course of your conversations you had, you or one of the individuals you were with, Mr. Dalton or Zeb, excuse me, or Torrence had threatened them with jail or mentioned that they could go to jail.

A.    That could have happened.

Preliminary Hearing - November 2, 2017

45

Q. Okay.

A. While I was on the phone.

Q. And that you or one of the individuals that you were with prevented Mr. Franklin and his wife from returning to the highway?

A. Yes, until the officer arrived.

Q. Okay. And there's a last portion of this paragraph that we've been referred to in which it's written that the San Juan County Sheriff was called and responded and spoke with Mr. Franklin and his wife and cleared them to leave. All of those assertions are true, correct?

A. Yes.

MR. DELICINO: If I could have just a moment, Your Honor. Nothing further, Your Honor. Thank you.

MR. LAWS: I just have one follow-up question.

RE-DIRECT EXAMINATION

BY MR. LAWS:

Q. Mr. Williams started to ask you a question and then he refrained. So I'm going to follow up with that question. So you were testifying about the tire tracks and why you thought that the vehicle had gone past the gate, then past the hole, and then around and out. Do you remember testifying to that?

A. I said that it was possible they could have done that.

Q. The opposite. But what did you learn from the--what

Preliminary Hearing - November 2, 2017

46

did the tracks indicate to you? When you looked at the tracks, what did you think from those?

A.    The tracks indicated--

MR. WILLIAMS:  Judge, I have an objection. I think it's appropriate to have some foundation here as to the basis of knowledge of Mr. Odell.

THE COURT:  I agree. I agree. Sustained. I don't want his conclusion, I want just what he observed and then his inferences drawn from that.

BY MR. LAWS:

Q.    Yeah. So what did you see as far as the tracks go?

A.    There was a vehicle track at the gate. Prior to going up around the loop, there was no footprints from where they had been on the outside of the loop walking across the other tracks.

Q.    So--

A.    It just--

Q.    Okay. Keep going. Sorry.

A.    It just didn't fit. If they had stopped over here on the way out, they would have walked across the other tracks.

Q.    Okay.

THE COURT:  The other tracks being the other footprints or the other vehicle tracks?

THE WITNESS:  The other vehicle tracks.

THE COURT:  I'm probably the only one that doesn't

**Preliminary Hearing - November 2, 2017**

47

know what you're saying here. So I better ask the question. You saw tracks that came close--you saw vehicle tracks approaching the gate, footprints going through the gate around to where the gate was, going through the gate opening to where the gate was?

THE WITNESS:  Yes.

THE COURT:  And coming back to being latched?

THE WITNESS:  Yes, sir.

THE COURT:  And then you saw the vehicle tracks go on around the outside of the fence?

THE WITNESS:  On the outside of the fence.

THE COURT:  Past the opening?

THE WITNESS:  Along the fence, up near the fence, up near the opening, that was there for completion of the well, making a loop and driving out.

THE COURT:  Okay. Got it now. I thought you were saying that you saw them go through the--the vehicle tracks go through the gate and around inside and back out. I was wondering how that could happen. So, all right.

MR. LAWS:  If I may approach?

BY MR. LAWS:

Q.    Do you remember, does that photograph look familiar to you?

A.    Yes.

Q.    And do you remember seeing what that image captures on April 1st?

48

A.    Yes. It helps to point which direction that vehicle was traveling.

Q.    Okay. So how does that photograph help?

A.    It helps to say that this was the first way traveled and then this would be on the way out.

Q.    Okay.

A.    Making a left-hand turn and coming out.

Q.    So because of which tracks are on top of which tracks?

MR. WILLIAMS:  Your Honor, I need to object. This is almost crossing over into 702 area. This is requiring--this isn't just layperson observation about tire tracks and the direction of travel of the vehicle. I think he's really crossing over into some expert area testimony.

THE COURT:  Overruled. Did you want to say something? See if you can talk me out of that ruling?

MR. LAWS:  Nope, I'm not going to talk you out of it, Judge.

BY MR. LAWS:

Q.    So your observations are based on which tracks are on top of which tracks?

A.    Yes, sir.

Q.    Okay.

MR. LAWS:  Your Honor, the State would move to admit Exhibit 3.

**Preliminary Hearing - November 2, 2017**

49

MR. WILLIAMS:  Same objection.

THE COURT:  Let me see it and I'll decide whether I can sustain or deny the objection. Are you're offering it because it shows footprints on top of tire tracks?

MR. LAWS:  No, Your Honor. He's testified that he was relying on which tire tracks were on top of--this is--

THE COURT:  Oh, I see.

MR. LAWS:  This is where they crossed.

THE COURT:  Okay.

MR. LAWS:  The entrance and exit.

THE COURT:  Okay. And your objection is?

MR. WILLIAMS:  I'll withdraw my objection as to the admissibility. But I'll just try to--if I could have a moment to cross?

THE COURT:  Okay. Well, I'm sure you'll be given a chance to ask questions on recross.

MR. LAWS:  I move for admission.

THE COURT:  Okay. I'll receive Exhibit 3 and overrule the objection and receive Exhibit 3.

MR. LAWS:  Thank you, Your Honor. No additional questions. Thank you.

MR. WILLIAMS:  Judge, could I have that exhibit?

RE-CROSS EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Odell, I apologize if this was asked. But you

50

testified that your daughter took this photograph earlier?

A.   Deputy Wilcox took photographs also. I believe those on the outside of the tire tracks are Deputy Wilcox's.

Q.   Okay.

A.   Those--

Q.   So that's a different question. But let me ask my same question again. This photograph, who captured this image on the camera?

A.   I believe that photograph to be Deputy Wilcox.

Q.   So Deputy Wilcox took this photograph?

A.   I'm sure, because my daughter didn't take any pictures outside of the enclosure.

MR. WILLIAMS:   I probably have a foundation objection for the Court admitting this. But I'll get to that in just a minute.

THE COURT:   And when you get to that, I'll get to my ruling.

MR. WILLIAMS:   Okay. Can I approach Mr. Odell?

BY MR. WILLIAMS:

Q.   Mr. Odell, this document has been admitted into evidence so I wanted to ask you a couple of questions about this. You testified that a footprint that is through these tire tracks was caused by Deputy Wilcox?

A.   No, that's my boot track.

Q.   Oh, so this is your footprint across the tire tracks?

**Preliminary Hearing - November 2, 2017**

51

A.    That is my footprint. Do I need to speak into the mic? It rained that day. Lightly showered on these car tracks. And that track has no rain in it.

Q.    Mr. Odell, where was this picture taken in relation to the closed gate?

A.    That picture--

THE COURT:  Try to keep your mouth close to the mic, please.

MR. WILLIAMS:  Sorry. I thought I was speaking loudly enough.

THE WITNESS:  That picture is taken just out in front of the gate that was closed, not the opening.

BY MR. WILLIAMS:

Q.    Did you walk up and follow the tire tracks up to where they turned around?

A.    Yes, sir.

Q.    Did you see the footprints up there? Did you photograph those?

A.    There were none.

Q.    And how closely did you look?

A.    Real close. With that fresh rain, everything was pristine.

Q.    Is it possible with the rain that the footprints were washed away?

A.    No, sir. As you can see in that photograph, it didn't

**Preliminary Hearing - November 2, 2017**

52

rain that much.

Q.    Let me ask you this. You've talked about and testified and put in a written statement that--let me strike that. I asked you if it's possible that the vehicle drove up, turned around by the opening, the opening where the well was being worked on, and then turned around and got out of their vehicle. I asked you if that was possible. You said yes?

A.    Anything is possible. If that's what they chose to do, that would have been possible.

Q.    Okay. And that would be consistent with what Mr. Franklin was telling you that day. On April 3rd when Deputy Begay arrived, he told you he could see that the cows were going in and out, right?

A.    He could see that they have. But they hadn't yet. Because when he arrived there, the gate was not shut.

MR. WILLIAMS:  I don't have any other questions.

MR. DELICINO:  I don't have any questions. I'm sorry.

THE COURT:  Okay. Any re-redirect?

MR. LAWS:  No, Your Honor.

THE COURT:  All right. Thank you. You can step down.

THE WITNESS:  Thank you.

MR. LAWS:  Your Honor, the State would call Deputy Begay to the stand.

THE COURT:  It's noon. So what's--do you guys want to take a recess to 1:30 and come back or would you like to try

**Preliminary Hearing - November 2, 2017**

53

and push through and get this done?

MR. LAWS:  We'll just push through.

THE COURT:  Okay.

MR. LAWS:  I don't know that he'll be on as long.

(WITNESS IS SWORN IN)

DEPUTY JAY BEGAY

Having first been duly sworn, testified

upon his oath as follows:

DIRECT EXAMINATION

BY MR. LAWS:

Q.    All right. Deputy Begay, can you state your name and tell us what you do for a job, and how long you've been doing that?

A.    My name is J.R. Begay. I work for the San Juan County Sheriff's Office. I'm a deputy. I work patrol and I've been with the sheriff's office for two years and a month.

Q.    Okay. Two years and a month. But who's counting, right? So were you working on April 3rd of this year?

A.    I was.

Q.    Okay. And did you have some sort of contact with Mr. Franklin and Ms. Chilcoat that day?

A.    Yes, I was dispatched to a call where they were, the parties involved.

Q.    Okay. And where were you? Just for time frame purposes, where were you sitting when you received the dispatch

54

call?

A.    I was responding to some cows on the road call at the intersection of Highway 163 and 191, which is approximately 12 months from where Zane Odell's garage on Highway 163 and Lime Ridge.

Q.    Okay.

A.    So I was near bluff.

Q.    Okay. So you were about 12 months on the highway from where you responded?

A.    Yes, at the intersection on the highway.

Q.    Okay. So when you arrived on scene at the corral on Lime Ridge, what did you find?

A.    I arrived on scene and I saw Zeb Dalton, Zane Odell and I believe Torrence Weber and Mr. Franklin outside of the vehicle and they were in a group talking when I approached.

Q.    Okay. And did you notice any vehicles there where they were grouped together?

A.    Yes. The first vehicle I parked near was a brown truck that was parked diagonally across the roadway. Beyond that, was a red Toyota Rav4 pulling a silver and yellow trailer.

Q.    Okay. And did that vehicle jump out to you for any reason?

A.    Yes, it did. Because a few days prior to my arrival to that, we were sent alerts to be on the lookout for a vehicle

**Preliminary Hearing - November 2, 2017**

55

matching that description that had been reported to be tampering with maybe or trespassing at all. So as the road until we were sent photographs and information to be on the lookout for the vehicle and to stop question if we approached any matching that description.

Q.    Okay. So when you arrived you had, what, four males outside Mr. Franklin and then the three, Mr. Odell, Mr. Dalton and then Mr. Weber?

A.    Correct.

Q.    Did you--at some point did you identify or attempt to identify the parties?

A.    Yes. When I first arrived, the first two people that identified themselves to me were Mr. Odell and Mr. Franklin. I did not identify the other parties, Zeb Dalton, Torrence Weber and Rose Chilcoat until the end of my interviews and as I was getting ready to let them leave.

Q.    Okay. So with regards to identifying Ms. Chilcoat, can you explain how that process happened?

A.    Well, after I interviewed Mr. Franklin--Mr. Franklin was the only one that I had spoken to as he was outside of the vehicle. Ms. Chilcoat remained inside the vehicle and she didn't participate in any of my questioning. When I walked with Mr. Franklin back to his vehicle, before I let them leave I asked the passenger for her name as a witness to the incident.

Q.    And can you explain how that conversation went?

56

A.   She was sitting in the passenger's seat. I was questioning Mr. Franklin from the driver's side door. And when I asked her name, she asked me why she--how she was involved. I told her that I would need her name as a witness so I could turn that into the county attorney to review. She gave me her first name, Rosalee. I had her spell it out. And she did. And that's when I asked Franklin and she said yes. Then she gave me her date of birth.

Q.   Okay. So why did you ask Franklin?

A.   Well, they were traveling together. And usually in my experience when people have the same last name they don't use it again. So I inferred that, when she said Rosalee, I just thought her last name was the same as Mr. Franklin.

Q.   Okay. And she affirmed that?

A.   And she did.

Q.   Okay. What--who was the vehicle registered to?

A.   Later when I ran the check on the vehicle and the trailer, they were registered to Rosalee Chilcoat and Mr. Franklin. The same with the trailer.

Q.   Okay. And during your investigation did you have reason or did you ever view Ms. Chilcoat's Facebook page?

A.   After the investigation on Lime Ridge, I did.

Q.   Okay. And what did you (inaudible) on Facebook?

A.   On the Facebook profile that I viewed it had the name as Rose Chilcoat.

**Preliminary Hearing - November 2, 2017**

57

Q.    Okay. If I may approach? So this has been marked as State's Exhibit 7. Can you identify that?

A.    This is the Facebook. It's a screenshot of a Facebook page with the name Rose Chilcoat and Ms. Chilcoat's picture.

Q.    Okay.

A.    Profile picture.

Q.    So just to recap, the vehicle of a trailer were registered to Mark Franklin and Rose Chilcoat?

A.    Yes.

Q.    Okay. And then did you do any sort of, as part of your investigation, any sort of driver's license check or anything like that?

A.    Yes, I conducted a driver's license check with the name Rose Franklin and the date of birth that she provided. Our local return for the computer system we used, returned the name Rose Chilcoat and that's when I was able to get a return on the Colorado driver's license Rose Chilcoat.

Q.    Okay. When you were there at the corral that day on April 3rd did either Mr. Franklin or Ms. Chilcoat make any accusations of assault?

A.    No, they did not.

Q.    Okay. At some point during your investigation did you or someone else ask Mr. Franklin about closing the gate?

A.    Yes, that was the first question that I asked when I made contact with Mr. Franklin. And Mr. Franklin admitted that

**Preliminary Hearing - November 2, 2017**

58

he did close the gate. And when I asked why, he said he shuts gates all the time and that he knew that there was an opening for cows to get in.

Q.   Okay. Did he say anything else as to why he did that to you?

A.   No, he did not. We walked back to the corral with Mr. Odell and they were discussing land and public uses and things like that. But much of the debate was why the gate was closed. And Mr. Franklin did not have--did not provide me a reason on why he said that he sees an open gate and he shuts it, is his answer.

Q.   Okay. Give me just a second. So when you arrive, so you arrive down there, you walk up to the opening so that you could look at it?

A.   Yes.

Q.   And on that day on April 3rd was this opening or break in the fence line, was it readily apparent or obvious to you?

A.   It was very obvious to me because there was a vehicle parked there.

Q.   Okay.

A.   I think several vehicles and a lot of equipment.

Q.   Okay.

A.   Where there was a tall pulling system I believe they were working on. So it was apparent when I walked up.

**Preliminary Hearing - November 2, 2017**

59

Q.    But because the equipment was parked there?

A.    Yes.

Q.    Okay. Have you viewed the corral without vehicles parked there? Have you had an opportunity to see that either in photographs or in person?

A.    I've only seen it in photographs.

Q.    Okay. So based on your observations have the--if not for the vehicles parked in there would it have been easily visible? It meaning the opening. Would it have been visible?

A.    As I was walking up the only thing I noticed was the railroad ties and the fences going along. So if I just had not known, I don't think I would have seen a break in the fence.

Q.    Okay. So are you familiar with the organization Great Old Broads for Wilderness?

A.    I was not at the time of my interviews and investigation of the incident. But following the incident, I was made aware of what the Gradle Broads organization was and I reviewed the website a couple of times.

Q.    And did you, in the course of your investigation, did you find a connection between the defendants and that organization?

A.    Yes, I did find a connection with Rose Chilcoat as a prior director for the Great Old Broads organization.

Q.    Okay. And is that visible on her Facebook page?

A.    Yes, it is. It's right there under, on, it says

**Preliminary Hearing - November 2, 2017**

60

former associate director at Great Old Broads for Wilderness.

MR. LAWS:  Your Honor, I don't know that I've done this, but I want to admit State's Exhibit 7.

THE COURT:  Any objection to 7?

MR. DELICINO:  No objection.

THE COURT:  7 is received.

BY MR. LAWS:

Q.    So you said that over the course of your investigation that you have familiarized yourself with the Great Old Broads organization. Is that correct?

A.    Yes.

Q.    And so what are the sources or how have you educated yourself on that organization?

A.    My primary, I guess, interest in the Great Old Broads organization for the time I reviewed it was more for the case that I was working, and that involved grazing for livestock and cattle business, which their Great Old Broads organization, they are, I would say, advocates for public land misuse. And they observe and report any misuse that they see.

Q.    Okay. Misuse in their eyes?

A.    In their eyes, yes.

Q.    And so can you, based on what you've read and based on your investigation, what's that organization's position on grazing and livestock on public lands?

MR. DELICINO:  Objection, relevance.

**Preliminary Hearing - November 2, 2017**

61

MR. LAWS:  It's highly relevant, Your Honor. It goes to the mental state of the closing of this gate.

MR. DELICINO:  I don't think the mental state of an organization is at issue in this case.

MR. LAWS:  She's the executive director, former executive director. I think it's highly relevant.

THE COURT:  Objection overruled.

THE WITNESS:  From what I've read and what they make public on their website at greatoldbroads.org, is that they are advocates for, I guess, managing the grazing practices.

BY MR. LAWS:

Q.    Okay.

A.    In how they see that there's overgrazing. The livestock are disturbing water, soil, other free--other animals that the livestock industry's affecting.

Q.    Okay.

MR. LAWS:  Give me just a second, Your Honor.

I don't have any additional questions for you at this point. Thank you.

MR. WILLIAMS:  Judge, I don't have any cross.

MR. DELICINO:  Nor do I, Judge.

THE COURT:  Thank you. You can step down.

MR. LAWS:  The State has no additional witnesses, Your Honor.

THE COURT:  Okay. Any witnesses for the defense?

**Preliminary Hearing - November 2, 2017**

62

MR. WILLIAMS:  Your Honor, on behalf of Mr. Franklin, no, we do not.

MR. DELICINO:  And on behalf of Ms. Chilcoat, we do not. I have spoken with Ms. Chilcoat about her right to testify at a preliminary hearing and I'm aware that Mr. Franklin was also so advised by Mr. Williams and they both have elected not to testify at this hearing.

THE COURT:  Okay. Do you want to make any closing arguments?

MR. LAWS:  Your Honor, I'll just sum up the State's position. So we'll start with Mr. Franklin, Your Honor. Mr. Franklin is charged with attempted wanton destruction of livestock, dealing with an animal enterprise. That requires that the defendant, Mr. Franklin, did attempt to, without permission of the livestock's owner, Mr. Odell, did attempt to injure, physically alter, release or cause the death of livestock which has a value of more than $5,000 with the intent to halt, impede, obstruct or interfere with the lawful operation of an animal enterprise or to take damage, take or cause the loss of a property owned by, used by or in the possession of a lawful animal enterprise as defined by Utah Code 76-6-110, which defines animal enterprise as being a, among other things, being a business that is in the business of raising livestock for food or clothing.

So we have heard testimony that with regards to the

Preliminary Hearing - November 2, 2017

63

animal enterprise enhancement, that Mr. Odell has cattle for business purposes for the sake of, for the purpose of raising beef cattle, raising the animals for food. So therefore it does fit the definition of animal enterprise.

With regards to the attempted wanton destruction of livestock, you've heard testimony that the defendant, in this case Mr. Franklin, admitted to closing the gate. He claims or claimed at the time that he saw this opening further down the fence line. But based on testimony that you've heard, the vehicle pulled up to the gate that was then, the gate in question prior to getting to a point down the fence line where they could actually visibly see the opening in the fence.

You know, it's possible that his mental state changed as far as the mental state required for this crime; within minutes of him closing the gate, as he pulled down and saw the opening in the fence. The State's position is that at the time that the gate was closed, Mr. Franklin had no reason, no practical, no reasonable reason to close that gate other than, based on testimony that you've heard, his connections with Ms. Chilcoat as well as the organization that she belongs to, that would be to cause injury or the death of these livestock.

You also heard testimony that the value was well in excess of $5,000 of what would have been damaged or could have been damaged by this.

So then moving on to the trespass of the trust land

Preliminary Hearing - November 2, 2017

64

dealing with an animal enterprise, I'm not going to reiterate the animal enterprise because we've discussed that. But in order for there to be a trespass on trust land, this being state land, (inaudible) trust land, it requires that the defendant, without written authorization from the director of SITLA, and then there's a variety of options--and I notice that one word was actually cut off count 2 subparagraph (i) when it was filed. I'm not sure how that happened. But if you look at the state code, it actually says interfere with activities of a leasee or other person that have been authorized by the administration, whether or not the trust land has been withdrawn from occupancy or the use pursuant to the subsection with the intent to halt, impede, obstruct or interfere with the lawful operations.

But closing this gate they had--there was no reason for them to close this gate to alter or change the way that the cattle were getting water, to eliminate the way that the cattle could get to water. And mister--you heard testimony from Mr. Odell that he does have authorization from the director to operate his animal, his livestock operation on that trust property. And so the defendants, both of them, are charged with the same thing. But their actions did in fact interfere with the activities of a leasee or other person that had been authorized by messing with gates that they have no reason to mess with.

**Preliminary Hearing - November 2, 2017**

65

Moving on to Ms. Chilcoat, count one is the attempted wanton destruction of the livestock animal enterprise. The same evidence that supports the charge against Mr. Franklin supports it against Ms. Chilcoat. Ms. Chilcoat's letter to the BLM indicates that she was in that area recreating over the weekend, the weekend in question, and she was with Mr. Franklin at the end of the weekend. She's down there recreating. It's her vehicle. It's her trailer. She--so she's tied to Mr. Franklin's actions by virtue of, if nothing else, the accomplice, you know, being an accomplice to the fact, to the action itself.

Count number two, retaliation against a witness, victim or informant, the defendant, Ms. Chilcoat did, believing that an official proceeding or investigation was pending, was about to be instituted or had been concluded, and then it goes down and says makes a threat of harm or cause harm and directs the threat or action against the witness or informant regarding any official proceeding or, as retaliation or retribution against the witness, victim or informant.

The letter that you have that has been submitted into evidence is pretty clear. Ms. Franklin, it's dated the day after or two days after this incident occurred, and she's, as you heard testimony, she claims that there was an assault that took place, which nobody has testified to any accusations or assault on that day. She also makes some claims about the

**Preliminary Hearing - November 2, 2017**

66

misuse of, that he, that Mr. Odell had gone outside the scope of what he was allowed to do for the ponds.

And then she follows that up with saying that she wanted that information put into the permanent file of the allottee, Mr. Odell. So she's actually causing harm by, as retaliation or retribution, in that she's making up false allegations to an organization that Mr. Odell relies on for his livelihood to continue to allow him to permit and lease BLM property so that he can continue to graze that property in accordance with their rules.

Count three is the trespass on trust land. The same argument would go for what Mr. Franklin was looking at. The same argument stands there. We have an accomplice type situation here.

And then count four, the false information to a peace officer, Ms. Chilcoat, while not maybe asserting that her name was Rose Franklin, she allowed the officer and affirmed the officer's question about whether her name was Rose Franklin or something else, and she affirmed that, thereby misleading the officer in his understanding by giving a false name.

THE COURT:  Let me just ask you about that.

MR. LAWS:  Yeah.

THE COURT:  It says it has to be with the intent of misleading. So what do you think the motive was there, an attempt to what?

**Preliminary Hearing - November 2, 2017**

67

MR. LAWS:  That--

THE COURT:  What's your theory there as to why she said, why she willingly accepted the last name of Franklin when that wasn't actually the name she'd been using?

MR. LAWS:  Well, she was, she didn't want to give the name in the first place. She asked why she even needed to give the name. The State's theory there is that she didn't give her appropriate name because of her connection to the Great Old Broads for Wilderness, that she had some concern or some thought that by her name being attached to this incident that it would make it worse than what was already done.

THE COURT:  Okay. So that's the State's theory? She was afraid of--she thought maybe it would be better if they didn't have her last name, they may not figure out who she is and they might not think the same things as they would think if they knew--

MR. LAWS:  Yes, Your Honor.

THE COURT:  --who she was?

MR. LAWS:  Yes, Your Honor.

So for that reason, I think the State has put on more than enough evidence for bindover purposes on all, on both counts on Mr. Franklin and all four counts on Ms. Chilcoat.

THE COURT:  Okay.

MR. LAWS:  Thank you, Your Honor.

THE COURT:  Who's going first? Mr. Delicino?

**Preliminary Hearing - November 2, 2017**

68

MR. DELICINO:  Your Honor, I can sum up the State's theory with respect to count one, the wanton destruction. It's guilt by association. That's the only theory they can go off of. And the reason that's the only theory they can go off of is because there's no actual evidence that Rose Chilcoat was there on April 1st. There's no physical surveillance indicating she was present. There's no physical still, photo still, indicating that she was in the car that they believe was present or that was present according to testimony of Mr. Odell. And there's absolutely no indication that she had any involvement with the gate. None. None whatsoever. They haven't presented a scintilla of evidence to suggest that she was there on April 1st, other than guilt by association and conjecture. Now, I know the standard at a preliminary hearing is low. But it's not so toothless that we can allow bindovers in situations where all it is is conjecture.

They refer, and just now the State referred to the letter that she sent, the letter that she sent from BLM. Well, what's notably absent from that letter that she sent to BLM on April 5th is any mention whatsoever that she was in the location on April 1st. She says that she was in the area camping, a wild wilderness area, but being in an area, being in a county, being in a recreational facility, whatever it might be, isn't enough to tie her to the location where all of this took place or was alleged to have taken place. Simply not

**Preliminary Hearing - November 2, 2017**

69

enough to bind over Ms. Chilcoat. She didn't make any statements about being there to Mr. Odell, like Mr. Franklin did. She didn't make any statements to Mr. Begay. So there's nothing that the State, no concrete evidence the State can point to to support a bindover.

With respect to count two, the retaliation count, the State goes to great lengths to overlook one of the critical provisions of the statute. And that is subsection three. This section does not prohibit any person from seeking any legal redress, to which the person is otherwise entitled. Ms. Chilcoat is entitled just like I am, just like Your Honor is, just like everyone in this court is, of filing a complaint with BLM regarding overuse or overgrazing of property, misuse of property. She simply exercised what is her statutory right, and I would suggest probably her constitutional right, to file that complaint or to send that complaint.

The other premise that the State is operating under with respect to count two is also troubling, and that is this notion that in this statement she says that there's a false, that she conveys a false allegation, a false allegation that an assault took place. There's no mention of an assault in that exhibit. The exhibit says that she was accosted by--

THE COURT:  There actually is a mention of an assault.

MR. DELICINO:  What's that?

70

THE COURT:  There actually is mention of assault. At least the word assault is used.

MR. DELICINO:  Not in the context that the State is implying. The word that was used was that Ms. Chilcoat and her husband were accosted by the three, I believe she refers to them as cowboys, but Mr. Odell and two people who were accompanying him.

THE COURT:  Then she later says this assault by BLM permittees.

MR. DELICINO:  But the assault that they're trying to convey, the State is trying to suggest happened, is this physical altercation. There's nothing in this complaint that suggests that she's making false accusations. As I went through it--

THE COURT:  So you're saying that the assault, the use of the word assault was, it should be disregarded because why?

MR. DELICINO:  Which portion is the Court referring to specifically?

THE COURT:  It's just a couple of sentences.

MR. DELICINO:  The last portion?

THE COURT:  Yeah, it's on that last page.

MR. DELICINO:  This assault--

THE COURT:  This assault and behavior by BLM permittees.

Preliminary Hearing - November 2, 2017

71

MR. DELICINO: Well, as the Court knows, a threat can be an assault, right? And we know that Mr. Odell did say that it could have been conveyed as they were threatening them with criminal sanctions, they were threatening to call the police.

THE COURT: A threat to call the police, a threat of criminal sanctions is not an assault.

MR. DELICINO: Regardless--

THE COURT: A threat of physical action--I mean, it gets into the fine details.

MR. DELICINO: Sure. And fine details that we're not going to expect Ms. Chilcoat to be able to parse when she's filing a complaint, making allegations, many of which Mr. Odell has acknowledged were true, against the BLM permittee. But the fact remains that--

THE COURT: Yeah, I think it would be fair to say they were accosted.

MR. DELICINO: Yeah.

THE COURT: That's a term that maybe has more derogatory meaning than--

MR. DELICINO: Sure. And it's fair to say, as Mr. Odell acknowledged, that they were physically blocked from the vehicle, they were accused of criminal activity, they were threatened with jail, they prevented the return to the highway. So there is accurate information in this complaint.

But the statute, the legislature has a carve-out. And

**Preliminary Hearing - November 2, 2017**

72

the carve-out is subsection three, which is this section does not prohibit any person from seeking any legal redress. And that's exactly what Ms. Chilcoat did. Ms. Chilcoat sought legal redress as is her statutory right and probably, arguably, her constitutional right. With respect to--

THE COURT:  What about--I don't know what Mr. Laws is going to say, but I'd like you to have a chance to respond now to what I think he's going to say, which is that you have a legal right to do things but you don't, to seek redress, but you don't have the right to say something false. So he's already leaned on the use of the word assault. Maybe, I thought from the way we started out here, he was going to lean on more, that she was claiming that there was a violation of the permit.

But what if the State says we're willing to go to trial. Mr. Odell says he wasn't violating the terms of the permit. And the standard will be she knew they were in compliance with the permit and she was claiming they weren't in order to cause trouble for him, just to retaliate. Is that something that would be--I know you won't agree with the allegation. But if it were proven, would it constitute--

MR. DELICINO:  It would go farther to meet the State's burden, but it would be still subject to this carve-out of subsection three. It would also--there's still problems with the requirement of subsection two. Subsection two makes an explicit requirement that the defendant makes a threat of harm

73

or causes harm. Okay. There is no threat of harm in this letter. She's not threatening--what this statute normally entails or normally covers is that somebody is threatening if you testify or if you go down this road to cooperate with the police, this is what's going to happen. It's not seeking legal avenues of redress. And by very nature of seeking legal avenues of redress we're causing harm or making a threat of harm. So I think that the State has stretched it so far where we're talking about sending a letter to BLM, not to the permittee, sending a letter to the BLM is somehow making a threat of harm or causing harm.

And it also has to direct a threat or action when the individual believes that an official investigation is pending. There's no indication that an official investigation, that she believed an official investigation was pending. She was let go. She didn't make an incriminating statements. She wasn't given a citation. She wasn't taken to jail. None of those things happened. So there's so many difficult hurdles that the State cannot overcome in this case. I think primarily my argument would focus on her ability to seek legal redress.

With respect to count three, again, this suffers from the same infirmities that count one suffers from, and that is that there's no evidence that my client, that Ms. Chilcoat was even there. Clearly she would have to be present at that location on April 1st in order to violate the trespass statute.

Preliminary Hearing - November 2, 2017

74

If she wasn't there, they can't meet their burden. And I'd suggest for the same reasons that I've elucidated in count one and numerated with respect to count one, that they haven't met their burden with that count, with count three.

With count four, I think the Court honed in on some of the important concerns about the allegation of giving a false name. The statute's very clear. And I went to look at the Information again before arguing this particular proposition. But it's that the defendant knowingly gave a name. Now, Mr. Begay's testimony was very clear, she gave her first name. She even spelled it for him. He said Franklin. He gave the name Franklin, not Ms. Chilcoat.

THE COURT:  Okay. You can make that argument once. Don't keep making it because it isn't flying with me.

MR. DELICINO:  Okay. So then I think I'd go to what the Court's concern is, is with the intent to mislead. If there was an intent to mislead, it's a really poor way to go about it by taking your husband's last name and giving your proper first name, giving all of the details, knowing that you're in the car that's registered to you and your husband, knowing that you have--pulling a trailer that's registered to you and your husband. The intent to mislead is, that's one of the worst approaches to mislead somebody I can ever think of, given all of the circumstances that point to her being compliant and providing the information.

**Preliminary Hearing - November 2, 2017**

75

THE COURT:  If she was intending to mislead, she did a terrible job.

MR. DELICINO:  Exactly. And I think the Court can look at how bad that was or would have been in order to debunk the State's theory that there was an intent to mislead.

Now, I suppose--you know, the Court, excuse me, the State has used an exhibit where she has Rose Chilcoat on her Facebook profile. I suppose the Court could say that, excuse me, the State could say that that's an intent to mislead because her real name is Rosalee.

We're talking about a husband and wife who have been married for a considerable period of time. They're traveling together. Even Mr. Begay, excuse me, Deputy Begay said I assumed it was Franklin, as most people would. So I don't think the intent to mislead is particularly strong in this case and certainly doesn't meet the standard. While not a heavy burden, there's still a burden the State must meet and it doesn't do that with respect to count four.

And I'd ask the Court to not bind over on any of the counts for the reasons that I just enumerated. Thank you.

THE COURT:  Thank you.

Okay. Mr. Williams, I will ask you not to duplicate arguments that have already been made. But you do have a different client and the evidence is different on him.

MR. WILLIAMS:  Your Honor, Mr. Delicino started out

Preliminary Hearing - November 2, 2017

76

by saying this is guilt by association. I think that the State's case suffers the same infirmity with regard to Mr. Franklin.

The State's theory is that his association with his wife and her association with Great Old Broads somehow is going to snowball down to him. And it's that association that gets them over this hurdle of the intent. And I would, for the Court, and I know the Court is well aware of all of these cases. And I just--for purposes of my argument, the Court of Appeals opinion in Ingrim, has a particular, in paragraph 17 has a particularly succinct way of going through the cases that the Court of Appeals and the Utah Supreme Court have decided. And that paragraph reads, "To show probable cause for intent, the State must only show that its theory of intent is reasonable. Knowledge or intent is a state of mind, generally to be inferred from the person's conduct viewed in light of all of the accompanying circumstances."

Well, the circumstances that came out in this evidence are that the second Mr. Franklin encounters Mr. Odell and the other employees of his is he readily says yes, I closed the gate, but it was open right there. Deputy Begay shows up, the same facts come out. Yes, I shut the gate but it was open right there. I could see it.

THE COURT:  I'm sorry, I didn't hear that.

MR. WILLIAMS:  I could see that it was open.

77

THE COURT:  No, no. I mean did I miss that evidence? I thought what he said was that's what I do, I help farmers, I help ranchers.

MR. WILLIAMS:  I believe Mr. Odell testified that those were the words of Mr. Franklin, is that he--when he was immediately approached--

THE COURT:  Okay. Do you agree with that? Did Mr. Odell say that?

MR. LAWS:  I think you're both correct.

THE COURT:  Okay. Fine. I just missed it.

MR. WILLIAMS:  So those are the facts and circumstances that we have here.

THE COURT:  So what's your theory as to why your client did close the gate? What's the point of closing a gate if the fence is open?

MR. WILLIAMS:  The theory that's not come out in this?

THE COURT:  The theory--I think what the State is saying is the reason he closed the gate is he didn't know the fence was open. Then when he saw the fence was open he thought well a lot of good that did. But it doesn't change the intent he had when he closed the gate.

MR. WILLIAMS:  But a last--

THE COURT:  So my question is, what's your theory as to why? And I think the State is also arguing that if he had

**Preliminary Hearing - November 2, 2017**

78

known the fence was open he wouldn't have shut the gate because there would have been no point in him shutting the gate. So given that there is evidence that he did shut the gate and that he did see that the fence was open, what's your theory as to why he did that?

MR. WILLIAMS:  Well, the State probably will--

THE COURT:  Is this just a guy that just can't bear to see a gate open? Every time he sees an open gate, it has to be closed or he can't sleep at night? Is that the theory? What's the theory? What's your theory?

MR. WILLIAMS:  Well, Judge--

THE COURT:  Because it would have been pointless as far as helping the farmer, the rancher.

MR. WILLIAMS:  And this is going a direction that the State is trying to do some burden shifting here. What they're doing is saying well there's no justification, there's no reason for him shutting the gate. Therefore, we're going to infer this intent.

THE COURT:  I don't think that's the burden shifting at all. So I'm asking you, I'm not saying he has to take the stand and testify, but I am saying there has to be some plausible reason for him to have done what the evidence seems to show that he did do.

MR. WILLIAMS:  Well--

THE COURT:  And the State has given me one plausible

**Preliminary Hearing - November 2, 2017**

79

reason. If you can give me one that is not only more plausible but so much more plausible that the State's theory is preposterous, then I won't bind over. So have you got one?

MR. WILLIAMS:  Well, Judge, one theory that I had a note taken down for when Deputy Begay testified, what he was doing on April 3rd is well I was, not surveillance but I was sitting on a call because there were cows in the road. So law enforcement was called to a situation where there were cows in the road. I think it's reasonable to say that clearly a gate was left open. If the cows were in the road, they got there somehow and they got to a gate when they did it. So I think there are any number of theories that would be just as reasonable as the State.

THE COURT:  Was this the fence that went right along the road then? I didn't get evidence of that. What I was getting was this was a fence to keep a corral separate from other things, right? That's the picture I have anyway from the testimony.

Okay. Anyway, that's your idea. Okay.

MR. WILLIAMS:  Thank you, Judge.

Judge, as for count two, I guess the State presented its theory and I anticipate the Court is wanting a similar response from me.

THE COURT:  Right.

MR. WILLIAMS:  So I will--

**Preliminary Hearing - November 2, 2017**

80

THE COURT:  I'll take it that you make the same argument as Mr. Delicino.

And I'll be candid with you, Mr. Laws. What I'm struggling with most here is counts two and four against Ms. Chilcoat. The ill intent--I think whether it's in the statute or not, I think there's case law that supports you have to have some ill motive, some evil motive for the report or for the threat.

MR. LAWS:  Yes.

So a couple of things on count two, defense counsel wants to rely on subparagraph three with regards to legal redress. She's claiming in there that was an assault. Deputy Begay's the person to get legal redress for an assault, not the BLM. Nobody said a word to Deputy Begay when he was there about an assault taking place. And that's the person that--so that subparagraph three, just to drive the point home, does not apply to the allegation of assault. I know they have a different definition of assault. But we all know what pops to mind when we hear assault and it isn't being accosted. It's an assault. It's a legal assault.

THE COURT:  Okay. I haven't decided this yet. But let's suppose I decide, you know, we're not going to parse the language that closely. People, and Ms. Chilcoat would not be the first one who's ever used the word assault to describe something that I know legally is not an assault. I think the

Preliminary Hearing - November 2, 2017

81

only other theory you'd have under count two for retaliation is that she's just making up stuff to give it to the BLM.

MR. LAWS:  That's exactly what we're saying, is she's embellishing, she's posturing and saying that there was an assault and that there were these other things for the sole purpose of lodging a complaint and have it put in Mr. Odell's permanent file.

THE COURT:  If I take that out, have you got enough? Do you want to pursue--in other words, if I tell you that what I'm going to require at trial is that you show that, aside from the information about the encounter which I may decide is not enough to support a claim of retaliation--

MR. LAWS:  Okay.

THE COURT:  --is there enough in the information not about the encounter, the information about the permit and the conditions, is there enough there for you to go to trial when I'm going to have to--I think I'm going to have to instruct the jury people can have differences of opinion about what things mean. But if they state things that just aren't true because they're factually incorrect or they are so distorting the law that they're that you can't count (inaudible). Do you really want to go forward on that charge if that's the way I limit it? That may be the only way I can see retaliation actually being a possible count here?

MR. LAWS:  Yes, Your Honor. So the side that--the

**Preliminary Hearing - November 2, 2017**

82

other false allegation that is made in the complaint is with regards to the scope of these repairs to ponds and things like that. And there would be sufficient evidence to show that some of the exhibits that were presented to the BLM with that letter were embellished or changed, altered to make those repairs look worse than they are. So, yeah, if you want to take the assault out, I think there's more than enough to move forward. We relied on the assaultive behavior because I think that's the most obvious.

THE COURT:  Okay. Now, the last question I have for you is how do you tie Ms. Chilcoat to this? What's your evidence that ties her in? I have--I think I understand what it is so far.

MR. LAWS:  Yeah.

THE COURT:  But I want to make sure I've got it all. You have her being married to Mr. Franklin. Him admitting that he did shut the gate.

MR. LAWS:  Yep.

THE COURT:  Her being married to him.

MR. LAWS:  Okay.

THE COURT:  It being her car.

MR. LAWS:  And trailer.

THE COURT:  And trailer. They being camping together in the area. And her views about grazing implied from her association with Great Old Broads against for Wilderness. And--

**Preliminary Hearing - November 2, 2017**

83

MR. LAWS:  Yes. So there's also the testimony, you heard Mr. Odell testify to the fact that photographs that he saw in his file from- that were associated with that complaint, were taken by somebody. And for scale purposes Ms. Chilcoat is in the photographs. And so they're there doing the same thing.

THE COURT:  So she was with someone having photographs taken on the permit?

MR. LAWS:  Yes. While camping in her trailer, her vehicle, admittedly camping there. She makes no reference in her complaint, nor was anybody else seen by Mr. Odell or law enforcement other than Ms. Chilcoat and Mr. Franklin. There's no--she refers to her husband in the complaint. There's no reference to anybody else. And nobody else was seen in the vicinity when law enforcement was called the second time on April 1st.

THE COURT:  Did I hear the evidence right that the corral where the water tank was, was about two miles from the place where the pond was, the dry pond?

MR. LAWS:  I don't know that you heard two miles. I know it's to the north. You can see the corral from that pond to the north. So I don't know that it's two miles. But I don't know that you've actually heard testimony as to the distance.

THE COURT:  Or maybe it was four miles. I heard something about the cattle would have to go four miles.

MR. LAWS:  So he testified that the pond to the north

**Preliminary Hearing - November 2, 2017**

84

was dry.

THE COURT:  Right.

MR. LAWS:  So Mr. Odell testified that in order for the cows to get water from someplace else, the next nearest water hole that had water in April of this year was four miles away.

THE COURT:  Okay.

MR. LAWS:  So that's what you heard.

THE COURT:  Okay. But that is some other water hole?

MR. LAWS:  Yes.

THE COURT:  Not the water tank that we heard about?

MR. LAWS:  No, the water tank here is inside the corral where the gate was leading into.

THE COURT:  Okay. So I don't really have any evidence about how far it is from the water tank inside the gate to this dry pond where she was photographed?

MR. LAWS:  It's a little bit to the north and you can see the pond from there. Mr. Odell said that he thought that they'd--he had gone up to that and turned around and come back.

THE COURT:  Okay. But I don't think I--all right. Thanks.

MR. LAWS:  Okay. Thank you.

THE COURT:  I'm not going to bind over on count four against Ms. Chilcoat, the false personal information. I just, I think the far, far more likely explanation for her having

Preliminary Hearing - November 2, 2017

85

exceeded to the officer's use of the last name Franklin is she just did not want to have a discussion she may have had many, many times about why if you're married do you not have the same last name and not to try to keep him from figuring out who she was.

With respect to count two against Ms. Chilcoat, the retaliation, the use of the word assault after having first just described more specifically it as accosting I think is just far, far more likely explained as just the looseness that people sometimes have with their language. And it gets annoying and it can be hurtful when someone says I was verbally assaulted. Well, we know legally there's no such thing as a verbal assault if there's not a threat of physical injury. But people do that. Not every one of them is playing fast and loose with the truth. They're just not up on the latest legal statutes.

So the only way you can proceed on that one is that-- and also when people make complaints to government agencies, they have to be able to make complaints to government agencies in good faith. So the only way, without that being considered retaliation, so the only way you can proceed on that one is a non-good faith, non-good faith information outside of the assault, the use of the word assault. You said you want to do it and so I'll let you have a crack at it. So, I'll bind over count two, but with that warning that that's what it's going to

86

be limited to that theory.

I guess Mr. Franklin, I want to make sure I get all the counts against him. I'm binding over on count one and count two. The only plausible explanation I've heard so far as to why he would--the most likely explanation as to why he would shut the gate is he wanted to shut the gate so that animals couldn't get to the water. There may be other explanations but they are not more likely. And I'm required, at this stage anyway, to take the State's inferences unless they are so unlikely as to be inherently improbable. So I'll bind him over on both counts.

That leaves the last question really whether there is enough tying Ms. Chilcoat to the actions of Mr. Franklin. And Mr. Laws has listed those for me. And I think, certainly for purposes of preliminary hearing, those are enough. So I'll bind her over on those counts as well.

So one and two on Mr. Franklin. One, two and three on Ms. Chilcoat. I find there's probable cause to believe the defendants did commit the offenses charged in the information and I order that they be held to answer to those charges in the district court.

I assume they want to get the arraignment over with now?

MR. WILLIAMS:  Yes, Judge.

MR. DELICINO:  If we could right now, that would be great.

**Preliminary Hearing - November 2, 2017**

87

THE COURT:  Okay. Do you waive the reading of the Information?

MR. DELICINO:  We do waive it.

THE COURT:  All right. Mr. Franklin and Ms. Chilcoat, each of you is charged with attempted wanton destruction of livestock in an animal enterprise, a second degree felony. How do you plead to that charge?

MS. CHILCOAT:  Not guilty.

MR. FRANKLIN:  Not guilty, Your Honor.

THE COURT:  Each of you is charged with trespassing on trust lands, animal enterprise, a class A misdemeanor. How do you plead to that charge?

MR. FRANKLIN:  Not guilty, Your Honor.

MS. CHILCOAT:  Not guilty.

THE COURT:  And then you, Ms. Chilcoat, are charged with retaliating against a witness. I think that's a third degree felony. Is that right?

MR. DELICINO:  That's correct, Your Honor.

MR. LAWS:  Yes.

THE COURT:  A third degree felony. How do you plead to that?

MS. CHILCOAT:  Not guilty, Your Honor.

THE COURT:  Each defendant pleads not guilty. Those pleas will be entered.

So how far do you want to go out for a trial?

**Preliminary Hearing - November 2, 2017**

88

MR. DELICINO:  Your Honor, before we get to the trial setting, can I raise one issue that I neglected to raise before? And I'm looking for the paperwork, but I believe that the statute that I had printed out, and maybe the State has a different application that I'm not aware of, I believe that the trespassing on trust lands statute that's cited in the information is a class B misdemeanor.

MR. LAWS:  It is, Your Honor. But when--just like with the count one, the animal enterprise statute specifically says that it enhances up one degree. That's why attempted wanton destruction--wanton destruction of livestock is a second degree felony. It's attempted, which would have dropped it to a third, but because it deals with an animal enterprise it bumps it back up to a second. That will be the same thing with regards to the trespass on state land.

MR. DELICINO:  And, Your Honor, they're totally different sections. I can see the State's argument and I understand the State's argument with respect to 76-6-111 because it comes in the same section as 76-6-110.

THE COURT:  Where's the animal enterprise statute?

MR. DELICINO:  76-6-110 is the enhancement provision and 76-6-111 is the wanton destruction.

Under the State's theory, if there were an assault that were committed, then you can try to apply this if there were an animal--on land following an animal enterprise. The

**Preliminary Hearing - November 2, 2017**

89

trespass comes in a totally separate section, which is 53C which governs trust lands. 53C-2-301, that is.

THE COURT: It's pretty broad language. A person who commits any criminal offense with the intent to et cetera, et cetera, et cetera is subject to an enhanced penalty. It's very broad. It doesn't say any criminal offense under this chapter. I'm not saying I won't look at this again, but with what you've given me so far I'm not going to set aside that. I'm not going to knock that down from an A to a B.

Okay. So how soon can you be ready for trial?

MR. DELICINO: What are the earliest dates available for trial?

THE COURT: Well, I guess we should ask how much time you need. Because if you just need a day, I mean, I have time this month. You probably don't want it.

MR. DELICINO: Well, and I think that the other--

THE COURT: Maybe you do. Maybe you're desperate to get this out of your client's hair. I'm setting most of my cases out in January or later. And I do, I really don't like to set a case for trial three or four times. I really would like to set it only once. And I'd like to give you the amount of time you'll need to be ready. So I encourage you to be generous with yourselves in allowing yourselves preparation time, taking into account the need of your clients to have this resolved promptly.

**Preliminary Hearing - November 2, 2017**

90

MR. DELICINO:  Your Honor, can I speak with Mr. Williams briefly and then my clients?

THE COURT:  Sure.

MR. DELICINO:  Or my client.

MR. WILLIAMS:  Judge, thank you for that time. Keeping in mind that our clients may need to address speedy trial issues with the Court, between our four calendars we're looking at a February date. We also probably need some time to address a couple of pretrial motions that I think would just be argument, not (inaudible) necessarily. If the Court could look at some February dates, that's our preference.

THE COURT:  How many days do you think it will take to try the case, Mr. Laws?

MR. LAWS:  I would say we could do it in one, Your Honor.

THE COURT:  What about you two?

MR. WILLIAMS:  I agree.

MR. DELICINO:  The other issue there is they're actually two separate cases right now.

THE COURT:  Right. And I guess I was assuming, and maybe shouldn't have, that we could consolidate them for trial.

MR. DELICINO:  If the State's motion is to join them, then I'd at least like to look at the motion and decide whether I'd like to respond.

THE COURT:  Uh-huh.

Preliminary Hearing - November 2, 2017

91

MR. DELICINO:  I'm not sure at this point whether I have an objection to it. As you can see, there's different defenses, not exactly similarly situated with respect to the tactical approach.

THE COURT:  Sure.

MR. DELICINO:  And so if the State wants to move to join them, then as long as I have the opportunity to reflect on that, do some research and talk to my client, then we may be able to consolidate them without objection. But I'm just not ready to make that decision yet.

MR. LAWS:  I'm fine with doing them separately, Your Honor.

THE COURT:  Okay. Well, are you guys fine with it?

MR. WILLIAMS:  I have no objection.

THE COURT:  Well, if the State doesn't even want to consolidate them and you two aren't asking me to, who am I? Well, I guess I mean it means spending two days with this issue instead of one. But I think I can suffer that.

Okay. So do you care which one you take first?

MR. LAWS:  It makes no difference to me, Your Honor?

MR. DELICINO:  If we could set Ms. Chilcoat's first, that would be our preference.

THE COURT:  Okay. All right. Starting in February, there's only one criminal case scheduled right now for February. And you probably don't want to be a second setting to

Preliminary Hearing - November 2, 2017

92

that. Because I'm assuming you guys think you're going to go to trial on this case. So the 1st, the 2nd, the 5th, the 15th, the 16th, the 19th, the 22nd, the 23rd, the 27th, the 28th, they're all available to be.

THE COURT CLERK:  (Inaudible).

THE COURT:  The 19th is not really available, President's Day.

MR. DELICINO:  Your Honor, it looks like the 5th and 6th work with my calendar and Mr. Williams' calendar.

THE COURT:  So it would be the 5th. Is that okay with you?

MR. DELICINO:  Oh, they wouldn't be set back and back?

MR. LAWS:  The 6th is juvenile court in this court.

MR. WILLIAMS:  Oh, I thought we were saying 5th and 6th.

THE COURT:  We don't have the courtroom available on the 6th. We can do one of them on the 5th but we can't schedule the other one on the 6th.

MR. DELICINO:  Would the next week be available, 12th and 13th?

THE COURT:  Not 12 and 13. 15 and 16 if the State doesn't mind trying them on consecutive days.

MR. DELICINO:  I'm going to be in a conference that I'm speaking at on the 16th.

**Preliminary Hearing - November 2, 2017**

93

THE COURT:  The 22nd and 23rd are also consecutive days.

MR. LAWS:  I'd prefer not to do three in a row, Your Honor.

THE COURT:  Oh, yeah, you have somebody scheduled on the 21st. Okay.

MR. WILLIAMS:  We prefer that.

THE COURT:  27th and 28th?

THE COURT CLERK:  27th is juvenile.

THE COURT:  The 27th is the courtroom's used by the juvenile court. But the 28th and the 1st of March. The 1st of March and the 2nd of March. For that matter the 31st of January and the 1st of February.

MR. DELICINO:  What were the--did you just mention the 31st of January?

THE COURT:  The 31st of January and the 1st of February are available to me.

MR. DELICINO:  Does those work for you?

(COUNSEL CONFER)

MR. WILLIAMS:  So Mr. Franklin would be the 1st of February, Your Honor?

THE COURT:  Yes.

MR. WILLIAMS:  That's fine.

THE COURT:  Okay. So these cases are scheduled for trial to a jury. Ms. Chilcoat, on January 31st; Mr. Franklin on

**Preliminary Hearing - November 2, 2017**

94

February 1. I'm setting one day for each trial. We'll start at 9:00 a.m. I'm going to ask the clerk to summon 50 jurors. I think we maybe need a few more because this has had a little publicity. So if anyway thinks that. I usually do 35, I'll go 50 on these. If anyone has a different idea, they can tell me. So 50's yours for each one.

I have stock jury instructions that I give and I read throughout the trial. If you want to ask my clerk for those, you can get them from her. I usually, all I need from counsel is elements and definition instructions. If there's something peculiar to this case that you think really needs to be covered in a separate instruction. Otherwise, it shouldn't--I really don't need a full set of jury instructions from both of you. And those full sets that lots of lawyers give me don't really fit in my format anyway. And if you look at what I've got and you think that's going to be awful, we'll work and, you know, please feel free to suggest something else. I just like to instruct jurors as the trial goes along instead of telling them what to do after they've already done almost all of it.

Unless you ask for it, I won't set any other dates. When I set a trial date I don't need to tell me at any other time you're serious. I assume you're serious right now.

MR. DELICINO:  Not at this time.

THE COURT:  Okay.

MR. WILLIAMS:  Thank you, Judge.

**Preliminary Hearing - November 2, 2017**

95

THE COURT:  Thanks.

The court will be in recess.

(PROCEEDING CONCLUDED)

**Preliminary Hearing - November 2, 2017**

96

C E R T I F I C A T E

I, Jayme Mackay, do hereby certify that the foregoing pages contain a true and accurate transcript of the electronically recorded proceedings and was transcribed by me to the best of my ability.

_____

Jayme Mackay

I, Kelly Thacker, do certify this transcription was prepared under my supervision and direction.

_____

Kelly Thacker

State of Utah vs.
Rosalie Chilcoat

Preliminary Hearing
November 2, 2017

**$**

**$5,000 (2)**
62:17;63:23

**A**

**ability (3)**
39:12,19;73:20
**able (7)**
28:2;33:10;37:15;
57:16;71:11;85:19;
91:9
**about- (1)**
18:7
**about-I (1)**
72:6
**about-kept (1)**
16:8
**absent (1)**
68:19
**Absolutely (3)**
10:20;16:23;68:10
**accepted (1)**
67:3
**accompanying (2)**
70:7;76:17
**accomplice (3)**
65:10,10;66:13
**accordance (1)**
66:10
**according (3)**
37:22;38:6;68:9
**accosted (4)**
69:22;70:5;71:16;
80:19
**accosting (1)**
85:8
**account (1)**
89:24
**accurate (1)**
71:24
**accusation (1)**
44:12
**accusations (3)**
57:20;65:24;70:13
**accused (4)**
31:2;44:8,9;71:22
**acknowledge (1)**
31:6
**acknowledged (3)**
16:21;71:13,21
**across (5)**
18:20;46:14,20;
50:25;54:19
**act (2)**
26:7,8
**action (5)**
26:1,5;65:11,17;
73:12
**action-I (1)**
71:8

**actions (3)**
64:22;65:9;86:12
**activities (2)**
64:9,23
**activity (4)**
44:9,16,18;71:22
**actual (1)**
68:5
**actually (16)**
6:17;9:21;10:5,7;
20:5;33:14;63:12;
64:7,9;66:5;67:4;
69:23;70:1;81:23;
83:22;90:19
**additional (4)**
29:19;49:20;61:18,
23
**address (3)**
4:15;90:6,9
**administration (1)**
64:11
**admissibility (1)**
49:13
**admission (1)**
49:17
**admit (4)**
17:14;21:20;48:24;
60:3
**admitted (3)**
50:20;57:25;63:7
**admittedly (1)**
83:9
**admitting (2)**
50:14;82:16
**advised (1)**
62:6
**advocates (2)**
60:18;61:10
**affecting (1)**
61:15
**affirmed (3)**
56:14;66:17,19
**afraid (1)**
67:13
**again (7)**
18:24;36:1;50:7;
56:12;73:21;74:8;
89:7
**against (15)**
24:7,8;43:5;65:3,4,
12,17,19;71:13;80:4;
82:25;84:24;85:6;
86:3;87:16
**agencies (2)**
85:18,19
**ago (1)**
31:14
**agree (5)**
46:7,7;72:19;77:7;
90:17
**agreement (2)**
7:21,22
**ahead (4)**

**11:5;18:11;23:16;**
**29:1**
**a-it (1)**
31:16
**alerted (1)**
33:25
**alerts (1)**
54:25
**allegation (7)**
43:25;69:20,20;
72:20;74:6;80:17;
82:1
**allegations (5)**
24:5,5;43:5;66:7;
71:12
**alleged (1)**
68:25
**allotment (4)**
6:3;8:2;20:19;
27:23
**allottee (2)**
25:10;66:5
**allow (5)**
23:25;25:17;39:10;
66:8;68:15
**allowed (4)**
26:15,19;66:2,17
**allowing (1)**
89:23
**almost (2)**
48:11;94:19
**Along (4)**
47:12;59:11;79:14;
94:18
**also-there's (1)**
72:23
**alter (2)**
62:16;64:16
**altercation (1)**
70:12
**altered (1)**
82:5
**always (1)**
30:15
**amendment (1)**
26:17
**among (1)**
62:23
**amount (1)**
89:21
**And- (1)**
82:25
**ANDERSON (1)**
4:2
**animal (16)**
62:13,19,21,22;
63:1,4;64:1,2,20;
65:2;87:6,11;88:9,13,
20,25
**animal-on (1)**
88:25
**animals (4)**
8:14;61:14;63:3;

**86:6**
**annoying (1)**
85:10
**answered (3)**
16:8;28:6;37:21
**anticipate (1)**
79:22
**any-did (1)**
15:14
**apologize (3)**
39:16;40:11;49:25
**apparent (2)**
58:17,25
**Appeals (2)**
76:10,12
**application (1)**
88:5
**apply (2)**
80:17;88:24
**appreciate (1)**
40:6
**approach (7)**
20:15;38:18;43:16;
47:19;50:18;57:1;
91:4
**approached (3)**
37:23;54:15;55:4
**approached- (1)**
77:6
**approaches (1)**
74:23
**approaching (1)**
47:2
**appropriate (3)**
25:11;46:5;67:8
**approximate (2)**
36:23;37:7
**approximately (3)**
11:24;35:7;54:3
**approximation (1)**
37:2
**April (38)**
6:10,11,14;8:25;
9:4,15,15,25;10:1,2;
13:24,25;19:21,21;
21:16;22:10;28:2;
29:2;33:17;39:5;40:5,
7;42:4,4;43:12;47:25;
52:11;53:18;57:19;
58:16;68:6,12,20,21;
73:25;79:6;83:15;
84:5
**arch (2)**
10:24;37:14
**arching (1)**
37:17
**area (14)**
5:25;11:15,25;
12:23;21:2;22:20;
37:3;48:11,14;65:5;
68:21,22,22;82:24
**aren't (2)**
81:19;91:16

**arguably (1)**
72:4
**arguing (2)**
74:8;77:25
**argument (9)**
66:12,13;73:19;
74:13;76:9;80:2;
88:17,18;90:10
**arguments (2)**
62:9;75:23
**arms (1)**
23:4
**around (22)**
9:22;10:7,24;11:6,
10,15;16:8;29:2,5;
30:15;36:20;38:6,11;
45:22;46:13;47:3,9,
17;51:15;52:5,6;
84:19
**arraignment (1)**
86:21
**arrival (1)**
54:24
**arrive (2)**
58:12,13
**arrived (13)**
16:15;35:20,21;
36:5;40:12;41:14;
45:6;52:12,15;54:11,
13;55:6,12
**aside (2)**
81:10;89:8
**asking-it's (1)**
6:17
**assault (34)**
23:2;57:20;65:23,
25;69:21,21,24;70:1,
2,8,10,15,16,24;71:2,
6;72:11;80:12,13,15,
17,18,19,20,20,24,25;
81:5;82:6;85:7,13,23,
23;88:23
**assault- (1)**
70:23
**assaulted (2)**
22:23;85:12
**assaultive (1)**
82:8
**asserted (1)**
44:8
**asserting (1)**
66:16
**assertion (3)**
26:5,7;44:1
**assertions (1)**
45:11
**associate (1)**
60:1
**associated (1)**
83:3
**association (7)**
68:3,13;76:1,4,5,6;
82:25

**assume (5)**
9:8;17:19;33:25;
86:21;94:22
**assumed (2)**
41:23;75:14
**assuming (3)**
30:17;90:20;92:1
**attached (1)**
67:10
**attempt (4)**
55:10;62:14,15;
66:25
**attempted (6)**
62:12;63:5;65:1;
87:5;88:10,12
**attention (1)**
14:13
**attorney (2)**
31:5;56:5
**authenticated (1)**
21:6
**authorization (4)**
7:12,18;64:5,19
**authorized (2)**
64:10,24
**available (6)**
89:11;92:4,6,17,20;
93:17
**avenues (2)**
73:6,6
**aware (6)**
40:19;41:2;59:17;
62:5;76:8;88:5
**away (4)**
35:8;39:13;51:24;
84:6
**awful (1)**
94:16

## B

**baby (1)**
29:4
**back (23)**
10:3;11:6;14:16;
18:16;21:19;29:8,13;
30:14;31:16;33:22;
38:11,12;42:4,25;
47:6,17;52:25;55:23;
58:6;84:19;88:14;
92:12,13
**bad (1)**
75:4
**badgering (1)**
15:23
**based (8)**
11:8;27:22;48:20;
59:7;60:22,22;63:9,
19
**basically (1)**
29:14
**basis (1)**
46:5

**bear (1)**
78:7
**become (1)**
29:13
**beef (3)**
5:17,20;63:3
**BEGAY (18)**
3:9;39:24;40:11,11,
12,19,24;52:12,23;
53:6,11,14;69:3;
75:13,13;76:21;79:5;
80:14
**Begay's (2)**
74:10;80:13
**behalf (4)**
4:10;22:14;62:1,3
**behavior (2)**
70:24;82:8
**be-I (1)**
72:19
**believes (1)**
73:13
**believing (1)**
65:13
**belongs (1)**
63:20
**better (2)**
47:1;67:13
**beyond (2)**
35:2;54:19
**bind (7)**
69:1;75:19;79:3;
84:23;85:24;86:10,14
**binding (1).**
86:3
**bindover (2)**
67:21;69:5
**bindovers (1)**
68:15
**birth (2)**
56:8;57:14
**bit (7)**
8:5;11:13;12:23;
16:24;30:14;43:13;
84:17
**BLM (30)**
6:3,6;7:25;17:16;
18:19;19:8;20:19;
21:12;23:7,14;24:14,
24;25:5,5,13,24;27:5;
65:4;66:8;68:18,19;
69:13;70:8,24;71:13;
73:9,10;80:14;81:2;
82:4
**blocked (4)**
43:9;44:3,3;71:21
**blocking (1)**
39:12
**blow (1)**
9:18
**blown (1)**
10:5
**bluff (1)**

54:7
**body (1)**
40:19
**boot (1)**
50:24
**Both (8)**
7:3,21;62:6;64:21;
67:21;77:9;86:10;
94:13
**bottom (1)**
43:20
**break (2)**
58:17;59:12
**breaks (1)**
11:17
**breed (1)**
29:13
**briefly (1)**
90:2
**broad (2)**
89:3,6
**Broads (10)**
59:14,17,23;60:1,
10,14,17;67:9;76:5;
82:25
**brought (2)**
20:24;33:7
**brown (1)**
54:18
**bumps (1)**
88:13
**burden (7)**
72:22;74:1,4;75:16,
17;78:15,19
**business (5)**
21:8;60:17;62:23,
23;63:2
**butcher (1)**
5:13
**butt (1)**
6:4
**by- (1)**
69:22

## C

**cable (2)**
14:3,11
**calendar (2)**
92:9,9
**calendars (1)**
90:7
**calf (2)**
29:8,15
**Call (11)**
4:24,25;19:6;23:21;
52:22;53:22;54:1,2;
71:4,5;79:7
**called (6)**
6:21;10:12;44:15;
45:9;79:8;83:14
**calls (3)**
22:11;23:9;27:14

**calves (2)**
29:4,11
**calving (1)**
29:3
**came (12)**
9:24,25;13:2,5;
19:25;31:6;38:11,12;
42:12,15;47:2;76:18
**camera (13)**
12:23;13:1,4,6,16;
15:8,10,25;40:20;
42:11,14,17;50:8
**camping (4)**
68:22;82:23;83:8,9
**can (57)**
5:8;6:25;8:17;
12:17,23;13:8;17:6,
13;18:6,14;23:18;
24:2,11,13;27:18;
38:18;41:17;42:19;
48:16;49:3;50:18;
51:25;52:20;53:11;
55:18,25;57:2;60:22;
61:22;66:9;68:1,3,4,
15;69:4;71:1;74:13,
23;75:3;79:1;81:18,
23;83:20;84:17;
85:11,17,21;88:2,17,
24;89:10;90:1;91:2,
18;92:18;94:5,9
**can't (8)**
36:19,25;42:18;
74:1;78:7,9;81:21;
92:18
**candid (1)**
80:3
**captured (1)**
50:7
**captures (1)**
47:24
**car (7)**
11:6;38:6,9;51:2;
68:8;74:19;82:21
**card (1)**
13:6
**care (1)**
91:19
**carve-out (3)**
71:25;72:1,22
**case (14)**
26:4;33:10;60:15;
61:4;63:7;73:19;
75:15;76:2;80:6;
89:20;90:13;91:24;
92:2;94:11
**cases (6)**
4:4;76:9,11;89:19;
90:19;93:24
**catch (2)**
14:13,14
**cattle (17)**
5:21,24;6:13;7:12,
18,25;8:20;9:5;10:3;

28:1,19;60:17;63:1,3;
64:17,17;83:24
**cause (7)**
62:16,20;63:21;
65:16;72:18;76:13;
86:17
**caused (1)**
50:23
**causes (1)**
73:1
**causing (3)**
66:5;73:7,11
**cell (1)**
34:24
**certain (1)**
43:4
**certainly (3)**
42:8;75:16;86:13
**cetera (3)**
89:4,5,5
**chain (4)**
9:17,22;10:6,7
**chance (3)**
22:5;49:16;72:7
**change (3)**
24:11;64:16;77:21
**changed (3)**
26:17;63:13;82:5
**chapter (1)**
89:6
**charge (4)**
65:3;81:22;87:7,12
**charged (9)**
6:18;32:18;33:4;
62:12;64:21;86:18;
87:5,10,15
**charges (1)**
86:19
**check (4)**
13:4;56:17;57:11,
13
**checkerboarded (1)**
6:6
**Chilcoat (62)**
4:5,8;14:9;15:20;
17:23;18:6;19:17;
21:3;22:9,14,21;23:3;
24:7;30:11;42:9;43:8;
44:3;53:21;55:15,17,
21;56:18,25;57:4,8,
16,17,19;59:22;62:3,
4;63:20;65:1,4,13;
66:16;67:22;68:5;
69:1,11;70:4;71:11;
72:3,3;73:23;74:12;
75:7;80:5,23;82:11;
83:4,11;84:24;85:6;
86:12,17;87:4,8,14,
15,22;93:25
**Chilcoat's (4)**
56:21;57:4;65:4;
91:21
**chose (1)**

State of Utah vs.
Rosalie Chilcoat

Preliminary Hearing
November 2, 2017

52:8
**circumstances (4)**
74:24;76:17,18;
77:12
**citation (1)**
73:17
**cited (1)**
88:6
**claim (2)**
25:21;81:12
**claimed (2)**
22:23;63:8
**claiming (3)**
72:13,17;80:12
**claims (3)**
63:7;65:23,25
**clarification (1)**
17:25
**clarify (1)**
18:6
**class (2)**
87:11;88:7
**cleaned (1)**
9:10
**cleaning (1)**
22:25
**clear (3)**
65:21;74:7,10
**cleared (1)**
45:10
**Clearly (2)**
73:24;79:9
**CLERK (4)**
92:5;93:9;94:2,8
**client (5)**
73:23;75:24;77:14;
90:4;91:8
**client's (1)**
89:18
**clients (4)**
17:20;89:24;90:2,6
**close (8)**
42:5,9;51:7,21;
58:1;63:18;64:16;
77:14
**closed (15)**
10:11;12:1;13:4;
33:23;35:6,11;40:13;
51:5,12;58:8;63:17;
76:20;77:19,22;78:9
**closely (2)**
51:20;80:23
**closer (1)**
31:1
**close-you (1)**
47:2
**closing (12)**
12:16;15:20;16:6;
34:4,5;57:23;61:2;
62:8;63:7,15;64:15;
77:14
**clothing (1)**
62:24

**Code (2)**
62:22;64:9
**Colorado (2)**
31:16;57:17
**coming (4)**
10:3;13:12;47:6;
48:7
**comment (1)**
16:2
**commit (1)**
86:18
**commits (1)**
89:4
**committed (1)**
88:24
**complained (1)**
27:13
**complaining (1)**
18:21
**complaint (17)**
19:6;20:16;24:20,
24;27:22;43:23;
69:12,16,16;70:12;
71:12,24;81:6;82:1;
83:3,10,12
**complaints (3)**
22:22;85:18,19
**complete (1)**
11:21
**completion (1)**
47:13
**compliance (1)**
72:17
**compliant (1)**
74:24
**computer (1)**
57:15
**concern (4)**
28:1;29:1;67:9;
74:16
**concerns (1)**
74:6
**concluded (2)**
65:15;95:3
**conclusion (5)**
23:10;24:12;27:15,
18;46:8
**concrete (1)**
69:4
**conditions (1)**
81:16
**conduct (2)**
26:11;76:16
**conducted (1)**
57:13
**CONFER (1)**
93:19
**conference (1)**
92:24
**confirm (1)**
15:7
**confusion (1)**
18:7

**conjecture (2)**
68:13,16
**connection (3)**
59:20,22;67:8
**connections (1)**
63:19
**consecutive (2)**
92:23;93:1
**consequences (5)**
24:3,14;25:2;26:3;
32:7
**conservative (1)**
7:8
**considerable (1)**
75:12
**considered (1)**
85:20
**consistent (1)**
52:10
**consolidate (3)**
90:21;91:9,16
**constitute- (1)**
72:20
**constitutional (3)**
26:17;69:15;72:5
**construction (1)**
24:4
**contact (3)**
14:9;53:20;57:25
**context (1)**
70:3
**continue (4)**
38:3,4;66:8,9
**conversation (7)**
15:14,14,22;16:13;
40:16;44:14;55:25
**conversations (1)**
44:22
**convey (1)**
70:11
**conveyed (1)**
71:3
**conveys (1)**
69:20
**convicted (1)**
32:8
**cooperate (1)**
73:4
**copies (1)**
20:24
**copy (1)**
21:7
**coral (1)**
30:24
**corner (1)**
11:20
**corners (1)**
36:20
**corral (28)**
8:5,6,7,8,11,11;
9:25;12:8;14:6;15:25;
16:13,17,25;28:10;
30:23;33:18,18;34:5;

36:6;40:13;54:11;
57:18;58:6;59:3;
79:16;83:17,20;84:13
**corrals (1)**
8:9
**correcting (1)**
40:6
**correctly (2)**
11:9;30:22
**correspondence (4)**
21:1,2,15;25:9
**couldn't (4)**
9:18;28:19,22;86:6
**Counsel (6)**
4:5,21;39:25;80:10;
93:19;94:9
**count (30)**
24:7;36:25;64:7;
65:1,12;66:11,15;
68:2;69:6,6,18;73:21,
22;74:2,3,4,4,5;75:18;
79:21;80:10;81:1,21,
24;84:23;85:6,25;
86:3,3;88:9
**counting (1)**
53:17
**counts (7)**
67:22,22;75:20;
80:4;86:3,10,15
**COUNTY (10)**
4:1;5:22,25;10:15;
31:5;34:1;45:9;53:14;
56:5;68:23
**couple (10)**
13:7;26:24;27:25;
32:16;42:15;50:21;
59:18;70:20;80:10;
90:9
**course (4)**
29:14;44:21;59:19;
60:8
**COURT (201)**
4:3,13,15,19;6:23;
7:3;11:3;12:4;13:22;
17:5,12,19,25;18:2,8,
12,25;20:5,8,11,13;
21:10,13,23;22:2,13,
15;23:11,16,24;24:9,
12,16,23;25:3,12,16,
19,23;26:4,7,10,15,
25;27:5,7,16;28:18,
21,24;30:25;31:21;
33:9,14;35:10;36:13,
15,23;38:19;41:10,15,
17,21,24;43:17;46:7,
22,25;47:6,8,11,15;
48:15;49:2,7,9,11,15,
18;50:14,16;51:7;
52:18,20,24;53:3;
60:4,6;61:7,22,25;
62:8;66:21,23;67:2,
12,18,23,25;69:12,23;
70:1,8,15,18,20,22,

24;71:1,5,8,15,18;
72:6;74:5,13;75:1,3,6,
8,19,21;76:8,8,9,12,
12,24;77:1,7,10,13,
18,24;78:7,12,19,25;
79:14,22,24;80:1,21;
81:8,14;82:10,15,19,
21,23;83:6,16,23;
84:2,7,9,11,14,20,23;
86:20;87:1,4,10,15,
20,23;88:20;89:3,13,
17;90:3,7,10,12,16,
20,25;91:5,13,15,23;
92:5,6,10,14,14,17,
22;93:1,5,8,9,10,11,
16,22,24;94:24;95:1,2
**court- (1)**
33:7
**Court's (1)**
74:16
**courtroom (3)**
4:21;31:22;92:17
**courtroom's (1)**
93:10
**cover (1)**
18:8
**covered (1)**
94:11
**covers (1)**
73:3
**cow (3)**
9:19;35:23;36:14
**cowboys (1)**
70:6
**cows (28)**
5:13,13,17;6:8,10,
15;8:24;9:14;28:2,6,
15;29:3,4,12,13;
35:17,21;36:3,5;41:1,
5;52:12;54:2;58:3;
79:7,8,10;84:4
**coyotes (1)**
29:11
**crack (1)**
85:24
**created (1)**
21:7
**crime (4)**
32:18,22;33:12;
63:14
**criminal (9)**
44:9,16,18;71:4,6,
22;89:4,6;91:24
**critical (1)**
69:7
**crop (1)**
29:15
**cross (3)**
18:8;49:14;61:20
**crossed (1)**
49:8
**Cross-Examination (4)**
3:4,5;29:21;42:2

**crossing (2)**
48:11,14
**cut (2)**
35:25;64:7

## D

**daily (1)**
8:18
**dairy (1)**
5:19
**Dalton (8)**
14:1;15:1;39:16;
44:2,23;54:13;55:7,
14
**damage (1)**
62:19
**damaged (2)**
63:23,24
**date (8)**
12:16;21:15;40:4,5;
56:8;57:14;90:8;
94:21
**dated (1)**
65:21
**dates (3)**
89:11;90:11;94:20
**daughter (3)**
35:2;50:1,11
**daughter's (1)**
34:24
**day (21)**
10:1;13:3;14:9;
19:25;23:3;30:7,10;
37:6;40:20;43:10,12;
51:2;52:11;53:21;
57:18;58:16;65:21,
25;89:14;92:7;94:1
**days (8)**
29:14;42:15;54:24;
65:22;90:12;91:17;
92:23;93:2
**deal (1)**
31:16
**dealing (2)**
62:13;64:1
**deals (1)**
88:13
**death (2)**
62:16;63:21
**debate (1)**
58:8
**debunk (1)**
75:4
**decide (6)**
17:14;23:12;49:2;
80:22;81:11;90:23
**decided (4)**
24:24;25:13;76:12;
80:21
**decision (1)**
91:10
**defendant (7)**

62:14;63:6;64:5;
65:13;72:25;74:9;
87:23
**defendants (5)**
4:4;17:2;59:20;
64:21;86:18
**defense (2)**
61:25;80:10
**defenses (1)**
91:3
**defined (1)**
62:21
**defines (1)**
62:22
**definition (3)**
63:4;80:18;94:10
**degree (5)**
87:6,17,20;88:10,
12
**dehydration (1)**
29:12
**Delicino (68)**
3:5;4:7,7,17;6:20;
11:2;13:20;17:4,10;
18:3,9;21:4,22;22:11,
14;27:14;41:23,25;
42:3;43:16,18;45:13;
52:17;60:5,25;61:3,
21;62:3;67:25;68:1;
69:25;70:3,10,18,21,
23;71:1,7,10,17,20;
72:21;74:15;75:3,25;
80:2;86:24;87:3,18;
88:1,16,21;89:11,16;
90:1,4,18,22;91:1,6,
21;92:8,12,20,24;
93:14,18;94:23
**deny (1)**
49:3
**Department (1)**
10:15
**deposition (1)**
31:18
**deputies (1)**
38:21
**deputy (24)**
34:11,13,15;35:1,
20;39:22,24;40:11,
23;50:2,3,9,10,23;
52:11,22;53:6,11,15;
75:13;76:21;79:5;
80:12,14
**derogatory (1)**
71:19
**describe (1)**
80:24
**described (2)**
35:6;85:8
**description (2)**
55:1,5
**designation (1)**
41:14
**designed (1)**

8:10
**desperate (1)**
89:17
**destroyed (1)**
22:24
**destruction (7)**
62:12;63:5;65:2;
68:2;87:5;88:11,22
**destruction-wanton (1)**
88:11
**details (3)**
71:9,10;74:19
**diagonally (1)**
54:19
**didn't (22)**
9:11;20:7;25:20;
38:22;39:10,19;
41:25;42:5,8;46:19;
50:11;51:25;55:22;
67:5,7,14;69:1,3;
73:16;76:24;77:19;
79:15
**did-so (1)**
23:1
**die (1)**
29:11
**difference (1)**
91:20
**differences (1)**
81:18
**different (10)**
34:9;44:20;50:6;
75:24,24;80:18;88:5,
17;91:2;94:5
**difficult (1)**
73:18
**dilapidated (1)**
8:10
**Direct (6)**
3:3,10;5:6;25:4;
53:9;73:12
**direction (4)**
35:12;48:1,13;
78:14
**director (6)**
59:23;60:1;61:5,6;
64:5,19
**directs (1)**
65:16
**discuss (1)**
25:10
**discussed (1)**
64:2
**discussing (1)**
58:7
**discussion (1)**
85:2
**dishonesty (1)**
33:14
**dispatch (7)**
10:13,14;15:24;
33:25;44:14,15;53:25
**dispatched (1)**

53:22
**disregarded (1)**
70:16
**distance (4)**
9:5;12:4;35:15;
83:22
**distorting (1)**
81:20
**district (1)**
86:20
**disturb (1)**
10:12
**disturbing (1)**
61:14
**document (11)**
18:19;19:3,4;20:21,
23;21:5,5,6,8,8;50:20
**doesn't (9)**
20:5;40:17;46:25;
75:16,17;77:21;89:6;
91:15;92:23
**don't (49)**
16:10;17:12;18:8,
13;20:6,8;26:14;
28:21;29:13,19;
30:15,17,22;31:19;
32:6;33:4;37:20;
38:25;41:19;42:21;
44:13;46:7;52:16,17;
53:4;56:11;59:12;
60:2;61:3,18,20;72:6,
9,10;74:14;75:14;
78:19;83:19,21,21;
84:14,20;89:15,19;
91:25;92:17;94:13,
14,21
**done (9)**
22:1;26:1;31:11;
45:23;53:1;60:2;
67:11;78:22;94:19
**door (1)**
56:2
**double (1)**
37:11
**down (18)**
10:8;12:19;28:2;
31:8;38:3,5;52:20;
58:13;61:22;63:8,11,
15;65:7,16;73:4;76:6;
79:5;89:9
**dozer (1)**
9:10
**drawn (1)**
46:9
**drink (3)**
8:14,21;29:6
**drive (3)**
38:5;39:12;80:16
**driver's (4)**
56:2;57:11,13,17
**drives (1)**
39:6
**driving (2)**

42:21;47:14
**dropped (1)**
88:12
**drove (4)**
11:6;15:1;38:9;
52:4
**dry (6)**
9:10;19:16;29:2;
83:18;84:1,16
**duly (2)**
5:4;53:7
**duplicate (1)**
75:22
**Durango (1)**
31:16
**during (6)**
8:16;20:8;38:21;
44:21;56:20;57:22

## E

**earlier (2)**
19:25;50:1
**earliest (1)**
89:11
**early (1)**
10:2
**easily (1)**
59:8
**educated (1)**
60:12
**effect (2)**
26:11;28:18
**either (3)**
16:1;57:19;59:4
**elected (1)**
62:6
**element (1)**
6:18
**elements (1)**
94:10
**eliminate (1)**
64:17
**else (10)**
15:19;57:23;58:4;
65:9;66:19;83:10,13,
13;84:4;94:17
**elucidated (1)**
74:2
**emaciated (1)**
29:13
**email (2)**
42:25;43:25
**embellished (1)**
82:5
**embellishing (1)**
81:4
**employees (1)**
76:20
**empty (4)**
9:11,12;17:1,2
**enclosure (1)**
50:12

State of Utah vs.
Rosalie Chilcoat

Preliminary Hearing
November 2, 2017

encounter (4)
31:12;39:7;81:11, 15
encountered (3)
13:1;30:12;39:9
encounters (1)
76:19
encourage (1)
89:22
end (4)
10:24;33:9;55:15; 65:7
enforcement (3)
79:8;83:11,14
enhanced (1)
89:5
enhancement (2)
63:1;88:21
enhances (1)
88:10
enough (12)
21:13;51:10;67:21; 68:24;69:1;81:8,12, 14,16;82:7;86:12,14
ensues (1)
40:16
entails (1)
73:3
entered (2)
41:1;87:24
enterprise (15)
62:13,19,21,22; 63:1,4;64:1,2;65:2; 87:6,11;88:9,13,20,25
entirety (1)
39:3
entitled (2)
69:10,11
entrance (1)
49:10
enumerated (1)
75:20
environment (1)
29:2
equipment (2)
58:22;59:1
establish (3)
24:23;25:19;27:2
established (1)
28:22
estate (1)
31:17
estimate (2)
6:13;7:7
et (3)
89:4,4,5
even (7)
18:14;38:16;67:6; 73:24;74:11;75:13; 91:15
evening (2)
10:3;33:22
everyone (1)

69:12
evidence (22)
10:12;21:21;25:4; 34:21;50:21;65:3,21; 67:21;68:5,12;69:4; 73:23;75:24;76:19; 77:1;78:3,22;79:15; 82:3,12;83:16;84:14
evil (1)
80:7
exact (2)
20:3;43:14
exactly (4)
72:3;75:3;81:3; 91:3
Examination (8)
3:3,6,7,10;5:6; 45:16;49:23;53:9
examining (1)
30:16
exceeded (1)
85:1
exception (1)
26:13
excess (2)
7:9;63:23
exclusionary (1)
4:18
excuse (4)
44:23;75:6,8,13
executive (2)
61:5,6
exercised (1)
69:14
Exhibit (16)
13:8,19;20:21; 21:21,23;27:20; 29:20;48:25;49:18, 19,22;57:2;60:3; 69:22,22;75:7
exhibits (1)
82:4
existing (1)
19:9
exists (1)
35:14
exit (1)
49:10
exited (3)
37:23;38:11;41:1
exits (1)
38:7
expect (1)
71:11
experience (1)
56:11
expert (1)
48:14
explain (5)
12:17,23;16:5; 55:18,25
explained (1)
85:9

explanation (3)
84:25;86:4,5
explanations (1)
86:7
explicit (1)
72:25
eyes (2)
60:20,21

## F

Facebook (7)
56:21,23,24;57:3,3; 59:24;75:8
facilities (1)
8:20
facility (2)
11:25;68:23
fact (8)
25:20;37:6;38:5; 44:11;64:22;65:10; 71:14;83:2
facts (2)
76:22;77:11
factually (1)
81:20
failure (1)
26:7
fair (4)
36:12;37:8;71:15, 20
faith (3)
85:20,22,22
false (14)
24:6,20;32:1;66:6, 15,20;69:19,20,20; 70:13;72:10;74:7; 82:1;84:24
familiar (4)
11:24;13:9;47:21; 59:13
familiarized (1)
60:9
far (15)
9:8;11:25;46:11; 63:14;73:8;78:13; 82:13;84:15,25,25; 85:9,9;86:4;87:25; 89:8
farmer (1)
78:13
farmers (1)
77:2
farther (2)
37:18;72:21
fast (2)
39:5;85:14
faster (1)
15:2
February (8)
90:8,11;91:23,25; 93:13,17,21;94:1
federal (2)

16:19,22
feed (1)
33:3
feel (2)
27:10;94:17
feet (7)
35:16,17,18;37:8,8, 11,15
felony (5)
33:11;87:6,17,20; 88:12
female (1)
18:14
fence (29)
9:18;11:18,19; 12:11,19,20;28:10; 35:7;38:3,10;40:24; 41:12;47:9,10,12,12; 58:17;59:12;63:9,11, 12,16;77:15,20,20; 78:1,4;79:14,16
fences (1)
59:11
few (5)
31:9;37:14;39:21; 54:24;94:3
Fifty (1)
12:2
figure (2)
24:16;67:14
figuring (1)
85:4
file (9)
18:20;20:19,19; 21:11;43:1;66:4; 69:15;81:7;83:3
filed (1)
64:8
filing (2)
69:12;71:12
find (6)
9:25;10:17;54:12; 59:20,22;86:17
fine (8)
7:1;41:6;71:9,10; 77:10;91:11,13;93:23
first (21)
4:24;5:4;15:4,11; 38:1;40:9;48:4;53:7; 54:18;55:12,12;56:6; 57:24;67:6,25;74:10, 18;80:24;85:7;91:19, 21
fit (3)
46:19;63:4;94:15
flying (1)
74:14
focus (2)
43:20;73:20
follow (2)
45:19;51:14
following (2)
59:16;88:25

follows (3)
5:5;53:8;66:3
follow-up (1)
45:15
food (2)
62:24;63:3
footprint (4)
19:9;50:22,25;51:1
footprints (16)
10:18,23,25;18:4, 13,14;34:17;37:22; 38:1,12;46:13,23; 47:3;49:4;51:17,23
for- (2)
5:16;10:13
forgot (1)
39:17
forgotten (1)
24:9
for-it's (1)
5:17
format (1)
94:15
former (2)
60:1;61:5
forward (3)
39:5;81:22;82:7
found (2)
10:10;13:3
foundation (6)
6:16,20;7:2;17:4; 46:5;50:13
founded (1)
25:4
four (15)
9:5;29:5,7;55:6; 66:15;67:22;74:5; 75:18;80:4;83:23,24; 84:5,23;89:20;90:7
frame (6)
8:3;19:18;20:1,3,9; 53:24
Franklin (69)
4:4,10;14:9;15:20; 16:13,16,18;19:13; 23:3;30:1,8;39:6; 40:13,23;42:8;45:4, 10;52:11;53:21; 54:14;55:7,13,19,23; 56:2,7,9,13,19,25,25;58:9; 62:1,5,11,12,14;63:7, 17;65:3,6,21;66:12, 17,18;67:3,22;69:2; 74:11,12;75:14;76:3, 19;77:5;82:16;83:11; 85:1;86:2,12,16;87:4, 9,13;93:20,25
Franklin's (2)
44:3;65:9
Franklin-Mr (1)
55:19
free (2)

26:20;94:17
**freely (1)**
  35:21
**free-other (1)**
  61:14
**fresh (1)**
  51:21
**from- (1)**
  83:3
**front (2)**
  10:23;51:11
**full (3)**
  23:11;94:13,14
**further (5)**
  24:19,20;41:19;
  45:14;63:8

## G

**game (1)**
  15:8
**garage (1)**
  54:4
**gate (79)**
  9:13,16,17;10:2,4,
  10,23,24;11:10;12:1,
  6,10,13;13:3;15:20,
  25;16:4,6;28:2,10;
  33:19,23;34:4,6;35:6,
  11;36:23;37:23;
  38:12;40:13,15;
  41:11;42:5,6,9;45:21;
  46:12;47:3,3,4,4,4,17;
  51:5,12;52:15;57:23;
  58:1,8,10;61:2;63:7,
  10,10,15,17,18;64:15,
  16;68:11;76:21,22;
  77:14,14,19,22;78:1,
  2,3,8,8,17;79:9,11;
  82:17;84:13,15;86:6,
  6
**gates (3)**
  8:17;58:2;64:24
**gather (1)**
  22:4
**gave (6)**
  34:13;56:5,7;74:9,
  10,11
**generally (3)**
  8:21,22;76:15
**generous (1)**
  89:22
**gentleman (4)**
  7:13;14:20;16:3;
  30:2
**gets (4)**
  15:18;71:9;76:6;
  85:10
**gin (1)**
  14:2
**given (7)**
  32:17;49:15;73:16;
  74:23;78:3,25;89:8

**gives (2)**
  7:17;8:2
**giving (4)**
  66:20;74:6,18,19
**glance (1)**
  38:24
**goes (8)**
  24:4,5,19,20;61:1;
  65:15;69:7;94:18
**Good (5)**
  29:23,24;41:15;
  77:21;85:20
**government (2)**
  85:18,19
**governs (1)**
  89:2
**Gradle (1)**
  59:17
**graze (1)**
  66:9
**grazing (5)**
  8:16;60:16,24;
  61:10;82:24
**Great (11)**
  59:13,23;60:1,10,
  14,17;67:8;69:7;76:5;
  82:25;86:25
**greatoldbroadsorg (1)**
  61:9
**ground (1)**
  25:13
**grounds (1)**
  23:23
**group (5)**
  43:8;44:1,1,9;54:15
**grouped (1)**
  54:17
**guess (15)**
  5:15;7:12;9:15;
  19:6;24:1,9,16;25:3;
  60:14;61:10;79:21;
  86:2;89:13;90:20;
  91:17
**guilt (3)**
  68:3,13;76:1
**guilty (6)**
  87:8,9,13,14,22,23
**guy (1)**
  78:7
**guys (4)**
  16:4;52:24;91:13;
  92:1

## H

**habitat (1)**
  22:24
**had- (1)**
  17:16
**hadn't (1)**
  52:14
**had-there (1)**
  64:15

**hair (1)**
  89:18
**halt (2)**
  62:18;64:13
**hand (2)**
  21:12,25
**hang (1)**
  29:5
**happen (2)**
  47:18;73:5
**happened (8)**
  13:15;44:6,11,25;
  55:18;64:8;70:11;
  73:18
**harm (10)**
  65:16,16;66:5;
  72:25;73:1,1,7,7,10,
  11
**hasn't (3)**
  21:5;25:1;28:8
**have-did (1)**
  58:9
**have-I (1)**
  82:12
**haven't (6)**
  27:20;29:8;43:13;
  68:11;74:3;80:21
**have-pulling (1)**
  74:21
**he'll (2)**
  17:13;53:4
**he's (13)**
  12:6;17:5,11,18;
  24:2,13;25:25;28:6,
  12;48:13;49:5;72:8,
  10
**head (1)**
  7:16
**hear (5)**
  20:7;23:11;76:24;
  80:19;83:16
**heard (16)**
  30:7,10;62:25;63:6,
  9,19,22;64:18;65:23;
  83:2,19,22,23;84:8,
  11;86:4
**hearing (7)**
  23:24;31:4,23;62:5,
  7;68:14;86:14
**hearings (6)**
  4:3;23:25;26:16,18,
  19,20
**hearsay (12)**
  22:12,16;23:22,25;
  24:10,15;25:24;
  26:12,13,16,18,19
**heavy (1)**
  75:16
**held (1)**
  86:19
**help (7)**
  16:4;20:5;43:19,22;
  48:3;77:2,3

**helped (1)**
  16:11
**helping (3)**
  16:5,9;78:13
**helps (2)**
  48:1,4
**Here's (1)**
  29:20
**he-when (1)**
  77:5
**highly (2)**
  61:1,6
**highway (6)**
  45:5;54:3,4,8,10;
  71:23
**him- (1)**
  24:11
**Hofheins (1)**
  21:2
**Hofheins-you've (1)**
  22:5
**hold (2)**
  7:10;8:25
**holder (3)**
  7:10;25:10;27:10
**hole (4)**
  38:12;45:21;84:5,9
**holes (1)**
  9:6
**home (1)**
  80:16
**honed (1)**
  74:5
**honest (1)**
  36:25
**Honor (59)**
  4:7,9,12,14,17,25;
  6:19;7:5;12:8;13:18;
  17:17;18:3,23;20:10;
  21:4,20,25;24:8;
  26:14;29:20;33:8;
  42:1;43:16;45:14,14;
  48:10,24;49:5,20;
  52:19,22;60:2;61:1,
  17,24;62:1,10,11;
  67:17,19,24;68:1;
  69:11;75:25;81:25;
  87:9,13,18,22;88:1,8,
  16;90:1,15;91:12,20;
  92:8;93:4,21
**HONORABLE (1)**
  4:2
**hooked (1)**
  9:18
**hopefully (1)**
  30:15
**hot (1)**
  29:2
**hours (1)**
  29:9
**hurdle (1)**
  76:7
**hurdles (1)**

73:18
**hurtful (1)**
  85:11
**husband (5)**
  70:5;74:20,22;
  75:11;83:12
**husband's (1)**
  74:18

## I

**I'd (14)**
  13:18;21:22;24:9;
  25:3;31:11;37:15;
  72:7;74:1,15;75:19;
  89:21;90:23,24;93:3
**I'll (22)**
  21:19,25;23:1,11,
  12,22;30:18;39:17;
  49:2,12,13,18;50:14,
  16;62:10;80:1,3;
  85:24,24;86:10,14;
  94:4
**I'm (61)**
  6:17;7:1;8:16;12:4;
  13:7;18:24;20:7,10,
  12,15,20;21:4;22:1,4;
  24:16;26:20;28:11;
  29:24,25;30:16;31:2;
  36:18;37:17;41:11,
  21;43:13,20;45:19;
  46:25;48:17;49:15;
  50:11;52:17;53:15;
  62:5;64:1,8;76:24;
  78:20,20;80:3;81:10,
  17,17;84:23;86:3,8;
  88:3,5;89:7,8,8,18;
  91:1,9,11;92:1,24,25;
  94:1,2
**I've (11)**
  30:21,23,23;53:15;
  59:6;60:2;61:8;74:2;
  82:15;86:4;94:15
**I-all (1)**
  84:20
**idea (3)**
  27:19;79:19;94:5
**identified (1)**
  55:13
**identify (6)**
  4:5;20:21;55:10,11,
  14;57:2
**identifying (1)**
  55:17
**identify-or (1)**
  13:9
**Ill (4)**
  34:5,7;80:5,7
**image (2)**
  47:24;50:7
**immediately (3)**
  13:5;16:3;77:6
**impede (2)**

62:18;64:13
**implied (1)**
82:24
**implying (1)**
70:4
**important (1)**
74:6
**improbable (1)**
86:10
**inaudible (10)**
7:15;8:11,12;24:22;
36:13;56:23;64:4;
81:21;90:10;92:5
**incident (5)**
55:24;59:16,16;
65:22;67:10
**incorrect (1)**
81:20
**incriminating (1)**
73:16
**indicate (1)**
46:1
**indicated (1)**
38:15
**indicated- (1)**
46:3
**indicates (1)**
65:5
**indicating (2)**
68:6,7
**indication (2)**
68:10;73:14
**individual (2)**
44:2;73:13
**individuals (2)**
44:22;45:3
**industry's (1)**
61:15
**infer (1)**
78:18
**inferences (2)**
46:9;86:9
**inferred (2)**
56:12;76:16
**infirmities (1)**
73:22
**infirmity (1)**
76:2
**inform (1)**
35:10
**informant (3)**
65:13,17,19
**information (17)**
20:18;32:18;33:3;
55:3;66:4,15;71:24;
74:8,25;81:11,14,15;
84:24;85:22;86:18;
87:2;88:7
**informed (1)**
34:3
**Ingrim (1)**
76:10
**inherently (1)**

86:10
**injure (1)**
62:16
**injury (2)**
63:21;85:13
**inside (4)**
47:17;55:21;84:12,
15
**instead (2)**
91:18;94:18
**instituted (1)**
65:15
**instruct (2)**
81:17;94:18
**instructed (1)**
4:20
**instruction (1)**
94:12
**instructions (3)**
94:7,10,13
**intending (1)**
75:1
**intent (18)**
34:5,7;62:17;64:13;
66:23;74:16,17,22;
75:5,9,15;76:7,13,14,
15;77:21;78:18;89:4
**intent-I (1)**
80:5
**interest (1)**
60:14
**interested (2)**
41:11,21
**interfere (4)**
62:18;64:9,13,22
**intersection (2)**
54:3,10
**interviewed (1)**
55:19
**interviews (2)**
55:15;59:15
**into (13)**
14:11;21:21;33:7;
48:11,14;50:20;51:1;
56:5;65:20;66:4;71:9;
84:13;89:24
**investigate (1)**
25:8
**investigated (2)**
23:14,19
**investigation (13)**
24:12;56:20,22;
57:11,22;59:16,19;
60:9,23;65:14;73:13,
14,15
**invoke (1)**
4:17
**involved (3)**
53:23;56:3;60:16
**involvement (1)**
68:10
**ironically (1)**
41:13

**is- (1)**
49:6
**is-as (1)**
28:1
**isn't (5)**
21:9;48:12;68:24;
74:14;80:19
**issue (4)**
61:4;88:2;90:18;
91:17
**issues (1)**
90:7
**it- (1)**
70:14
**It's (49)**
5:13;8:10,11;17:12;
21:8;22:15;25:4,7;
26:1,20;28:22;29:2,2;
36:12;37:14,17,19;
45:8;46:5;52:4,24;
57:3;59:25;61:1,6;
63:13;65:7,8,21;68:2,
14;70:20,22;71:20;
73:5;74:9,17;76:6;
79:9;80:5,19,20;
83:20,21;84:17;
85:25;88:12;89:3,5

**J**

**jail (4)**
44:24,24;71:23;
73:17
**January (5)**
89:19;93:12,15,16,
25
**JAY (2)**
3:9;53:6
**Jean (1)**
4:5
**Jeremy (1)**
4:7
**job (2)**
53:12;75:2
**join (2)**
90:22;91:7
**joint (1)**
14:4
**joke (1)**
36:14
**Jon (2)**
4:9;29:25
**JR (1)**
53:14
**JUAN (8)**
4:1;5:21,25;10:14,
15;34:1;45:9;53:14
**judge (13)**
31:22;38:18;46:4;
48:18;49:22;61:20,
21;79:4,20,21;86:23;
90:5;94:25
**Judge- (1)**

78:11
**jump (4)**
13:24;30:15;33:17;
54:22
**jurors (2)**
94:2,18
**jury (4)**
81:18;93:25;94:7,
13
**just- (1)**
46:17
**just-for (1)**
76:9
**justification (1)**
78:16
**juvenile (3)**
92:14;93:9,11

**K**

**keep (6)**
13:2;46:18;51:7;
74:14;79:16;85:4
**Keeping (1)**
90:6
**keeps (1)**
5:14
**Kendall (1)**
4:11
**kept (1)**
15:23
**Kevin (1)**
4:4
**kill (1)**
29:11
**kind (6)**
9:5;11:19;12:25;
16:15;27:3;34:5
**knew (3)**
11:1;58:2;72:16
**knew- (1)**
67:16
**knock (1)**
89:9
**knowing (2)**
74:19,20
**knowingly (1)**
74:9
**knowledge (5)**
23:8,15;34:15;46:6;
76:15
**known (4)**
17:2;40:4;59:12;
78:1
**knows (1)**
71:1

**L**

**land (20)**
5:14,24;6:3,6;7:12;
16:13,19,20,21,22;
58:7;60:18;63:25;

64:3,4,4,11;66:11;
88:15,25
**lands (5)**
7:11;60:24;87:11;
88:6;89:2
**language (3)**
80:23;85:10;89:3
**large (1)**
37:14
**last (13)**
39:17;45:7;56:11,
13;67:3,14;70:21,22;
74:18;82:10;85:1,4;
86:11
**last- (1)**
77:23
**latch (1)**
9:17
**latched (5)**
10:4,6;33:19,23;
47:6
**later (5)**
39:21;42:15;56:17;
70:8;89:19
**latest (1)**
85:15
**law (5)**
79:7;80:6;81:20;
83:10,14
**lawful (3)**
62:18,21;64:14
**Laws (123)**
3:3,6,10;4:11,11,24,
25;5:7;6:17,25;7:5,6;
11:4;12:6,9;13:18,23;
17:8,11,21;18:10,15;
19:1;20:10,12,14;
21:11,14,20,25;22:3,
17;23:13,17;24:2,11,
13,19;25:1,7,15,18,
22,25;26:6,9,14,22,
23;27:3,6,8,9,21;28:8,
11,16,20,25;29:19;
33:8;45:15,17;46:10;
47:19,20;48:17,19,24;
49:5,8,10,17,20;
52:19,22;53:2,4,10;
60:2,7;61:1,5,11,17,
23;62:10;66:22;67:1,
5,17,19,24;72:6;77:9;
80:3,9;81:3,13,25;
82:14,18,20,22;83:1,
8,19,25;84:3,8,10,12,
17,22;86:13;87:19;
88:8;90:13,14;91:11,
20;92:14;93:3
**lawyer (1)**
33:2
**lawyers (1)**
94:14
**layperson (1)**
48:12
**leading (1)**

84:13
**lean (1)**
72:12
**leaned (1)**
72:11
**learn (1)**
45:25
**learned (2)**
30:21,23
**lease (3)**
7:17,17;66:8
**leasee (2)**
64:10,23
**leases (1)**
7:14
**least (3)**
23:2;70:2;90:23
**leave (9)**
4:20;9:16,17;29:12;
39:10,19;45:10;
55:16,23
**leaves (1)**
86:11
**leaving (2)**
14:12;43:9
**left (7)**
11:7,11;29:4;34:10;
38:13;41:6;79:10
**left-hand (1)**
48:7
**legal (15)**
23:9;27:14,18;
31:19;69:9;72:2,3,9;
73:5,6,20;80:11,13,
20;85:15
**legally (2)**
80:25;85:12
**legislature (1)**
71:25
**length (1)**
23:4
**lengths (1)**
69:7
**let's (10)**
8:5,19;9:24;11:13;
13:24;18:16;32:21;
35:10;37:7;80:22
**letter (14)**
19:17;22:5,8,21;
24:6;65:4,20;68:18,
18,19;73:2,9,10;82:4
**license (6)**
15:5,9,16;57:11,13,
17
**lift (1)**
14:3
**light (1)**
76:16
**Lightly (1)**
51:2
**likely (4)**
84:25;85:9;86:5,8
**like-or (1)**

27:11
**Lime (10)**
5:25;6:24,25;8:8;
14:12;22:19;28:3;
54:4,12;56:22
**limit (1)**
81:22
**limited (1)**
86:1
**line (9)**
28:10;36:17,19;
37:9,14,19;58:17;
63:9,11
**listed (1)**
86:13
**little (11)**
8:5;11:13;12:23;
14:15;16:17,24;25:3;
30:14;43:13;84:17;
94:3
**livelihood (2)**
5:14;66:8
**Livestock (15)**
5:13,16;60:16,24;
61:14,15;62:13,17,24;
63:6,21;64:20;65:2;
87:6;88:11
**livestock's (1)**
62:15
**living (1)**
5:12
**local (1)**
57:15
**located (3)**
8:6,7;16:14
**location (7)**
6:21,22;28:12;
34:11;68:21,24;73:25
**lodging (1)**
81:6
**long (3)**
53:4,12;91:7
**longer (1)**
41:11
**look (19)**
10:4;13:9;15:5;
20:15;34:15;36:19;
38:25;43:20;47:21;
51:20;58:14;64:8;
74:7;75:4;82:5;89:7;
90:10,23;94:15
**looked (3)**
15:16;42:25;46:1
**Looking (6)**
12:19;18:20;35:12;
66:12;88:3;90:8
**lookout (2)**
54:25;55:4
**looks (1)**
92:8
**loop (3)**
46:13,14;47:14
**loose (1)**

85:14
**looseness (1)**
85:9
**loss (1)**
62:20
**lot (4)**
15:2;37:6;58:22;
77:21
**lots (2)**
25:5;94:14
**loud (1)**
31:2
**loudly (1)**
51:9
**low (1)**
68:14
**lower (1)**
14:3
**LYLE (1)**
4:2

## M

**makes (6)**
65:16,25;72:24,25;
83:9;91:20
**making (9)**
47:14;48:7;66:6;
70:13;71:12;73:7,10;
74:14;81:2
**male (1)**
18:13
**males (1)**
55:6
**man (1)**
14:1
**manager (1)**
21:3
**managing (1)**
61:10
**many (7)**
14:15;36:23;71:12;
73:18;85:2,3;90:12
**March (3)**
93:11,12,12
**Mark (5)**
4:4,10;30:1,8;57:8
**marked (3)**
13:8;20:20;57:1
**married (4)**
75:12;82:16,19;
85:3
**matched (1)**
15:10
**matches (1)**
42:14
**matching (2)**
55:1,5
**matter (3)**
23:22;24:1;93:12
**May (15)**
6:9;8:4;25:5;29:12;
32:22;43:16;47:19;

57:1;67:14;81:11,23;
85:2;86:7;90:6;91:8
**maybe (13)**
29:7,9;55:2;66:16;
67:13;71:18;72:11;
83:23;88:4;89:17,17;
90:21;94:3
**me- (1)**
43:15
**mean (12)**
8:25;12:17;17:22;
18:7;19:2;25:21;44:1;
71:8;77:1;81:19;
89:14;91:17
**Meaning (3)**
19:20;59:9;71:19
**means (6)**
17:19;32:5,6,8;
36:19;91:17
**meant (2)**
6:24;18:12
**meet (5)**
31:5;72:21;74:1;
75:16,17
**mental (4)**
61:2,3;63:13,14
**mention (5)**
68:20;69:21,23;
70:1;93:14
**mentioned (1)**
44:24
**mess (1)**
64:25
**messing (1)**
64:24
**met (4)**
30:2,5;40:9;74:3
**mic (2)**
51:2,7
**microphone (1)**
30:25
**might (5)**
16:10;31:12;33:3;
67:15;68:23
**miles (9)**
9:5;29:5,7;83:17,
19,21,23,24;84:5
**mind (4)**
76:15;80:19;90:6;
92:23
**minute (1)**
50:15
**minutes (3)**
31:9;39:21;63:15
**misdemeanor (3)**
33:13;87:11;88:7
**mislead (8)**
74:16,17,22,23;
75:1,5,9,15
**misleading (3)**
24:6;66:19,24
**miss (1)**
77:1

**missed (1)**
77:10
**mister-you (1)**
64:18
**misuse (5)**
60:18,19,20;66:1;
69:13
**moment (2)**
45:13;49:13
**monitor (1)**
12:25
**month (3)**
53:16,17;89:15
**months (2)**
54:4,8
**moral (1)**
33:12
**more (18)**
25:3;26:19,24;
39:17;41:21;60:15;
62:17;67:20;71:18;
72:12;79:1,2;82:7;
84:25;85:8,9;86:8;
94:3
**morning (6)**
10:2;13:25;14:6;
29:23;31:6;33:19
**most (5)**
75:14;80:4;82:9;
86:5;89:18
**motion (2)**
90:22,23
**motions (1)**
90:9
**motive (3)**
66:24;80:7,7
**mouth (2)**
31:1;51:7
**move (5)**
10:3;48:24;49:17;
82:7;91:6
**moving (4)**
31:1,1;63:25;65:1
**much (4)**
52:1;58:8;79:2;
89:13
**must (2)**
75:17;76:14
**my- (2)**
18:22;19:23

## N

**name (37)**
5:8;19:3;29:25;
30:7,11;39:17;53:11,
14;55:24;56:3,4,6,11,
13,24;57:4,14,15;
66:16,18,20;67:3,4,6,
7,8,10,14;74:7,9,10,
11,18,19;75:10;85:1,4
**nature (1)**
73:6

State of Utah vs.
Rosalie Chilcoat

**near (4)**
47:12,13;54:7,18
**nearest (1)**
84:4
**necessarily (1)**
90:10
**need (20)**
4:15;7:1;8:14;
17:18;28:14;32:14;
36:24;48:10;51:1;
56:4;89:14,14,22,24;
90:6,8;94:3,9,13,21
**needed (1)**
67:6
**needs (1)**
94:11
**neglected (1)**
88:2
**next (6)**
6:4;11:10;22:4;
29:17;84:4;92:20
**night (1)**
78:9
**Nobody (5)**
23:4,6;65:24;80:14;
83:13
**none (4)**
51:19;68:11,11;
73:17
**non-good (2)**
85:22,22
**noon (1)**
52:24
**Nope (1)**
48:17
**Nor (2)**
61:21;83:10
**normally (2)**
73:2,3
**north (5)**
16:25;83:20,21,25;
84:17
**no-she (1)**
83:12
**notably (1)**
68:19
**note (1)**
79:5
**Noted (1)**
21:23
**notice (4)**
10:18;14:14;54:16;
64:6
**noticed (1)**
59:10
**notification (1)**
19:8
**notify (1)**
10:15
**notion (1)**
69:19
**NOVEMBER (1)**
4:1

**number (2)**
65:12;79:12
**numerated (1)**
74:3

## O

**oath (5)**
5:5;31:13,24;36:3;
53:8
**object (3)**
21:4;23:22;48:10
**objecting (2)**
22:13;28:21
**Objection (34)**
6:16,20;11:2;13:20,
21;17:3,4,10,17;
18:23;21:22;22:11,
11;23:9,21;26:21;
27:14;28:5;30:17;
33:8;46:4;49:1,3,11,
12,19;50:13;60:4,5,
25;61:7;91:2,9,14
**Objection's (2)**
7:3;28:24
**objections (1)**
7:3
**observation (2)**
37:25;48:12
**observations (2)**
48:20;59:7
**observe (1)**
60:19
**observed (1)**
46:8
**obstruct (2)**
62:18;64:13
**obstructed (1)**
12:20
**obvious (4)**
12:11;58:17,19;
82:9
**occupancy (1)**
64:12
**occupants (1)**
42:18
**occur (1)**
15:14
**occurred (1)**
65:22
**October (2)**
6:9;8:4
**ODELL (42)**
3:2;5:1,3,8,10,11,
21;13:24;29:23;31:4;
33:17;39:5;41:18;
46:6;49:25;50:18,20;
51:4;54:13;55:7,13;
58:7;62:15;63:1;
64:19;66:1,5,7;68:9;
69:2;70:6;71:2,12,21;
72:15;76:19;77:4,8;
83:2,10;84:3,18

**Odell- (1)**
38:17
**O-d-e-l-l (1)**
5:10
**Odell's (2)**
54:4;81:6
**off (6)**
13:16;14:22;35:25;
64:7;68:3,4
**offense (3)**
33:5;89:4,6
**offenses (1)**
86:18
**offering (2)**
26:10;49:3
**office (6)**
20:19;21:3;31:21;
34:1;53:15,16
**officer (8)**
13:5;16:15,17;39:1;
45:6;66:16,17,20
**officer's (2)**
66:18;85:1
**official (5)**
65:14,18;73:13,14,
15
**of-how (1)**
9:16
**of-she (1)**
67:13
**often (1)**
30:15
**of-this (1)**
49:6
**old (10)**
8:10;59:14,23;60:1,
10,14,17;67:8;76:5;
82:25
**once (2)**
74:13;89:21
**one (50)**
6:18;14:4;16:1;
24:7;29:17;31:1,14;
35:5,6;36:22,24;37:2;
38:21;42:23;43:7;
44:22;45:3,15;46:25;
55:20;64:7;65:1;68:2;
69:7;73:22;74:2,3,22;
78:25;79:1,3,4;80:24;
85:14,17,21;86:3,16,
16;88:2,9,10;90:14;
91:18,19,24;92:18,19;
94:1,6
**only (21)**
30:5;32:22;33:10;
36:8,9;46:25;55:20;
59:6,10;68:3,4;76:14;
79:1;81:1,23;85:17,
20,21;86:4;89:21;
91:24
**open (19)**
8:17;9:17,21;10:2;
33:19;42:5,9;58:10;

76:21,22,25;77:15,20,
20;78:1,4,8,8;79:10
**opened (1)**
9:13
**opening (38)**
11:19;12:1,6,11,16;
28:9,10;35:7,11,12,
13,22;36:4,4,10,22,
24;37:15;38:3,5,10;
40:24,24;41:11,12;
47:4,11,13;51:12;
52:5,5;58:2,13,16;
59:9;63:8,12,16
**openings (1)**
11:18
**operate (1)**
64:20
**operating (1)**
69:17
**operation (2)**
62:19;64:20
**operations (1)**
64:14
**opinion (3)**
27:10;76:10;81:18
**opportunity (3)**
35:23;59:4;91:7
**opposed (2)**
5:19;31:21
**opposite (2)**
11:20;45:25
**options-and (1)**
64:6
**or- (1)**
26:3
**order (6)**
64:3;72:18;73:25;
75:4;84:3;86:19
**organization (11)**
59:13,17,21,23;
60:10,13,15,17;61:4;
63:20;66:7
**organization's (1)**
60:23
**other- (1)**
89:16
**otherwise (2)**
69:10;94:12
**out (43)**
8:21;10:3;13:6;
18:21;19:9;22:24;
24:16,21,21;29:4,15;
35:21;37:8,14,17;
40:25;41:6;45:22;
46:20;47:14,17;48:5,
7,16,17;51:11;52:6,
13;54:22;56:6;67:14;
72:12;75:25;76:18,
22;77:16;81:8;82:7;
85:4;87:25;88:4;
89:18,19
**outside (16)**
23:7;24:4;25:2;

26:12;27:1,12;46:14;
47:9,10;50:3,12;
54:14;55:7,20;66:1;
85:22
**over (19)**
7:14;10:25;30:12;
38:12;46:19;48:11,
14;60:8;65:5;69:1;
75:19;76:7;79:3;
84:23;85:24;86:3,10,
15,21
**overcome (1)**
73:19
**overgrazing (2)**
61:13;69:13
**overlook (1)**
69:7
**overrule (1)**
49:18
**Overruled (11)**
6:23;7:3,4;11:3;
21:13,23;22:16;
23:16;28:24;48:15;
61:7
**overuse (1)**
69:13
**own (1)**
5:13
**owned (1)**
62:20
**owner (3)**
7:17;8:3;62:15

## P

**page (5)**
43:21;56:21;57:4;
59:24;70:22
**paperwork (2)**
7:14;88:3
**paragraph (4)**
43:20;45:7;76:10,
13
**parked (8)**
12:12;39:14;54:18,
19;58:20;59:1,4,8
**parse (2)**
71:11;80:22
**part (5)**
6:8;7:22;11:17;
29:17;57:10
**participate (1)**
55:22
**particular (2)**
74:8;76:10
**particular-I (1)**
38:16
**particularly (2)**
75:15;76:11
**parties (3)**
53:23;55:11,14
**pass (1)**
11:23

**passed (1)**
26:17
**passenger (1)**
55:24
**passenger's (1)**
56:1
**past (4)**
13:1;45:21,21;
47:11
**patrol (1)**
53:15
**paygrade (1)**
35:2
**peace (1)**
66:15
**peculiar (1)**
94:11
**penalty (1)**
89:5
**pending (3)**
65:14;73:13,15
**people (9)**
55:12;56:11;70:6;
75:14;80:23;81:18;
85:10,14,18
**period (1)**
75:12
**perjury (1)**
32:3
**permanent (2)**
66:4;81:7
**permission (1)**
62:15
**permit (17)**
7:10,11;19:9;22:24;
25:10,14,14,20;26:12;
27:1,10;66:8;72:13,
16,17;81:15;83:7
**permits (1)**
7:24
**permitted (2)**
6:9;8:3
**permittee (4)**
20:19;43:1;71:13;
73:9
**permittees (2)**
70:9,25
**person (12)**
21:7;28:1;42:23;
59:5;64:10,23;69:9,
10;72:2;80:13,15;
89:3
**person's (1)**
76:16
**personal (1)**
84:24
**personally (1)**
39:14
**Pg (6)**
3:3,4,5,6,7,10
**phone (3)**
34:24;44:13;45:2
**photo (1)**

68:7
**photograph (9)**
34:21;47:21;48:3;
50:1,7,9,10;51:18,25
**photographed (1)**
84:16
**photographs (18)**
14:17,19;17:15;
18:16,17,19;19:12,12,
18;35:3;42:18;50:2;
55:3;59:5,6;83:2,5,7
**physical (5)**
68:6,7;70:12;71:8;
85:13
**physically (6)**
39:12;43:8,9;44:3;
62:16;71:21
**pick (1)**
14:3
**pickup (2)**
14:10;15:1
**picture (6)**
13:12;51:4,11;57:4,
6;79:17
**picture- (1)**
51:6
**pictures (4)**
13:6,8;19:13;50:12
**pipe (2)**
11:23;14:3
**place (9)**
6:21;44:19;65:24;
67:6;68:25,25;69:21;
80:15;83:18
**placed (1)**
31:24
**plan (1)**
41:25
**plate (2)**
15:9,17
**plate- (1)**
15:5
**plausible (5)**
78:22,25;79:1,2;
86:4
**playing (1)**
85:14
**plead (3)**
87:7,12,20
**pleads (1)**
87:23
**pleas (1)**
87:24
**please (6)**
4:6;18:25;30:18;
36:13;51:8;94:17
**point (22)**
8:24,25;14:21;
15:19;16:10,12;
27:19;29:8;32:13;
39:7;41:10;48:1;
55:10;57:22;61:19;
63:11;69:5;74:24;

77:14;78:2;80:16;
91:1
**pointless (1)**
78:12
**poles (1)**
14:2
**police (3)**
71:4,5;73:5
**pond (9)**
9:9;16:24;22:25;
83:18,18,20,25;84:16,
18
**ponds (7)**
9:7;19:10,16;23:8;
27:12;66:2;82:2
**poor (2)**
40:6;74:17
**pops (1)**
80:18
**portion (3)**
45:7;70:18,21
**position (3)**
60:23;62:11;63:16
**possession (1)**
62:21
**possibility (2)**
38:13,14
**possible (9)**
38:9;45:23;51:23;
52:4,7,8,9;63:13;
81:24
**post (2)**
10:7;12:20
**posts (1)**
35:15
**posturing (1)**
81:4
**practical (1)**
63:18
**practices (1)**
61:10
**prefer (3)**
25:3;93:3,7
**preference (2)**
90:11;91:22
**preliminarily (1)**
4:16
**preliminary (10)**
4:3;23:24,25;26:16,
18,19,20;62:5;68:14;
86:14
**premise (1)**
69:17
**preparation (2)**
31:4;89:23
**preposterous (1)**
79:3
**present (4)**
68:7,8,9;73:24
**presented (3)**
68:11;79:21;82:4
**President's (1)**
92:7

**pretrial (1)**
90:9
**pretty (2)**
65:21;89:3
**prevented (2)**
45:4;71:23
**previous (2)**
8:3;18:4
**previously (1)**
30:2
**primarily (1)**
73:19
**primary (1)**
60:14
**printed (1)**
88:4
**prior (14)**
7:13,17;9:15;22:9,
9;30:7,10;40:4,5,7;
46:12;54:24;59:23;
63:11
**prison (1)**
32:9
**pristine (1)**
51:22
**probable (2)**
76:13;86:17
**probably (10)**
28:14;32:20;46:25;
50:13;69:15;72:4;
78:6;89:15;90:8;
91:25
**problems (2)**
13:1;72:23
**proceed (2)**
85:17,21
**proceeding (4)**
4:18;65:14,18;95:3
**process (1)**
55:18
**proclaimed (1)**
24:22
**production (1)**
5:14
**proffering (2)**
25:12,16
**profile (3)**
56:24;57:6;75:8
**prohibit (2)**
69:9;72:2
**promptly (1)**
89:25
**pronounce (2)**
30:22,23
**proper (3)**
27:16;28:5;74:18
**properly (1)**
39:17
**property (13)**
6:22;7:18,25;8:6;
9:7;25:7;42:12;62:20;
64:21;66:9,9;69:13,
14

**proposition (1)**
74:8
**prosecuted (1)**
32:2
**prosecutor (1)**
32:17
**proven (1)**
72:20
**provide (1)**
58:9
**provided (3)**
21:6;42:17;57:14
**providing (1)**
74:25
**provision (1)**
88:21
**provisions (1)**
69:8
**public (4)**
58:7;60:18,24;61:9
**publicity (1)**
94:4
**pull (1)**
14:11
**pulled (5)**
10:22;11:10;13:6;
63:10,15
**pulling (2)**
54:20;58:24
**pump (2)**
14:2,4
**purchased (3)**
7:13,17;8:2
**purpose (2)**
63:2;81:6
**purposes (7)**
4:18;53:25;63:2;
67:21;76:9;83:4;
86:14
**pursuant (1)**
64:12
**pursue (1)**
24:25
**pursue-in (1)**
81:9
**push (2)**
53:1,2
**put (5)**
13:1;52:3;66:4;
67:20;81:6
**putting (1)**
14:2

## Q

**quick (1)**
32:16

## R

**railroad (2)**
12:19;59:11
**rain (4)**

51:3,21,23;52:1
**rained (1)**
    51:2
**raise (5)**
    5:16,20;7:25;88:2,2
**raising (3)**
    62:24;63:2,3
**ran (1)**
    56:17
**rancher (1)**
    78:13
**ranchers (1)**
    77:3
**rather (2)**
    16:22;24:21
**Rav4 (1)**
    54:20
**read (8)**
    22:5;27:22;38:25;
    43:13,22;60:22;61:8;
    94:7
**readily (2)**
    58:17;76:20
**reading (1)**
    87:1
**reads (1)**
    76:13
**ready (5)**
    4:13;55:16;89:10,
    22;91:10
**Real (2)**
    51:21;75:10
**realized (1)**
    16:18
**really (14)**
    31:11;36:17,19;
    48:13;74:17;81:21;
    84:14;86:11;89:19,
    20;92:6;94:11,12,14
**reason (19)**
    5:16;17:1,5,7,9;
    26:11;54:23;56:21;
    58:9;63:17,18;64:15,
    24;67:20;68:4;77:19;
    78:17,22;79:1
**reasonable (4)**
    63:18;76:15;79:9,
    13
**reasons (3)**
    25:5;74:2;75:20
**rebuilt (2)**
    8:9;37:3
**recall (4)**
    15:24;22:18;33:4;
    40:23
**recap (1)**
    57:7
**receive (2)**
    49:18,19
**received (8)**
    13:22;21:24;24:2,
    13;25:1;26:3;53:25;
    60:6

**recess (2)**
    52:25;95:2
**recognize (2)**
    14:17;40:2
**recognized (1)**
    14:19
**recollection (3)**
    33:3;43:19,22
**record (4)**
    4:6;5:9;21:8;42:11
**recorded (1)**
    40:22
**recreating (4)**
    19:19;22:19;65:5,7
**recreational (1)**
    68:23
**recross (1)**
    49:16
**Re-cross (2)**
    3:7;49:23
**red (1)**
    54:20
**Re-direct (2)**
    3:6;45:16
**redress (9)**
    69:10;72:2,4,9;
    73:6,7,20;80:12,13
**refer (3)**
    6:25;39:17;68:17
**reference (4)**
    19:14,18;83:9,13
**referenced (1)**
    20:16
**referred (2)**
    45:8;68:17
**referring (5)**
    6:21,22;18:7;42:25;
    70:18
**refers (2)**
    70:5;83:12
**reflect (1)**
    91:7
**refrained (1)**
    45:19
**refresh (2)**
    43:19,22
**regard (1)**
    76:2
**regarding (3)**
    34:16;65:17;69:13
**Regardless- (1)**
    71:7
**regards (10)**
    8:19;20:16;21:5;
    23:7;55:17;62:25;
    63:5;80:11;82:2;
    88:15
**registered (5)**
    56:16,18;57:8;
    74:20,21
**reiterate (1)**
    64:1
**related (1)**

33:6
**relation (1)**
    51:4
**release (1)**
    62:16
**relevance (1)**
    60:25
**relevant (4)**
    20:25;33:10;61:1,6
**relied (1)**
    82:8
**relies (1)**
    66:7
**rely (1)**
    80:11
**relying (1)**
    49:6
**remained (1)**
    55:21
**remains (1)**
    71:14
**remedy (1)**
    25:11
**remember (9)**
    39:18;41:1,3,5,7,8;
    45:22;47:21,24
**renew (1)**
    21:22
**repair (1)**
    12:7
**repairs (2)**
    82:2,5
**rephrase (1)**
    30:19
**report (2)**
    60:19;80:7
**reported (1)**
    55:1
**represent (1)**
    30:1
**representing (1)**
    4:11
**reprimanded (1)**
    26:2
**reprimands (1)**
    24:14
**require (1)**
    81:10
**required (2)**
    63:14;86:8
**requirement (2)**
    72:24,25
**requires (2)**
    62:13;64:4
**requiring-this (1)**
    48:11
**re-redirect (1)**
    52:18
**research (1)**
    91:8
**resolved (1)**
    89:24
**respect (12)**

18:4,5;68:2;69:6,
    18;72:5;73:21;74:3;
    75:18;85:6;88:18;
    91:3
**respond (3)**
    16:1;72:7;90:24
**responded (3)**
    34:11;45:9;54:9
**responding (1)**
    54:2
**response (1)**
    79:23
**retaliate (1)**
    72:18
**retaliating (2)**
    24:18;87:16
**retaliation (10)**
    24:7,21;65:12,18;
    66:6;69:6;81:1,23;
    85:7,21
**retaliation- (1)**
    81:12
**retribution (2)**
    65:18;66:6
**retrieved (1)**
    20:23
**return (3)**
    57:15,16;71:23
**returned (1)**
    57:15
**returning (1)**
    45:4
**review (1)**
    56:5
**reviewed (3)**
    13:6;59:18;60:15
**Ridge (10)**
    5:25;6:24,25;8:8;
    14:12;22:19;28:3;
    54:5,12;56:22
**right (46)**
    4:13;5:8;6:24;9:9;
    13:24;22:1;25:14;
    30:2;32:13;34:25;
    36:9,20;38:5;39:24;
    42:6;44:6;47:18;
    52:13,20;53:11,18;
    59:25;62:4;69:14,15;
    71:2;72:4,5,9,10;
    76:21,23;79:14,17,24;
    83:16;84:2,20;86:24;
    87:4,17;90:19,20;
    91:23,24;94:22
**road (9)**
    14:24;16:17;54:2;
    55:2;73:4;79:7,9,10,
    15
**roadway (1)**
    54:19
**Rosalee (4)**
    56:6,12,18;75:10
**Rosalie (2)**
    4:5,8

**Rose (18)**
    17:23;18:6;19:13;
    21:3;30:11,12;55:15;
    56:25;57:4,8,14,16,
    17;59:22;66:17,18;
    68:5;75:7
**Rose's (1)**
    19:3
**rough (1)**
    6:13
**roughly (2)**
    35:15,17
**row (1)**
    93:3
**rub (1)**
    9:19
**rule (2)**
    4:18;7:1
**rules (4)**
    24:1;26:17;27:23;
    66:10
**ruling (2)**
    48:16;50:17
**run (6)**
    5:13,21,24;7:12,18;
    35:2
**running (2)**
    14:22;15:2

---

## S

**Safe (1)**
    44:18
**sake (1)**
    63:2
**same (25)**
    8:3;18:23;20:1,3;
    22:11;41:14;49:1;
    50:7;56:11,13,19;
    64:22;65:2;66:11,13;
    67:15;73:22;74:2;
    76:2,22;80:1;83:5;
    85:3;88:14,19
**SAN (7)**
    4:1;5:21,25;10:14,
    15;45:8;53:14
**sanctions (2)**
    71:4,6
**saw (16)**
    11:8;15:10;23:2;
    36:3,24;40:24;43:1;
    47:2,2,8,16;54:13;
    63:8,15;77:20;83:3
**saying (18)**
    11:9,9;15:24;18:21;
    44:20;47:1,16;66:3;
    70:15;76:1;77:19;
    78:16,20,21;81:3,4;
    89:7;92:15
**scale (1)**
    83:4
**scene (2)**
    54:11,13

State of Utah vs.
Rosalie Chilcoat

Preliminary Hearing
November 2, 2017

schedule (1)
  92:18
scheduled (3)
  91:24;93:5,24
scintilla (1)
  68:11
scope (8)
  18:21;22:24;24:4;
  25:2;27:11,12;66:1;
  82:2
screenshot (1)
  57:3
searching (1)
  20:18
seat (1)
  56:1
second (12)
  21:19;22:4;41:16;
  43:21;58:12;61:17;
  76:19;83:14;87:6;
  88:11,14;91:25
section (6)
  8:9;9:10;69:9;72:1;
  88:19;89:1
sections (1)
  88:17
secure (1)
  10:9
see-I (1)
  37:9
seeing (1)
  47:24
seek (2)
  72:9;73:20
seeking (4)
  69:9;72:2;73:5,6
seems (1)
  78:22
sees (2)
  58:10;78:8
self- (1)
  24:21
sell (1)
  5:17
send (1)
  69:16
sending (2)
  73:9,10
sense (1)
  36:18
sent (7)
  19:17;21:8;54:25;
  55:3;68:18,18,19
sentences (1)
  70:20
separate (5)
  6:5;79:16;89:1;
  90:19;94:12
separately (1)
  91:11
serious (2)
  94:22,22
set (11)

12:23;14:2;26:18;
  89:8,20,21;91:21;
  92:12;94:13,20,21
sets (1)
  94:14
setting (4)
  88:2;89:18;91:25;
  94:1
settlement (1)
  31:17
several (3)
  16:7;29:3;58:22
share (1)
  30:21
she'd (1)
  67:4
she's (14)
  24:17;61:5;65:7,8,
  22;66:5,6;70:13;
  71:11;73:2;80:12;
  81:2,3,4
she-how (1)
  56:3
sheriff (2)
  15:18;45:9
Sheriff's (4)
  10:15;34:1;53:15,
  16
She-so (1)
  65:8
shifting (2)
  78:15,19
shouldn't (1)
  90:21
shouldn't-I (1)
  94:12
show (6)
  13:7;76:13,14;
  78:23;81:10;82:3
showed (1)
  31:7
showered (1)
  51:2
shows (3)
  39:22;49:4;76:21
shut (18)
  9:18,19;10:4,4,5,5,
  24;15:25;16:4;38:12;
  40:14;52:15;76:22;
  78:1,3;82:17;86:5,6
shuts (2)
  58:1,10
shutting (2)
  78:2,17
side (4)
  14:6;36:24;56:2;
  81:25
sides (1)
  14:16
sight (3)
  36:17,19;37:9
signed (4)
  7:13,14,21;21:3

silver (1)
  54:20
similar (1)
  79:22
similarly (1)
  91:3
simply (3)
  6:17;68:25;69:14
sincerely (1)
  21:3
sit (1)
  31:8
SITLA (3)
  7:21,22;64:6
sitting (7)
  4:21;8:8;14:10;
  39:24;53:25;56:1;
  79:7
situated (1)
  91:3
situation (2)
  66:14;79:8
situations (1)
  68:15
six (1)
  37:11
sleep (1)
  78:9
snowball (1)
  76:6
So- (1)
  46:16
soil (1)
  61:14
sole (1)
  81:5
somebody (6)
  38:14;41:17;73:3;
  74:23;83:4;93:5
somehow (3)
  73:10;76:5;79:11
someone (5)
  34:4;37:23;57:23;
  83:6;85:11
someplace (1)
  84:4
sometimes (1)
  85:10
soon (2)
  41:10;89:10
sorry (9)
  12:4,8;18:1,24;
  20:7;46:18;51:9;
  52:17;76:24
sort (5)
  12:22;25:9;53:20;
  57:10,11
sought (1)
  72:3
sounds (1)
  30:10
source (1)
  11:1

sources (1)
  60:12
space (1)
  12:10
speak (2)
  51:1;90:1
speaking (5)
  8:21,22;38:21;51:9;
  92:25
specifically (4)
  6:22;70:19;85:8;
  88:9
speculation (5)
  11:2;17:3,4,10,12
speedy (1)
  90:6
spell (2)
  5:9;56:6
spelled (1)
  74:11
spend (1)
  37:6
spending (1)
  91:17
spoke (1)
  45:9
spoken (2)
  55:20;62:4
stage (1)
  86:8
stand (6)
  5:1;28:17;30:16;
  35:5;52:23;78:21
standard (4)
  33:15;68:14;72:16;
  75:16
standards (1)
  26:18
standing (4)
  19:13;35:11;36:4,
  22
stands (1)
  66:13
start (2)
  62:11;94:1
started (3)
  45:18;72:12;75:25
Starting (1)
  91:23
State (53)
  4:11,25;5:8;6:3,6;
  7:11,12;8:9;9:9;
  16:19,21;21:7,20;
  22:8;48:24;52:22;
  53:11;61:2,3,23;
  63:13,14;64:4,9;
  67:20;68:17;69:4,4,7,
  17;70:3,11;72:14;
  73:8,18;75:7,9,17;
  76:14,15;77:18,25;
  78:6,15,25;79:13,21;
  81:19;88:4,15;91:6,
  15;92:22

State's (21)
  13:8,18;20:21;
  21:21;57:2;60:3;
  62:10;63:16;67:7,12;
  68:1;72:22;75:5;76:2,
  4;79:2;86:9;88:17,18,
  23;90:22
statement (11)
  22:15;25:24;26:10;
  27:18;34:13;38:22;
  39:1,2,3;52:3;69:19
statements (3)
  69:2,3;73:16
stating (1)
  17:16
status (1)
  9:16
statute (9)
  69:8;71:25;73:2,25;
  80:5;88:4,6,9,20
statute's (1)
  74:7
statutes (1)
  85:16
statutory (2)
  69:14;72:4
step (3)
  24:19;52:20;61:22
steps (2)
  36:23,25
still (10)
  16:10;24:16;25:23;
  42:14,17;68:7,7;
  72:22,23;75:17
stock (1)
  94:7
stood (1)
  12:15
stop (5)
  14:24;18:25;34:25;
  36:9;55:4
Stopped (6)
  10:12;15:4,10,13;
  39:18;46:19
straight (4)
  7:16;12:19;37:14,
  19
stretched (1)
  73:8
strike (1)
  52:3
strong (1)
  75:15
struggling (1)
  80:4
stuff (1)
  81:2
subject (2)
  72:22;89:5
submit (2)
  13:18;17:25
submitted (2)
  17:16;65:20

State of Utah vs.
Rosalie Chilcoat

Preliminary Hearing
November 2, 2017

subparagraph (3)
    64:7;80:11,16
subpoenaed (1)
    4:20
subsection (6)
    64:12;69:8;72:1,23,
    24,24
succinct (1)
    76:11
suffer (1)
    91:18
suffers (3)
    73:21,22;76:2
sufficient (1)
    82:3
suggest (5)
    68:12;69:15;70:11;
    74:2;94:17
suggests (1)
    70:13
sum (2)
    62:10;68:1
summon (1)
    94:2
Sun (1)
    34:1
support (2)
    69:5;81:12
supports (3)
    65:3,3;80:6
suppose (2)
    75:8;80:22
supposedly (1)
    22:15
suppose-you (1)
    75:6
Supreme (1)
    76:12
sure (12)
    15:17;43:13;49:15;
    50:11;64:8;71:10,20;
    82:15;86:2;90:3;91:1,
    5
surrounding (1)
    7:25
surveillance (2)
    68:6;79:6
sustain (2)
    26:21;49:3
Sustained (2)
    33:9;46:7
SWORN (4)
    5:2,4;53:5,7
swung (1)
    9:21
system (2)
    57:15;58:24

T

TAB (1)
    14:16
table (3)

4:21;39:25;41:22
tactical (1)
    91:4
talk (11)
    4:21;8:5;9:24;
    11:13;14:24;31:8,10;
    32:21;48:16,17;91:8
talked (3)
    16:8,24;52:2
talking (15)
    6:23;12:7;15:24;
    16:8;17:18;18:17;
    33:19;36:17,18;38:4,
    10;40:25;54:15;73:9;
    75:11
tall (1)
    58:24
tampering (2)
    10:16;55:2
tank (4)
    83:17;84:11,12,15
telling (5)
    40:23,23;41:5;
    52:11;94:18
telling- (1)
    17:11
temporary (1)
    11:20
ten (3)
    35:16,17,18
term (2)
    31:19;71:18
terms (5)
    25:14,20;26:12;
    27:1;72:15
terrible (1)
    75:2
testified (22)
    4:23;5:4;16:25;
    28:9,13;30:3;31:13;
    33:17;34:16;35:5;
    37:21;39:6;49:5;50:1,
    22;52:3;53:7;65:24;
    77:4;79:5;83:25;84:3
testify (9)
    4:20;21:9,10;26:25;
    62:4,7;73:4;78:21;
    83:2
testifying (4)
    21:5;25:25;45:20,
    22
testimony (22)
    4:22;18:4;33:14;
    34:7;36:3;37:4,13;
    39:21;43:4;48:14;
    62:25;63:6,9,19,22;
    64:18;65:23;68:9;
    74:10;79:18;83:1,22
than- (1)
    71:19
Thanks (2)
    84:21;95:1
that- (6)

23:8;36:12;37:19;
    67:1;71:14;85:17
That's (49)
    6:24;8:6;9:5;16:4;
    18:2;21:13;22:1;
    25:15;27:1,3;28:12;
    30:1;33:9;34:1;35:11,
    25;43:20;50:6,24;
    52:8;56:7;57:16;
    67:12;68:3,4;71:18;
    72:3;74:20,21,22;
    75:9;77:2,16;78:19;
    79:17,19;80:15;81:3,
    22;82:8;84:8;85:25;
    87:16,18;88:6,10;
    90:11;93:23;94:16
that-can (1)
    20:21
that-excuse (1)
    43:7
that-let (1)
    52:3
that-so (1)
    80:15
that-the (2)
    24:5;81:25
the- (2)
    17:18;24:4
the-and (1)
    33:25
the-did (1)
    93:14
the-if (1)
    59:7
the-or (1)
    9:15
theories (1)
    79:12
theory (22)
    67:2,7,12;68:2,3,4;
    75:5;76:4,14;77:13,
    16,24;78:4,9,10,10;
    79:2,4,22;81:1;86:1;
    88:23
theory-I (1)
    77:18
there's (35)
    9:7,9;18:3;25:8;
    26:8;29:4;30:17;45:7;
    61:13;64:6;68:5,6,7,
    9;69:3,19,21;70:12;
    73:14,18,23;75:17;
    78:16,16;80:6;82:7;
    83:1,11,12;85:12,13;
    86:17;91:2,24;94:10
thereby (1)
    66:19
therefore (2)
    63:3;78:17
the-that (1)
    12:7
the-the (1)
    47:16

the-to (1)
    9:24
the-what (1)
    45:25
they- (1)
    36:8
they'd-he (1)
    84:19
they're (15)
    6:23;8:21;25:8;
    29:6;30:16;70:10;
    75:12;78:15;81:20,
    21;83:5;85:15;88:16;
    90:18;92:3
they've (4)
    4:22;26:1,1;94:19
thing's (1)
    40:22
Thinking (1)
    44:20
third (3)
    87:16,20;88:13
Those- (1)
    50:5
though (3)
    23:25;25:7;44:20
thought (16)
    20:25;27:3,5;44:15,
    18;45:20;47:15;51:9;
    56:13;67:10,13;
    72:11;77:2,20;84:18;
    92:15
threat (13)
    65:16,17;71:1,5,5,
    8;72:25;73:1,7,10,12;
    80:8;85:13
threatened (2)
    44:23;71:23
threatening (3)
    71:3,4;73:3
threatening-what (1)
    73:2
three (17)
    29:14;37:7,8;39:18;
    55:7;66:11;69:8;70:5;
    72:1,23;73:21;74:4;
    80:11,16;86:16;
    89:20;93:3
throughout (2)
    6:6;94:8
tie (2)
    68:24;82:11
tied (2)
    10:8;65:8
ties (3)
    12:20;59:11;82:12
times (4)
    16:7;59:18;85:3;
    89:20
tire (17)
    10:18,22;18:5;
    34:16;37:22;38:1,2,4,
    11;45:20;48:12;49:4,

6;50:3,22,25;51:14
to- (4)
    20:10;24:10;25:15;
    72:5
today (3)
    8:7;31:12;33:19
today's (2)
    31:4,23
together (4)
    54:17;56:10;75:13;
    82:23
to-I (1)
    81:17
to-if (1)
    49:13
told (6)
    16:16;31:11;40:12,
    14;52:12;56:4
took (11)
    11:21;13:16;14:22;
    20:24;35:3;50:1,2,10;
    65:24;68:25;69:21
toothless (1)
    68:15
top (5)
    38:1;48:8,21;49:4,6
Torrence (5)
    14:1;44:2,23;54:14;
    55:14
Torrence's (1)
    39:17
Torrence-I (1)
    39:16
totally (2)
    88:16;89:1
touched (1)
    23:6
toward (1)
    38:3
towards (4)
    16:17;24:4,5,7
Toyota (1)
    54:20
to-you (1)
    37:3
track (4)
    13:2;46:12;50:24;
    51:3
tracks (38)
    10:18,22;11:8;18:5;
    34:16;37:22;38:1,2,4,
    7,11,15;45:20;46:1,1,
    3,11,15,20,22,23,24;
    47:2,2,8,16;48:8,9,12,
    20,21;49:4,6;50:3,23,
    25;51:2,14
traffic (3)
    32:22;33:5,6
trailer (9)
    54:21;56:18,19;
    57:7;65:8;74:21;
    82:22,23;83:8
trailers (1)

State of Utah vs.
Rosalie Chilcoat

14:15
**travel (3)**
9:8;29:7;48:13
**traveled (2)**
29:5;48:4
**traveling (4)**
9:5;48:2;56:10;
75:12
**traveling- (1)**
8:24
**trespass (6)**
63:25;64:3;66:11;
73:25;88:15;89:1
**trespassing (3)**
55:2;87:10;88:6
**trial (16)**
72:15;81:10,16;
87:25;88:1;89:10,12,
20;90:7,21;92:2;
93:25;94:1,8,18,21
**tried (1)**
30:23
**trouble (1)**
72:18
**troubling (1)**
69:18
**trough (1)**
10:25
**truck (2)**
14:18;54:19
**true (4)**
39:4;45:11;71:13;
81:19
**trust (9)**
63:25;64:3,4,11,20;
66:11;87:11;88:6;
89:2
**truth (2)**
32:14;85:15
**try (10)**
14:24;30:18,25;
33:3;49:13;51:7;
52:25;85:4;88:24;
90:13
**trying (6)**
24:16;27:2;70:10,
11;78:15;92:23
**turn (2)**
48:7;56:5
**turned (6)**
11:10;38:10;51:15;
52:5,6;84:19
**turns (1)**
38:6
**turpitude (1)**
33:12
**twice (1)**
37:7
**two (29)**
23:2;35:15;44:20;
53:16,17;55:12;
65:12,22;69:6,18;
70:6;72:24,24;79:21;

80:4,10;81:1;83:17,
19,21;85:6,25;86:4,
16,16;90:16,19;91:16,
17
**tying (1)**
86:12
**type (2)**
19:4;66:13

**U**

**under (8)**
31:13,24;36:3;
59:25;69:17;81:1;
88:23;89:6
**underlined (1)**
43:21
**unfinished (1)**
38:3
**unfounded (3)**
24:20,24;25:21
**unless (4)**
4:21;33:1;86:9;
94:20
**unlikely (1)**
86:9
**up (37)**
6:4;11:6,10;12:23;
13:1;14:3,3,5;16:17,
18;29:6;30:14;31:7;
39:6,22;45:19;46:13;
47:12,12;51:14,14,17;
52:4;58:13,25;59:10;
62:10;63:10;66:3,6;
68:1;76:21;81:2;
84:19;85:15;88:10,14
**upon (2)**
5:5;53:8
**use (7)**
56:11;64:12;70:16;
72:11;85:1,7,23
**used (10)**
26:15;34:24,25;
57:15;62:20;70:2,4;
75:7;80:24;93:10
**uses (1)**
58:7
**using (1)**
67:4
**usually (6)**
8:12;23:25;31:2;
56:10;94:4,9
**UTAH (3)**
4:1;62:21;76:12

**V**

**value (6)**
6:15;7:7,7,8;62:17;
63:22
**value-what (1)**
6:14
**variety (1)**

64:6
**vehicle (41)**
13:12;14:11;15:7,9;
37:23;39:6,13,14;
42:11,14,18;43:9,9;
44:4;45:21;46:12,23,
24;47:2,8,16;48:1,13;
52:4,7;54:15,18,22,
25;55:4,21,21,23;
56:16,17;57:7;58:19;
63:10;65:8;71:22;
83:9
**vehicles (5)**
13:2;54:16;58:22;
59:3,8
**verbal (1)**
85:13
**verbally (1)**
85:11
**very- (1)**
28:4
**vicinity (1)**
83:14
**victim (3)**
24:8;65:13,19
**view (4)**
12:20;14:11;37:22;
56:21
**viewed (3)**
56:24;59:3;76:16
**views (1)**
82:24
**violate (2)**
25:20;73:25
**violating (2)**
25:13;72:15
**violation (4)**
19:9;27:11,23;
72:13
**violations (1)**
32:22
**virtue (1)**
65:9
**visible (8)**
12:12,15,18;28:11,
12;59:9,9,24
**visibly (1)**
63:12

**W**

**wait (2)**
15:17;23:11
**waive (2)**
87:1,3
**walk (3)**
35:24;51:14;58:13
**walked (6)**
10:24;16:17;46:20;
55:22;58:6,25
**walking (3)**
35:21;46:14;59:10
**wanton (7)**

62:12;63:5;65:2;
68:2;87:5;88:11,22
**wants (2)**
80:11;91:6
**warning (1)**
85:25
**washed (1)**
51:24
**wasn't (11)**
9:21;10:5;12:18;
25:10;28:11,12;67:4;
72:15;73:16,17;74:1
**wasn't-somebody (1)**
10:5
**was-you (1)**
13:16
**watch (1)**
34:23
**water (31)**
8:11,14,17,20;9:6,
11,14,14,20;10:25;
11:1,1;28:2,7,19,22;
29:5,7,12;61:14;
64:17,18;83:17;84:4,
5,5,9,11,12,15;86:7
**watering (1)**
38:12
**way (23)**
8:10;16:18;24:23;
27:16,19;31:1,16;
36:8,9;37:19;46:20;
48:4,5;64:16,17;
72:12;74:17;76:11;
81:22,23;85:17,20,21
**we'd (2)**
4:17;28:16
**We'll (4)**
53:2;62:11;94:1,16
**We're (18)**
4:3;6:21;8:7;15:15;
20:1;36:17;38:4,10;
40:25;71:10;72:14;
73:7,8;75:11;78:17;
80:22;81:3;90:7
**we've (4)**
16:24;33:18;45:8;
64:2
**wearing (1)**
40:19
**Weber (3)**
54:14;55:8,14
**website (2)**
59:18;61:9
**week (1)**
92:20
**weekend (5)**
19:19;22:9;65:6,6,7
**weeks (1)**
29:4
**Well- (1)**
78:24
**weren't (1)**
72:17

**what's (18)**
15:16,16,23;21:15;
28:1;29:1;60:23;67:2;
68:19;69:25;73:5;
77:13,14,24;78:4,10,
10;82:11
**what's-do (1)**
52:24
**whatsoever (2)**
68:11,20
**What-who (1)**
56:16
**what-why (1)**
14:13
**when-just (1)**
88:8
**where- (1)**
12:3
**Where's (1)**
88:20
**whether- (1)**
28:15
**Who's (4)**
22:13;53:17;67:25;
80:24
**whole (2)**
29:15;40:22
**wide (1)**
35:13
**wider (1)**
35:17
**width (1)**
12:20
**wife (4)**
45:4,10;75:11;76:5
**Wilcox (4)**
50:2,9,10,23
**Wilcox's (1)**
50:3
**wild (1)**
68:22
**Wilderness (5)**
59:14;60:1;67:9;
68:22;82:25
**will- (2)**
78:6;79:25
**Williams (70)**
3:4,7;4:9,9,14;6:16;
13:21;17:3,17;18:23;
23:9,21;28:5,9,14,23;
29:22;30:1,25;31:2,3;
33:12,16;36:14,16;
38:18,20;41:13,16,18;
45:18;46:4;48:10;
49:1,12,22,24;50:13,
18,19;51:9,13;52:16;
61:20;62:1,6;75:22,
25;76:25;77:4,11,16,
23;78:6,11,14,24;
79:4,20,25;86:23;
90:2,5,17;91:14;
92:15;93:7,20,23;
94:25

**Williams' (1)**
92:9
**willing (1)**
72:14
**willingly (1)**
67:3
**wind (1)**
9:18
**wipe (1)**
29:14
**wire (1)**
12:21
**withdraw (1)**
49:12
**withdrawn (1)**
64:12
**within (2)**
23:4;63:14
**without (7)**
6:22;9:20;59:3;
62:14;64:5;85:20;
91:9
**WITNESS (28)**
3:1;4:24;5:2;17:7,
15;18:1,24;20:7;24:8;
29:20;35:23;38:18;
41:20;46:24;47:5,7,
10,12;51:11;52:21;
53:5;55:24;56:4;61:8;
65:12,17,19;87:16
**witnesses (3)**
4:19;61:23,25
**won't (5)**
38:16;72:19;79:3;
89:7;94:20
**wondering (1)**
47:18
**word (10)**
24:3;64:7;70:2,4,
16;72:11;80:14,24;
85:7,23
**wording (1)**
43:14
**words (3)**
37:13;77:5;81:9
**work (9)**
7:11;8:1;11:14;
35:13;53:14,15;92:9;
93:18;94:16
**worked (1)**
52:6
**working (5)**
14:5,8;53:18;58:25;
60:16
**world (1)**
6:8
**worse (2)**
67:11;82:6
**worst (1)**
74:22
**Would-do (1)**
17:1
**wouldn't (5)**

12:18;22:16;24:14;
78:1;92:12
**would-the (1)**
86:5
**wrapped (2)**
9:22;10:7
**write (1)**
38:22
**written (3)**
45:8;52:3;64:5
**wrong (3)**
15:16,23;25:8

---

### Y

**yards (2)**
12:2;35:7
**year (9)**
6:7,11,14;8:16;9:1;
10:1;13:25;53:18;
84:5
**years (4)**
30:13;31:14;53:16,
17
**yellow (2)**
14:16;54:20
**Yep (1)**
82:18
**you'd (3)**
4:5;40:9;81:1
**you'll (2)**
49:15;89:22
**you're (26)**
11:8,9,24;18:16;
20:11;25:12,16;
26:10;27:1;28:18,21;
35:11,12;40:25;
41:10,22;47:1;49:3;
70:15;74:19;77:9;
85:3;89:17;92:1;
94:22,22
**you've (20)**
16:25;20:16;27:22;
30:2,5,10;33:7;34:16;
35:6;37:20,21;39:6;
52:2;53:12;60:22;
63:6,9,19;83:22;89:7
**you-at (1)**
55:10
**you-how (1)**
7:11
**young (1)**
14:1
**you-so (1)**
8:19
**you-what- (1)**
18:11
**you-you (1)**
39:9

---

### Z

**ZANE (6)**

3:2;4:25;5:3,10;
54:4,13
**Z-a-n-e (1)**
5:10
**Zeb (8)**
14:1;15:1,24;44:2,
2,23;54:13;55:14

---

### 1

**1 (9)**
6:9;8:4;9:4;20:21;
21:21,23;27:20;
29:20;94:1
**1:30 (1)**
52:25
**12 (3)**
54:3,8;92:22
**12th (1)**
92:20
**13 (1)**
92:22
**13th (1)**
92:21
**15 (1)**
92:22
**15th (1)**
92:2
**16 (1)**
92:22
**163 (2)**
54:3,4
**16th (2)**
92:3,25
**17 (1)**
76:10
**1717-40 (1)**
4:4
**191 (1)**
54:3
**19th (2)**
92:3,6
**1st (23)**
6:10;9:15,15,25;
10:1,2;19:21;29:2;
33:17;42:4,5;47:25;
68:6,12,21;73:25;
83:15;92:2;93:11,11,
13,16,20

---

### 2

**2 (5)**
4:1;13:8,19,22;64:7
**2009 (2)**
8:9;37:3
**2017 (3)**
4:1;21:18;42:5
**21st (1)**
93:6
**22nd (2)**
92:3;93:1
**23rd (2)**

92:3;93:1
**24 (1)**
29:9
**27th (4)**
92:3;93:8,9,10
**28th (3)**
92:3;93:8,11
**29 (1)**
3:4
**2nd (2)**
92:2;93:12

---

### 3

**3 (3)**
48:25;49:18,19
**300,000 (1)**
7:9
**31st (6)**
6:9;8:4;93:12,15,
16,25
**35 (1)**
94:4
**3rd (12)**
13:24,25;15:10;
39:5;40:5,7;43:12;
52:11;53:18;57:19;
58:16;79:6
**3rd- (1)**
19:21

---

### 4

**41 (1)**
4:4
**42 (1)**
3:5
**45 (1)**
3:6
**49 (1)**
3:7

---

### 5

**5 (1)**
3:3
**50 (3)**
35:7;94:2,5
**50's (1)**
94:6
**53 (1)**
3:10
**53C (1)**
89:1
**53C-2-301 (1)**
89:2
**5th (8)**
21:16;22:9;68:20;
92:2,8,10,15,18

---

### 6

**6:00 (1)**

10:4
**6th (5)**
92:9,14,16,18,19

---

### 7

**7 (4)**
57:2;60:3,4,6
**702 (1)**
48:11
**76-6-110 (3)**
62:22;88:19,21
**76-6-111 (2)**
88:18,22

---

### 9

**9:00 (1)**
94:2

---