IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ROSALIE CHILCOAT, an individual<br><br>Plaintiff,<br><br>v.<br><br>ZANE ODELL,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING ZANE ODELL'S [69] MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 4:19-cv-00027-DN<br><br>District Judge David Nuffer |

This dispute arises out of a criminal prosecution of a wilderness advocate, Plaintiff Rosalie Chilcoat ("Chilcoat"), for an alleged trespassing incident in the Spring of 2017.[1] Chilcoat was accused of trespassing by Zane Odell ("Odell"), who she now sues.[2] First, under 42 U.S.C. § 1983, Chilcoat alleges that Odell acted under color of law, violating Chilcoat's constitutional rights.[3] Second, Chilcoat alleges that Odell perpetrated a civil assault on Chilcoat.[4]

Odell's Motion for Summary Judgment ("Motion")[5] argues that Chilcoat cannot show that Odell was acting under color of state law and cannot show that Odell had the requisite intent for the assault.[6] Chilcoat responds that there are questions of fact as to whether Odell acted under color of law and acted with the intent to cause an apprehension of immediate harm.[7] Because a

---

[1] Complaint and Jury Demand ("Complaint"), docket no. 2, filed April 10, 2019.

[2] *Id.*

[3] *Id.* ¶¶ 8-10.

[4] *Id.* ¶¶ 7-8.

[5] Defendant Zane Odell's Motion for Summary Judgment ("Motion"), docket no. 69, filed October 16, 2020.

[6] Motion at 17.

[7] Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposition"), docket no. 81, filed November 17, 2020.

jury could not reasonably conclude that Odell was acting under color of law or that Odell had the intent to cause apprehension of immediate harm to Chilcoat, Odell's Motion[8] is GRANTED.

**Contents**

UNDISPUTED FACTS ........................................................................................................... 2
STANDARD OF REVIEW ................................................................................................. 17
     Admissibility of Evidence on Summary Judgment Motion............................................. 17
DISCUSSION ....................................................................................................................... 18
     Chilcoat's § 1983 claim fails because Odell was not acting under color of law ............. 18
          The Public Function Test is Not Met.................................................................. 19
          The Nexus Test is Not Met.................................................................................. 20
          The Symbiotic Relation Test is Not Met ............................................................ 22
          The Joint Action Test is Not Met........................................................................ 22
     Chilcoat's claim for assault fails because Odell lacked intent  to cause apprehension of
          harmful contact to Chilcoat................................................................................. 25
ORDER .................................................................................................................................. 30

## UNDISPUTED FACTS

These Undisputed Facts were determined by careful examination of the Statement of Undisputed Material Facts in Odell's Motion[9] and the responses to those facts in "Chilcoat's Response to Disputed Paragraphs in 'Defendant Odell's Statement of Undisputed Material Facts'" in Chilcoat's Opposition.[10] These Undisputed Facts also include facts from Chilcoat's Statement of Undisputed Material Facts in her Opposition.[11] But that section of Chilcoat's Opposition does not comply with DUCivR 56-1(c)(3) and (4);[12] was not responded to by Odell;

---

[8] Docket no. 69, filed October 16, 2020.

[9] Motion ¶¶ 1-80 at 4-16.

[10] Opposition at 23-30.

[11] *Id.* at 4-22.

[12] For a Statement of Material Facts; Response to Statement of Undisputed Material Facts; and Statement of Additional Material Facts that are more compliant with DUCivR 56-1(c)(3) and (4), see Counterclaim Defendants' Motion for Summary Judgment at 3-11, docket no. 67, filed October 15, 2020; Counterclaim Plaintiff's Response to Counterclaim Defendants' Motion for Summary Judgment at 2-10, docket no. 92, filed November 30, 2020; and Counterclaim Defendants' Reply Memorandum in Support of Motion for Summary Judgment at 2-7, docket no. 95, filed December 14, 2020.

is an entirely new narrative of facts; and is largely immaterial to the resolution of Odell's Motion.

A key location in these facts is Odell's cattle corral in San Juan County, Utah (the "Corral"). Some persons mentioned are officers of the San Juan County Sheriff's Office ("SJCSO").

1.      On April 1, 2017, Mark Franklin closed a gate along the perimeter of the Corral.[13]

2.      When Odell noticed the closed gate at the Corral, he called the SJCSO's dispatch number.[14]

3.      Sergeant Robert Wilcox ("Sgt. Wilcox") reported to the Corral following Odell's call, and prepared a report about the incident which was authenticated by Sgt. Wilcox during his deposition.[15]

4.      At the Corral, Sgt. Wilcox spoke with Odell and viewed the pictures of a camper (the "Camper") and partial license plate that had been taken by Odell's trail camera.[16]

5.      Sgt. Wilcox performed further investigation at the Corral by observing tire tracks and footprints suspected to belong to whomever had closed the gate.[17]

6.      Sgt. Wilcox then downloaded the photographs from Odell's trail camera to his computer.[18]

---

[13] Motion ¶ 1 at 4; Exh. A at 20:10-22:9.

[14] Motion ¶ 2 at 4; Exh. B at 21:22-22:18.

[15] Motion ¶ 3 at 4; Exh. D at 9:4-9:17.

[16] Motion ¶ 4 at 5; Exh. C at p. 3; Exh. D at 20:10-20:20.

[17] Motion ¶ 5 at 5.

[18] *Id.* ¶ 6 at 5.

7.      Sgt. Wilcox then informed Odell that he was going to attempt to locate the Camper in the area, which included checking back roads and other popular camping spots for a camper that matched what was present on the trail camera.[19]

8.      Later that same day, Sgt. Wilcox received word from dispatch that Odell had located what he believed to be the Camper at the Sand Island campground in Bluff, Utah. Sgt. Wilcox proceeded to meet Odell nearby, along with an officer from the Towoac police department.[20]

9.      When Sgt. Wilcox met Odell, Odell stated "we got them," which he states he meant "we" as referring to himself and his daughter, who was working and traveling with Odell that day.[21]

10.     At a motions hearing later on in the prosecution of Chilcoat, Sgt. Wilcox testified that Odell did not specify who the "we" were in that statement.[22]

11.     Odell asked Sgt. Wilcox to speak to the occupants of the camper at the Sand Island campground.[23]

---

[19] Id. ¶ 7 at 5.

[20] Id. ¶ 8; Exh. C at p. 3; Exh. D at 27:19-28:3.

[21] Motion ¶ 9 at 5; Exh. B at 92:9-92:12 ("Who did you mean by 'we'?" A: "My daughter and I."). While Chilcoat referred to testimony of Sgt. Wilcox that his understanding that "we" "possibly" meant Sgt. Wilcox and Odell, Sgt. Wilcox never testified as to his actual understanding. Opposition at 3; Exhibit J to Opposition, Testimony of Rob Wilcox, 33:13-15.

[22] Motion ¶ 10 at 5. While Odell's testimony clearly stated his intent in using "we," Sgt. Wilcox testified that at the time he thought it was "possible" that Odell meant "we" to include Sgt. Wilcox. See Motion, Exh. F, pp. 27:22-28:3, 68:24-69:15; Exh. J, p. 33:15-20 ("Q. And 'we' was you and him?" "A. He didn't specify." "Q. Was that your understanding, though?" "A. Possibly, yeah.").

[23] Opposition at 23; see also Motion, Exh. F at 29:12-18, 29:20-31:3 ("Q. [I]s it a true statement that Mr. Odell said, 'The camper's parked there at the Sand Island Campground, just asked me'" – meaning you – "to go, you know, ask them some questions about it." "A. Yes.").

12.     Sgt. Wilcox interviewed the occupants of the camper about the closing of the gate at the Corral and ultimately determined that they were not involved and that it was not the Camper at issue.[24]

13.     While Odell asked Sgt. Wilcox to speak with the occupants of the camper at the Sand Island campground, Sgt. Wilcox testified that he would have performed that portion of his investigation whether or not Odell had asked him to.[25]

14.     After Sgt. Wilcox informed Odell that it was not the same camper, he told Odell that he would continue searching for the subject Camper, and Odell responded that he would do the same.[26] They agreed to tell each other if they found anything.[27]

15.     Sgt. Wilcox testified that he got the impression that Odell would be proactive in the case, and that it was not an unusual thing for a victim to be involved in a case like this.[28]

16.     After checking a couple of additional locations for the Camper, Sgt. Wilcox sent the information on the Camper, along with the trail camera pictures, to other officers at the SJCSO, and made a Facebook post under the SJCSO's official page to attempt to get the public's help in locating the Camper.[29]

---

[24] Motion ¶ 11 at 5-6; Exh. C at 3 ("[Odell] told me where the camper was … I went up to them and made a little small talk. I then started asked them about places they had been."); Exh. D at 23:4-23:7, 26:19-27:10.

[25] Motion ¶ 12 at 6; *but see* Opposition, Exh. D at 70:2-70:6, 70:20-71:4 ("So, regardless if Mr. Odell told you that, was that what you were planning on doing when you got there?" "Yes.").

[26] Motion ¶ 13 at 6. *See* Opposition, Exh. C at p. 3; *see also* Exh. D at 71:5-71:9.

[27] Opposition at 23-24; *see also* Motion, Exh. J at 36:13-24 ("Q. And you were both going to continue to investigate the circumstances? A. Yeah." "Q. And he was going to let you know if the found anything? A. And vice versa, yes.").

[28] Motion ¶ 14 at 6.

[29] Motion ¶ 15 at 6.

17.     On April 3, 2017, Odell was putting a pump into a well located within the Corral, and was being assisted by a neighboring rancher, Zeb Dalton, and Mr. Dalton's hired help, Torrance Weaver.[30]

18.     Odell later recounted the events of that day in a Voluntary Statement Form he prepared on or about April 4, 2017, at the request of Sgt. Wilcox, which Odell authenticated during his deposition.[31]

19.     While working on the installation of the pump, Odell caught a glimpse of the Camper he had seen in the trail camera photographs.[32]

20.     When Odell saw the Camper, he left his pickup truck, whistled at Mr. Dalton, pointed at the Camper, and took off running towards the Camper.[33]

21.     Based on the distance from where Odell was working to where the Camper would intersect with the road to the Corral, Odell knew it was not physically possible for him to catch the Camper.[34]

22.     At the preliminary hearing in the prosecution of Chilcoat, Odell stated that his purpose in running to catch the Camper was to stop the vehicle and see if the license plate on the Camper matched the picture from his trail camera.[35]

---

[30] *Id.* ¶ 16.

[31] *Id.* ¶ 17 at 6-7.

[32] *Id.* ¶ 18 at 7; Exh. B at 54:8-54:24 ("you said you caught a glimpse of the trailer; is that right?" "Yes, ma'am."); *see also* Exh. F at p. 5; *but see* Opposition, Exh. D at 55:4-10, 55:21-24 ("… so we can check license plate to confirm it is a match").

[33] Motion ¶ 19 at 7; Exh. B at 55:7-56:9; Exh. F at p. 5; *but see* Opposition at 24; Exh. K, pp. 16:14-17:14, 17:25-18:4; Exh. D, pp. 55:21-56:22.

[34] Motion ¶ 20 at 7.

[35] *Id.* ¶ 21 at 7; Exh. B at 56:9-56:14, 92:1-92:5; *but see* Opposition at 24; Exh. G, p. 14:20–15:8 (was running "to try to get to the road to stop and talk to them," and "Zeb Dalton drove his pickup there because that was a lot faster than my running. When we did get there, then we stopped.")

23.     On that day, Odell did not provide any other cue or instruction to Mr. Dalton, and prior to spotting the Camper, had only asked Mr. Dalton to keep an eye out for it.[36]

24.     Mr. Dalton proceeded to drive his pickup truck past Odell, who was running along the road that accessed the Corral. Odell then fell or dove out of the way.[37]

25.     Both Chilcoat and Mr. Franklin (who were traveling in the Camper) witnessed the pickup truck speed past Odell, who had fallen or dove, which Chilcoat described in a statement she prepared and authenticated in her deposition.[38]

26.     Mr. Dalton then pulled his pickup across the road that the Camper was traveling on right up to the bank on the other side, blocking the travel of the Camper.[39]

27.     Mr. Dalton testified that Odell never instructed him to stop the Camper as he did on April 3, 2017.[40]

28.     When Mr. Dalton exited the pickup truck after blocking the Camper's path, Chilcoat testified that Mr. Dalton aggressively approached them, by running towards the driver's side, while gesturing and yelling at Chilcoat and Mr. Franklin.[41]

29.     Odell and Mr. Weaver reached the Camper, after Mr. Dalton had stopped it, and Odell proceeded to catch his breath following his sprint.[42]

---

[36] Motion ¶ 22 at 7; Exh. B at 56:8-56:17, 90:18-90:24, 92:6-92:8; Exh. G at 10:14-10:25, 17:9-17:24.

[37] Motion ¶ 23 at 7; Exh. G at 17:25-18:17; Exh. A at 42:5-42:12 ("then I see one of the cowboys falling, and I go, Oh, my God that truck is going to run over one of the guys. I can't remember which one of the two fell. The pickup truck then passed them."); *but see* Opposition, Exh. E at 42:5-12. Whether Odell fell or dove out of the way is immaterial.

[38] Motion ¶ 24 at 7-8; Exh. A at 42:5-42:12; Exh. H at 11:8-12:13; Exh. I at 3.

[39] Motion ¶ 25 at 8.

[40] *Id.* ¶ 26.

[41] *Id.* ¶ 27.

[42] *Id.* ¶ 28.

30.     While Odell was running towards the Camper and then catching his breath, Chilcoat did not find Odell's behavior aggressive, nor did she think that Odell was intending to cause her harm.[43]

31.     Mr. Dalton continued to yell at Chilcoat and Mr. Franklin, while Odell and Mr. Weaver remained mostly quiet while affirming Mr. Dalton's actions and speech by nodding their heads.[44]

32.     At this point in time, Chilcoat and Mr. Franklin both testified that Odell seemed to be mainly affirming Mr. Dalton's actions.[45]

33.     Odell asked Mr. Franklin if Mr. Franklin had shut the gate, why Mr. Franklin had done that, and whether Mr. Franklin thought that was helpful.[46]

34.     While having this conversation, Odell did not touch the Camper Chilcoat and Franklin were riding in, nor did he attempt to enter it.[47]

35.     Odell proceeded to call the SJCSO in order to report the encounter with Chilcoat and Mr. Franklin.[48]

36.     When Odell told dispatch that day that "we got them," the "we" Odell was referring to was himself and Mr. Dalton.[49]

---

[43] Motion ¶ 29 at 8.

[44] *Id.* ¶ 30 at 8; Exh. A at 46:4-49:2; 27:4-9; 30:21-31:1 ("[Odell] was affirming with his body and head what Zeb was saying."), Exh. E at 46:4-47:4, 48:10-49:7; Exh. G at 97:10-17.

[45] Motion ¶ 31 at 8; Exh. H at 29:16-29:25, 31:2-31:22, 35:11-36:6; *see also* Exh. A at 48:24-49:7, 35:11–36:3 ("Odell never turned and looked at us."); Exh. E at 51:2-25 ("Zane [Odell] said, 'You can take all the pictures you want. We've got you on camera. We've got videos of you. Zane was saying all that.'").

[46] Motion ¶ 32 at 9.

[47] *Id.* ¶ 33.

[48] *Id.* ¶ 34.

[49] *Id.* ¶ 35.

37.     Even though Chilcoat wrote that "[w]e were being unlawfully detained by some crazy scary cowboys in the middle of nowhere," neither Chilcoat nor Mr. Franklin attempted to call 911.[50]

38.     While Chilcoat could not know whether Odell was actually calling the sheriff, Chilcoat had no reason to distrust that Odell was doing so based on her past encounters with him, and was given a sense of a relief by him doing so.[51]

39.     While Mr. Franklin could not know whether Odell was actually calling the sheriff, Mr. Franklin did not feel the need to call 911, and assumed that the officer would arrive in only a few minutes, even though he had no idea how long it could take.[52]

40.     Mr. Franklin later stated that he did not feel an imminent threat of being struck, or an imminent threat that Mr. Dalton, Odell, or Mr. Weaver were going to physically attack him.[53] However, he also testified that he was concerned for his safety.[54]

41.     Chilcoat never told Mr. Franklin that she felt like there was an imminent threat she would be struck, or that Mr. Dalton, Odell, or Mr. Weaver were going to attack her.

42.     Chilcoat described being fearful of the ranchers laughing at the situation, because she thought "they were feeling empowered and happy about something."[55]

---

[50] Motion ¶ 36 at 9; Exh. H at 34:3-34:7; Exh. A at 53:1-53:5; *but see* Opposition, Exh. A at 34:3-18.

[51] Motion ¶ 37 at 9; Exh. H at 34:3-34:21.

[52] Motion ¶ 38 at 9.

[53] Motion ¶ 39 at 10; Exh. A at 54:8-54:13 ("Did you feel an imminent threat of being struck?' "No." "That any of the ranchers were going to physically attack you?" "No.")

[54] Opposition, Exh. E, p. 52:1-18 ("I was basically fearful of my safety at that time, yes."), 54:20-24, 55:4-15.

[55] Motion ¶ 41 at 10; Exh. H at 37:5-37:10.

43.     Chilcoat also testified that she thought the men were crazy and scary, that they would not answer questions about what was happening, that she was traumatized, and that the situation was high-adrenaline and she hoped it would de-escalate.[56]

44.     While Odell was on the phone with the SJCSO dispatcher, Mr. Franklin asked Mr. Dalton questions regarding why Mr. Dalton had stopped the Camper, and Mr. Dalton continued to yell at Chilcoat and Mr. Franklin.[57]

45.     Mr. Dalton repeatedly informed Mr. Franklin that Mr. Franklin would find out why Mr. Dalton stopped him when the sheriff arrived.[58]

46.     Mr. Dalton also informed Mr. Franklin that they had pictures of Mr. Franklin closing the gate, in an attempt to bluff Mr. Franklin, even though Odell never told Mr. Dalton that such pictures existed.[59]

47.     Mr. Dalton and Odell both falsely stated that they had photographs of Mr. Franklin and Chilcoat closing the gate.[60]

48.     Chilcoat proceeded to exit the Camper to take pictures of Mr. Dalton, Odell, and Mr. Weaver, and of Mr. Dalton's pickup truck and license plate, after which she got back into the Camper.[61]

49.     Deputy Jay Begay ("Dep. Begay") received the call from dispatch to report to the Corral, and arrived there in approximately 10 minutes.[62]

---

[56] Opposition at 26; Exh. A, p. 29:5 – 30:25; p. 34:3-14; p. 35:11–36:3; p. 37:1-10; p. 42:23–44:19; Exh. D, p. 58:8-14; Exh. K, p. 21:6 – 22:20.

[57] Motion ¶ 42 at 10.

[58] Id. ¶ 43.

[59] Id. ¶ 44; Exh. G at 27:17-28:24.

[60] Opposition at 26; Exh. E at 51:2-25; Exh. K at 27:17–30:3.

[61] Motion ¶ 45 at 10.

[62] Opposition at 26; Exh. E at 51:2-25; Exh. K at 27:17 – 30:3

50.     When Dep. Begay arrived at the Corral, he approached Mr. Dalton, Odell, Mr. Weaver, and Mr. Franklin at the location where Mr. Dalton's truck had blocked the Camper, which is shown on Dep. Begay's bodycam footage and was authenticated during Dep. Begay's deposition.[63]

51.     Dep. Begay testified at the motions hearing in the prosecution of Chilcoat that the mood was not very tense when he arrived at the scene that morning, though it escalated later on.[64]

52.     Dep. Begay introduced himself and proceeded to ask Mr. Franklin whether Mr. Franklin had closed the gate to the Corral, which Mr. Franklin immediately admitted to.[65]

53.     Mr. Franklin suggested that Dep. Begay go and look at the Corral with him, and Dep. Begay, Mr. Franklin, and Odell proceeded to walk towards the Corral, while Mr. Dalton and Mr. Weaver rode back in Mr. Dalton's truck.[66]

54.     While walking towards the Corral, Odell asked Mr. Franklin questions about whether Mr. Franklin knew this was State trust land versus public land, why Mr. Franklin closed the gate, and where Mr. Franklin was from.[67] Mr. Franklin later characterized this as an interrogation.[68] However, Dep. Begay described it as a debate.[69]

---

[63] Motion ¶ 47 at 11.

[64] *Id.* ¶ 48 at 11; Exh. E at 71:4-71:14; *see also* Opposition at 27; Exh. J at 71:4-14, 109:2-11; Exh. E at 55:4-15.

[65] Motion ¶ 49 at 11.

[66] *Id.* ¶ 50.

[67] *Id.* ¶ 51; Exh. L at 1:06-2:44; *see also* Exh. M at 56:18-57:15 ("In your report you described when Mr. Odell was asking questions of Mr. Franklin, that they were debating. Is that right?" "That was my interpretation, yes.").

[68] Opposition at 27; Exh. E at 36:1-11 ("I was being interrogated mostly by Zane Odell and Zeb Dalton."), 60:19-61:1 ("But [Begay] was allowing Mr. Odell to ask most of the questions so that threw me for a loop"), Exh. J at 109:2-11; Exh. N at 10:00:34–10:15:45.

[69] Motion at 11; Exh. M at 56:18-57:15 ("In your report you described when Mr. Odell was asking questions of Mr. Franklin, that they were debating. Is that right?" "That was my interpretation, yes.")

55.     Upon reaching the Corral, Dep. Begay questioned the men regarding the gate closing, and Odell and Mr. Franklin informed Dep. Begay of what they had done and observed.[70]

56.     Odell again repeated some of the questions he had asked Mr. Franklin when they were walking from the vehicles to the Corral and Odell appeared to become annoyed by Mr. Franklin's conduct in closing the gate and his answers to the questions.[71]

57.     Dep. Begay interrupted the squabbling and walked Mr. Franklin back to the vehicles approximately two (2) minutes after they all arrived at the Corral. Dep. Begay continued to interview Mr. Franklin during their walk back, during which time Mr. Franklin again admitted multiple times to closing the gate.[72]

58.     Dep. Begay then instructed Franklin to return to his vehicle and that he would be calling Sgt. Wilcox to report in since Sgt. Wilcox had begun the investigation on April 1, 2017.[73]

59.     Dep. Begay then returned to his truck and called Sgt. Wilcox, and told Sgt. Wilcox that he had had to separate the parties because they were "arguing over the same moot point."[74]

60.     Dep. Begay informed Sgt. Wilcox that Odell wanted to press charges, which both Mr. Dalton and Odell stated to Dep. Begay in front of Mr. Franklin.[75]

---

[70] Motion ¶ 52 at 11-12; Exh. L at 2:55-3:42; *but see* Opposition at 27; Exh. B at 19:21–20:5; Exh. E at 36:1-11 ("I was being interrogated mostly by Zane Odell and Zeb Dalton. Deputy Begay asked me – if you look at the body camera, he asked me very few questions."); 60:19–61:1 ("[Begay] was allowing Mr. Odell to ask most of the questions so that threw me for a loop.").

[71] Motion ¶ 53 at 12.

[72] *Id.* ¶ 54.

[73] *Id.* ¶ 55.

[74] *Id.* ¶ 56.

[75] *Id.* ¶ 57.

61.     Sgt. Wilcox instructed Dep. Begay to get the rest of the parties' information, and that since Mr. Franklin had admitted to closing the gate, that no further pictures of the prints were necessary, although it would still help.[76]

62.     Sgt. Wilcox then told Dep. Begay that they would screen the case with the San Juan County Attorney, Kendall Laws, and that trespassing charges were the only likely charges available, and the two hung up the call.[77]

63.     Dep. Begay then checked in with dispatch, ran checks on Mr. Franklin's plates and driver's license.[78]

64.     Dep. Begay also received a call while awaiting results on Mr. Franklin's driver's license, which appeared to be from the Sheriff of San Juan County, and Dep. Begay proceeded to inform him of the progress of the investigation.[79]

65.     Dep. Begay then drove his truck up to the Camper to return Mr. Franklin's driver's license to him, informed Mr. Franklin and Chilcoat that he was going to return to speak with Mr. Dalton, Odell, and Mr. Weaver, informed Chilcoat and Mr. Franklin of the next steps of the investigation, requested Mr. Franklin's contact information and Chilcoat's name, and gave Mr. Franklin a SJCSO business card with Dep. Begay and Sgt. Wilcox's contact information on it.[80]

66.     Dep. Begay then moved his truck and allowed Mr. Franklin and Chilcoat to leave.[81]

---

[76] Motion ¶ 58 at 12-13; Exh. L at 9:01-9:12; *see also* Opposition at 27-28; Exh. N, 10:19:13.

[77] Motion ¶ 59 at 13.

[78] *Id.* ¶ 60.

[79] *Id.* ¶ 61.

[80] *Id.* ¶ 62.

[81] *Id.* ¶ 63.

67.     While Dep. Begay was speaking with Chilcoat and Mr. Franklin back at the Camper, neither Chilcoat nor Mr. Franklin made a report to Dep. Begay regarding any alleged assault, detention, or kidnapping by Mr. Dalton, Odell, or Mr. Weaver, nor did they tell Dep. Begay that they were in fear or distress in any way.[82]

68.     Chilcoat testified that she did not make a complaint because she believed that her former position with the Great Old Broads for Wilderness would cause any member of the SJCSO to not act in her best interests, even though nobody had spoken about that organization to Dep. Begay prior to Chilcoat and Mr. Franklin leaving the scene.[83] Chilcoat also testified that she did not believe Dep. Begay would be receptive to a complaint, particularly as Dep. Begay had been letting Odell interrogate Mr. Franklin.[84]

69.     Dep. Begay then returned to Odell and asked Odell what charges he wanted to tell the County Attorney,[85] Odell and Mr. Dalton expressed their concerns for the cows if they had been unable to access water, and Dep. Begay interviewed the ranchers further.[86]

70.     Dep. Begay informed Odell that Mr. Laws would be calling Odell when Mr. Laws was briefed on the investigation and ready to speak with Odell.[87]

71.     When Odell and Mr. Dalton asked for Chilcoat and Mr. Franklin's names, Dep. Begay deflected the questions.[88]

---

[82] Motion ¶ 64 at 13-14.

[83] *Id.* ¶ 65 at 14; Exh. H at 43:23-45:14; *see also* Exh. L at 0:00-17:21.

[84] Opposition at 28; Exh. A, p. 44:20–45:1

[85] Opposition at 28; Exh. N, 10:18:57; 10:26:16.

[86] Motion ¶ 66 at 14; Exh. L at 17:46-22:03.

[87] Motion ¶ 67 at 14.

[88] *Id.* ¶ 68.

72.     The Great Old Broads for Wilderness was brought up when Mr. Dalton mentioned that it was an environmental organization based in Durango, Colorado.[89]

73.     At this point, Dep. Begay reminded Odell that Odell said he wanted to press charges. Odell responded that he wanted to go as far as possible so that, "in their environmental world and social media, the rest of them will catch on."[90]

74.     Dep. Begay then turned the conversation back to Odell's contact information so Mr. Laws could contact Odell when Mr. Laws was ready to, proceeded to take down Mr. Dalton and Mr. Weaver's names, and continued to speak with the ranchers.[91]

75.     When Odell again asked for Chilcoat and Mr. Franklin's names, Dep. Begay again deflected the question, and informed Odell that Dep. Begay would need to run it by Sgt. Wilcox.[92]

76.     Dep. Begay then spoke with the ranchers for a couple more minutes, instructed them to call the SJCSO if they found any other issues in the area, and then departed from the scene approximately 30 minutes after he arrived.[93]

77.     This was the first time that Dep. Begay had met Odell, and after that interaction, Dep. Begay did not recall having another conversation with Odell, and that if he had had one, it would have been detailed in a supplemental report.[94]

---

[89] Motion ¶ 69 at 14; Exh. L at 22:55-24:07; *but see* Opposition at 28; Exh. D at 66:16-21.

[90] Opposition at 28-29; Exh. N at 10:23:04-10:26-13.

[91] Motion ¶ 70 at 14; Exh. L at 24:08-26:59.

[92] Motion ¶ 71 at 15.

[93] *Id.* ¶ 72.

[94] *Id.* ¶ 73.

78.     Dep. Begay later testified that the investigation of the gate closing incident at the Corral was the same as any of the other 200 or so scenes he had investigated in his several years as a deputy with the SJCSO.[95]

79.     Sgt. Wilcox testified that there was nothing unusual about the investigation of the gate closing incident at the Corral as compared to the 500 or so other investigations he had been involved with during his 12 years doing patrol operations with the SJCSO.[96]

80.     When Mr. Laws was presented with the investigation regarding Chilcoat and Mr. Franklin by the SJCSO, it appeared to follow the same general practice of the typical cases he would receive, as compared to the somewhere between 1200 and 1400 cases in his career as a prosecutor.[97]

81.     During the course of Mr. Laws's prosecution of Chilcoat's and Mr. Franklin's cases, he generated over 1000 pages of documents and filings.[98]

82.     Mr. Laws kept Odell appraised of the prosecution, and involved in the various steps of the case, based on Mr. Laws's obligations to Odell pursuant to the Victims' Bill of Rights.[99]

---

[95] Motion ¶ 74 at 15; Exh. M at 63:11-63:22; *but see* Opposition at 29 (pointing out that at the time of the incident, Dep. Begay had investigated approximately 50 scenes); Exh. B at 48:16–49:20 ("So, your experience in investigations to that point, how many times had you gone out on a call?" "I don't remember how many calls I had at that point." "Maybe more than a hundred or less? Just trying to get a ballpark." "It was definitely less than a hundred.").

[96] Motion ¶ 75 at 15; Exh. D at 67:10-68:18.

[97] Motion ¶ 76 at 15-16; Exh. O at 69:18-69:24, 72:5-72:14 ("was there anything about the investigation that was brought to you … weird or different … than the files typically brought to you for prosecution?" "No. It seemed to follow the same general practice of what I'm used to dealing with.").

[98] Motion ¶ 77 at 16; Exh. O at 75:25-76:22.

[99] Motion ¶ 78 at 16.

83.     While Odell expressed his desire to see Chilcoat convicted, Mr. Laws testified that it was not uncommon for a victim of a crime to express such desire.[100]

84.     While Odell had a role in the plea negotiations for Chilcoat's criminal case, Mr. Laws was clear with Odell that any decision was ultimately Mr. Laws's call.[101]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[102] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[103] In determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[104]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[105]

### Admissibility of Evidence on Summary Judgment Motion

"At the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial, but the content or substance of the evidence must be admissible."[106] "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[107]

---

[100] Motion, *supra*, note 3, ¶ 79 at 16.

[101] *Id.* ¶ 80 at 16; Exh. O at 79:5-79:23.

[102] Fed. R. Civ. P. 56(a).

[103] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[104] *Id.*

[105] *Id.* at 670-71.

[106] *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 999 (10th Cir. 2019) (citations and quotation marks omitted).

[107] *Id.* at 999 n.15 (citations and quotation marks omitted).

## DISCUSSION

Chilcoat claims Odell acted under "color of law," violating Chilcoat's constitutional rights and that Odell also perpetrated an assault on Chilcoat.[108] Odell argues in his Motion that these claims fail as a matter of law because (1) Odell was not acting under color of law as a state actor, and (2) Odell did not act with the intent to cause harmful or offensive contact or with intent to cause imminent apprehension of such.[109] The Undisputed Facts demonstrate that no reasonable jury could find Odell liable under either of Chilcoat's claims.

### Chilcoat's § 1983 claim fails because Odell was not acting under color of law

42 U.S.C. § 1983 allows citizen-plaintiffs to seek remedies against State actors for unlawful deprivation of federal rights.[110] To state a claim under § 1983, a party must allege that the defendant deprived him of a federal right, and that the defendant acted under color of law.[111] While § 1983 claims are usually brought against government employees, private persons may be liable when their conduct is "fairly attributable to the State."[112]

The Supreme Court has followed a two-prong approach to determine whether conduct is fairly attributable to the State.[113] "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the [S]tate or by a person for whom the State is responsible."[114] This may be shown when "the authority of [S]tate

---

[108] Complaint, *supra*, note 1, ¶¶ 52-65 at 15-17.

[109] Motion, *supra*, note 3, 19-30, 36-39.

[110] *Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002).

[111] *Id.* (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978)).

[112] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see also*, *Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002).

[113] *Lugar*, 457 U.S. at 937.

[114] Id. at 937, 940.

officials . . . put the weight of the State behind [a defendant's] private decision."[115] "Second, the party charged with the deprivation must be a person who may fairly be said to be a [S]tate actor."[116] To determine if the second prong is satisfied, "[t]he [c]ourt has taken a flexible approach," applying a variety of tests, including the four cited by the parties in this case: (1) the public function test, (2) the nexus test, (3) the symbiotic relationship test, and (4) the joint action test.[117] This decision focuses on the second prong, because Odell cannot be said, on the Undisputed Facts, to be a State actor.

**The Public Function Test is Not Met**

The "public function test" looks to whether the State has delegated "a function traditionally exclusively reserved to the States" to a private party.[118] This is considered "an arduous standard to satisfy" primarily because "very few [functions] have been exclusively reserved to the State."[119] Typical actions found to be public functions include holding elections or the management of a city park.[120] Private parties performing these functions are considered State actors because they performed a service traditionally under the exclusive prerogative of the State.[121]

While Chilcoat concedes that performing an arrest, investigating crimes, and interrogating witnesses are not functions exclusively reserved to the State,[122] she argues that the

---

[115] *Id.* (internal quotation marks and citations omitted); *see also Johnson* at 1202.

[116] *Id.* at 937.

[117] *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995)

[118] *Johnson*, 293 F.3d at 1203.

[119] *Id.*

[120] *See* id. (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 356 (1974)).

[121] *Id.*

[122] Opposition at 34.

authority to bring charges for criminal prosecution is within the exclusive purview of the State.[123] Specifically, Chilcoat argues that the San Juan County Attorney delegated his authority to bring criminal charges by relying upon photographs brought to him by Odell.[124]

At best, Chilcoat shows only that Odell provided the SJCAO with photographic evidence, which is not an action exclusively reserved to the State. There is no evidence that Odell was tasked with bringing the criminal charges, including the retaliation charge, against Chilcoat. Mr. "Laws was clear with Odell that any decision was ultimately Laws'[s] call."[125] Therefore, the Undisputed Facts demonstrate that Odell was not a State actor under the public function test, and no reasonable jury could find otherwise.

**The Nexus Test is Not Met**

Under the "nexus test," a plaintiff must show "a sufficiently close nexus" between the government and the challenged conduct such that the conduct "may be fairly treated as that of the State itself."[126] "[A] [S]tate normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."[127] Merely availing oneself of State judicial procedures is insufficient to constitute State action.[128] And "a [S]tate official's mere approval of or acquiescence to the conduct of a private party is insufficient to establish the nexus required for [S]tate action."[129]

---

[123] *Id.*; *see also* Utah Code §§ 77-2-1, 77-2-1.1.

[124] Opposition at 35.

[125] *See supra* Undisputed Facts ¶ 84.

[126] *Gallagher*, 49 F.3d at 1448 (citing *Jackson*, 419 U.S. at 351)

[127] *Johnson*, 293 F.3d at 1196 (internal quotations and citations omitted).

[128] *See id.*

[129] *Gallagher*, 49 F.3d at 1450.

Chilcoat argues that the SJCSO "provided significant assistance to Odell" by "delegat[ing] important parts of its investigation to Odell."[130] However, the facts highlighted by Chilcoat fail to move beyond mere acquiescence and into significant State encouragement. Rather, Odell's actions and the SJCSO's actions are akin to a typical victim-law enforcement relationship.

Odell provided the SJCSO with photographs and witness testimony, and the SJCSO relied upon that evidence.[131] Obtaining evidence and relying upon that evidence does not constitute significant encouragement.[132] It is routine for law enforcement to work with victims to obtain evidence of a crime.[133]

While Sgt. Wilcox followed through on Odell's request for him to interview the campers at the Sand Island campground, Wilcox explained that he would have done this regardless.[134] It is also true that Odell stated on his call to the police that "we're holding them for you", but the only response given by the dispatcher was "okay I'll get one [(an officer)] down there for ya."[135] This was not a direction by the dispatcher that Odell continue to detain Chilcoat.

Dep. Begay did allow Odell to do most of the questioning of Mr. Franklin. However, the Undisputed Facts demonstrate that Dep. Begay's actions did not go beyond approval or acquiescence of Odell's questioning. Dep. Begay also asked Odell what kind of charges Odell

---

[130] Opposition, *supra*, note 7, at 37.

[131] *Supra* Undisputed Facts ¶¶ 4-6, 55, 82.

[132] *See Johnson*, 293 F.3d at 1196.

[133] *Supra* Undisputed Facts ¶ 82 at 16.

[134] *Id.* ¶ 13; *see also* Motion for Summary Judgment ¶ 12 at 6; Opposition, Exh. D at 70:2-70:6, 70:20-71:4 ("So, regardless if Mr. Odell told you that, was that what you were planning on doing when you got there?" "Yes.").

[135] Motion for Summary Judgment at 23; *see also* Exh. J-K.

21

wanted conveyed to the County Attorney.[136] But it is not out of the ordinary for police to ask a victim about pressing criminal charges.

Nothing in the Undisputed Facts shows direction or significant encouragement on the part of the SJCSO.[137] At most, the facts represent mere approval, acquiescence, and nothing beyond the normal police-victim relationship, and no reasonable jury could find otherwise.

**The Symbiotic Relation Test is Not Met**

Under the "symbiotic relation test," the State must have "so far insinuated itself into a position of interdependence with a private party that it must be recognized as a joint participant in the challenged activity."[138] "[A] private party's mere invocation of [S]tate legal procedures does not constitute joint participation or conspiracy with state officials satisfying the § 1983 requirement of action under color of law."[139] Chilcoat fails to respond to this test in her Opposition[140] and has not established any material facts to support its application in this case. Based on the Undisputed Facts, no reasonable jury could find liability for Odell under the symbiotic relation test.

**The Joint Action Test is Not Met**

Under the joint action test, a court will find State action when a private party is a "willful participant in joint action with the [S]tate or its agents."[141] State action is present when "there is a substantial degree of cooperative action between [S]tate and private officials . . . or if there is

---

[136] *Supra* Undisputed Facts ¶¶ 60-62, 69, 73.

[137] *See supra* Undisputed Facts ¶¶ 13-15 ("Sgt. Wilcox testified that he got the impression that Odell would be proactive in the case, and that it was not an unusual thing for a victim to be involved in a case like this.").

[138] *Gallagher*, 49 F.3d at 1451 (internal citations and quotations omitted).

[139] *Johnson*, 293 F.3d at 1205 (internal alterations omitted) (citing *Lugar*, 457 U.S. at 939 n. 21 (internal quotations omitted)).

[140] *See* Opposition, *supra*, note 7, at 33-41.

[141] *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights."[142]

When a private citizen works with law enforcement, the citizen does not act under color of law merely by reporting an alleged crime or providing information to police officers who take further action. Rather, joint action is shown when an arrest stemmed from "concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise State power."[143] The mere acquiescence of a State official in the actions of the private party is not sufficient.[144]

Courts have found a private citizen to be acting under color of law where law enforcement relied solely upon the citizen's evidence, without any independent investigation.[145] In *Lusby v. T.G. & Y. Stores, Inc.*, a security guard reported a suspected shoplifter to police who then picked up the plaintiffs, handcuffed and frisked them, and took them to jail without interviewing witnesses or conducting an independent inquiry to determine probable cause for the arrest.[146] The security guard was ruled a State actor, in part, because the police "relied entirely on [the security guard's] word," and "made no independent investigation of the shoplifting" before making the arrest.[147] Conversely, in *Schaffer v. Salt Lake City Corp.*, the court did not find State action because the police officer "made the decision to arrest and book [the plaintiff] only after

---

[142] *Gallagher*, 49 F.3d at 1453-54.

[143] *Id.* at 1454.

[144] *See* id. at 1453.

[145] *See Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1430 (10th Cir. 1984), cert. granted, judgment vacated on other grounds sub nom. *City of Lawton, Oklahoma v. Lusby*, 474 U.S. 805, 106 S. Ct. 40, 88 L. Ed. 2d 33 (1985).

[146] *Id.*

[147] *See id.*

conducting an independent investigation."[148] Specifically, the officer had obtained witness statements and photographs; located the offending truck at the plaintiff's home; and observed handprints and marks on the truck consistent with the story.[149]

In this case, the Undisputed Facts are more like those in *Schaffer*, where an independent investigation was made. First, although Odell assisted in the initial investigation, the SCJSO took several independent investigative steps. While Odell provided photographs and witness testimony, Sgt. Wilcox independently attempted to locate the Camper by checking back roads and other popular camping spots.[150] Later, Odell asked Sgt. Wilcox to interview some occupants of a camper he believed to be the one in question.[151] However, not only did Sgt. Wilcox testify that he would have performed this interview regardless of the request, Sgt. Wilcox independently followed through with this step by interviewing the campers on his own, and then made the determination, by himself, that they were not involved.[152] Sgt. Wilcox also continued to search for the Camper; provided information to other SJCSO deputies regarding the Camper; and created a Facebook post to get help from the public in locating it.[153] These actions are all independent investigation by Sgt. Wilcox.

Second, in addition to Odell's questioning of Mr. Franklin, Dep. Begay performed his own questioning, along with other independent investigation. Before Dep. Begay arrived, Odell had already started to question Mr. Franklin at the Corral.[154] However, once Dep. Begay arrived,

---

[148] *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151 (10th Cir. 2016).

[149] *Id.*

[150] *Supra* Undisputed Facts ¶ 7 at 4.

[151] *Id.* ¶ 11 at 4.

[152] *Id.* ¶¶ 12-13 at 5.

[153] *Id.* ¶¶ 14-16.

[154] *Id.* ¶ 33 at 8.

Dep. Begay proceeded to ask Mr. Franklin whether he had closed the gate, which Mr. Franklin admitted.[155] Then, on the way to check out the Corral, Odell asked Mr. Franklin additional questions.[156] But once they reached the Corral, Dep. Begay questioned both of Odell and Mr. Franklin regarding the gate closing.[157] Later, even after Odell began repeating questions he had asked Mr. Franklin earlier, Dep. Begay interrupted and walked Mr. Franklin back to his vehicle, continuing to interview Mr. Franklin.[158] Again, Mr. Franklin admitted to Dep. Begay multiple times to closing the gate.[159] Each of these actions taken by Dep. Begay constitute investigative actions independent from those of Odell. Thus, like the officer in *Schaffer*, Sgt. Wilcox and Dep. Begay conducted independent investigations and did not solely rely upon the evidence conveyed to them by Odell.

Therefore, the Undisputed Facts demonstrate that Odell's conduct is not fairly attributable to the State. And under each of the *Gallagher* tests, the Undisputed Facts clearly show that, while Odell was relatively involved in the investigation of the gate closing, Odell's actions were nothing more than those of a normal victim of a crime. No reasonable jury could find otherwise.

### Chilcoat's claim for assault fails because Odell lacked intent to cause apprehension of harmful contact to Chilcoat.

In order for Chilcoat to prove her civil assault claim, she must show: (1) "[t]he defendant acted, intending to cause harmful or offensive contact with the plaintiff, or imminent apprehension of such contact;" (2) "[a]s a result, the plaintiff was thereby put in imminent

---

[155] *Id.* ¶ 52 at 11.

[156] *Id.* ¶ 54.

[157] *Id.* ¶ 55 at 12.

[158] *Id.* ¶ 57 at 12.

[159] *Id.*

apprehension of [harm] [contact];" and (3) "[t]he plaintiff suffered injuries proximately caused by the defendant's actions."[160] "An act is done with the intention of putting the other in apprehension of an immediate harmful or offensive contact if it is done for the purpose of causing such an apprehension or *with knowledge that, to a substantial certainty, such apprehension will result*."[161] Chilcoat argues that a jury could reasonably conclude that "Odell intended to stop the vehicle Chilcoat was riding in and to cause a harmful or offensive contact with Chilcoat, or, at the very least, to place Chilcoat in imminent apprehension of such contact."[162] However, the Undisputed Facts show that Odell lacked intent to cause these results.

First, while the Undisputed Facts show that Odell may have intended to have Mr. Dalton stop Chilcoat's vehicle,[163] the facts also show that Odell did not intend to cause harmful or offensive contact or apprehension of such contact to Chilcoat. After "Odell saw the Camper, he left his pickup truck, whistled at Mr. Dalton, pointed at the Camper, and took off running towards the Camper."[164] At best, Odell's whistling, pointing, and running to catch up to the Camper may reasonably lead a jury to believe Odell intended Mr. Dalton to stop the vehicle. These actions could not reasonably be interpreted to show Odell's intent to cause harm, offensive contact, or the apprehension of such contact.

This is true whether contact or apprehension was caused by Odell himself or by Mr. Dalton. Odell knew, based on the distance, that it was physically impossible for him to catch the

---

[160] *See D.D.Z. v. Molerway Freight Lines, Inc.*, 880 P.2d 1, 3 (Utah App. 1994) (quoting Model Utah Jury Instructions 10.18 (1993)).

[161] Restatement (Second) of Torts § 21, cmt. d (1965)) (emphasis in original).

[162] Opposition at 54.

[163] *See supra* Undisputed Facts ¶ 22 at 6 ("At the preliminary hearing, Odell stated that his purpose in running to catch the Camper was to stop the vehicle and see if the license plate on the Camper matched the picture from his trail camera."); *see also* Opposition, Exh. D at 55:4-10, 55:21-24 ("… so we can check the license plate to confirm it is a match"); Exh. G at 14:20 – 15:8 (Odell was running "to try to get to the road to stop and talk to them.")

[164] *Supra* Undisputed Facts ¶ 22 at 6.

Camper.[165] "[P]rior to spotting the Camper, [Odell] had only asked Mr. Dalton to keep an eye out for [the Camper]."[166] Outside of his whistling and pointing, "Odell did not provide any other cue or instruction."[167] Even assuming Odell intended that Mr. Dalton stop the Camper, once Mr. Dalton had raced past Odell and pulled his pickup across the road, that was the end of Odell's intent. Mr. Dalton's subsequent actions, such as "aggressively approach[ing]" the Camper's occupants and "running towards the driver's side, while gesturing and yelling at Chilcoat,"[168] are beyond Odell's potential intent that may have been implied by Odell's actions.

Second, once Odell caught up to the Camper, Odell's actions do not suggest an intent to cause offensive contact or apprehension of such contact. When Odell caught up to the Camper, Chilcoat testified that she "did not find Odell's behavior aggressive, nor did she think that Odell was intending to cause her harm."[169] In fact, Mr. Dalton continued to yell at Chilcoat and Mr. Franklin, while Odell remained mostly quiet, merely "affirming Mr. Dalton's actions and speech by nodding his head."[170] Odell's action of nodding his head does not reveal intent to cause physical or offensive contact or apprehension of such contact to Chilcoat.

Third, Odell's questioning of Mr. Franklin does not show an intent to cause offensive contact or apprehension of offensive contact. Throughout the rest of the encounter, Odell asked Mr. Franklin a series of questions about the gate.[171] While Mr. Franklin and Chilcoat remained in

---

[165] *Id.* ¶ 21 at 6.

[166] *Id.* ¶ 23 at 7.

[167] *Id.*

[168] *Supra* Undisputed Facts ¶ 28 at 7.

[169] *Id.* ¶ 30 at 8.

[170] *Id.* ¶ 31.

[171] *Id.* ¶ 33.

the Camper, "Odell did not touch the vehicle," "nor did he attempt to enter it."[172] Once Dep. Begay, Odell, and Mr. Franklin started walking towards the Corral, "Mr. Odell asked Mr. Franklin questions about whether Mr. Franklin knew this was state trust land versus public land, why Mr. Franklin closed the gate, and where Mr. Franklin was from."[173] While Mr. Franklin characterized this as an interrogation, Dep. Begay described it as a debate.[174] Whether this was a debate or an interrogation, Odell's communications with Mr. Franklin does not point to an intent to cause offensive contact or apprehension of such contact.

Additionally, Chilcoat quotes the Order Denying Odell's Motion to Dismiss[175] which found Chilcoat's assault claim was sufficiently pled.[176] In that order, the well-pleaded facts in Chilcoat's Complaint,[177] taken as true, described: "Odell and two other men physically blocked the road with their vehicle."[178] On summary judgment, however, the Undisputed Facts show that Mr. Dalton was the only actor who blocked the road and that Odell remained back on the side of the road.[179] The facts also show that, while Chilcoat later recounted that she feared for her safety, she never told Mr. Franklin that she felt there was an imminent threat she would be struck, or

---

[172] *Id.* ¶ 34.

[173] *Id.* ¶ 54 at 11.

[174] *Id.*; *see also* Motion, Exh. E, 74-16 - 74-18 (Dep. Begay also recounted that Odell and Franklin "were beginning to get louder and cutting each other's sentences off," but that he did not feel that there was a risk of physical confrontation.)

[175] Memorandum Decision and Written Order Denying Odell's Motion to Dismiss ("Order") at 7-8, docket no. 62, filed March 30, 2020.

[176] *See* Opposition, *supra* note 7, at 53 ("The Court earlier found sufficient allegations that '[Chilcoat] was traveling on a county road, that Odell and two other men physically blocked the road with their vehicle, refused to explain why they were detaining her and her husband, and told her that she would be going to jail.' The Court concluded it could be 'reasonably inferred' that Odell acted with the 'intent to cause [an] apprehension of an immediate harmful or offensive contact….'")

[177] Complaint, *supra* note 1, ¶ 7.

[178] Order, *supra* note 174, at 7-8.

[179] *Supra* Undisputed Facts ¶ 24 at 7.

that Mr. Dalton, Odell, or Mr. Weaver were going to attack her.[180] While Mr. Franklin later

testified he was generally "concerned for his safety," he also stated that he did not feel an

imminent threat of being struck, or an imminent threat that any of them were going to physically

attack him.[181] Further, Chilcoat never attempted to call 911, and did not express any fear or

concern to Dep. Begay while he was at the scene.[182] Unlike the facts in Chilcoat's State

Complaint, the Undisputed Facts fail to demonstrate an intent to cause an apprehension of

offensive contact on the part of Odell, no reasonable jury could find otherwise.

Therefore, the Undisputed Facts show that Odell had no intent to cause harmful or

offensive contact or apprehension of such contact to Chilcoat. At best, Odell's actions of

whistling and pointing to the Camper signaled to Mr. Dalton to stop the Camper. And Odell's

questioning of Mr. Franklin fails to reflect an intent to cause an assault. The bulk of Mr. Dalton's

more contentious actions were without any prompting by Odell. Accordingly, based on the

Undisputed Facts, a jury could not reasonably conclude that Odell had the requisite intent to

cause harm or apprehension of harm.

---

[180] *See id.* ¶¶ 40-41 at 9.

[181] *Id.*

[182] *Supra* Undisputed Facts ¶ 36.

**ORDER**

IT IS HEREBY ORDERED that Odell's Motion[183] is GRANTED. Chilcoat's claims against Odell are DISMISSED with prejudice.

Dated February 4, 2021.

BY THE COURT:

David Nuffer
United States District Judge

---

[183] Docket no. 69, filed October 16, 2020.